Andy C. Warshaw (263880)
awarshaw@bwlawcenter.com
Amanda G. Billyard (256838)
abillyward@bwlawcenter.com
Financial Relief Law Center, APC
1200 Main St., Suite C
Irvine, CA 92614
Telephone    714-442-3300
Facsimile    714-361-5380

Counsel for the Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:22-bk-12142-SC |
| 2nd Chance Investment Group, LLC, | Chapter 11 |
| Debtor. | **APPLICATION OF 2nd CHANCE INVESTMENT GROUP LLC TO EMPLOY BROKERS PURSUANT TO 11 U.S.C. §§ 327 AND 328; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATIONS OF IN SUPPORT** |
| | [11 U.S.C. §§ 327(a) and 328(a); Fed. R Bankr. P. 2014; Loc. Bankr. R. 2014-1(b)] |
| | [No Hearing Required Unless Requested] |

**TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE; THE 20 LARGEST UNSECURED CREDITORS; AND ALL PARTIES IN INTEREST:**

2ND Chance Investment Group, LLC (the "Debtor"), files this APPLICATION OF 2nd CHANCE INVESTMENT GROUP LLC TO EMPLOY BROKERS PURSUANT TO 11 U.S.C. §§ 327 AND 328; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATIONS OF IN SUPPORT

("Application").  In support of the Application, the Debtor submits the following memorandum of points and authorities and the attached declarations **STATEMENT OF FACTS**

On December 21, 2022, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code commencing case no. 8:22-bk-12142-SC (the "Case").  The Debtor remains as a debtor in possession. The Debtor scheduled fourteen parcels of real property on Schedule A/B of ECF No. 1. A summary of the property and known encumbrances is provided below in Table I.  Collectively, the real property parcels are referred to as the "Properties".

Table I: Real Property Equity Proceeds

| Address | Estimated Value | Cost of Sale | Secured Claim Totals | Equity Prior to Tax Analysis |
|---|---|---|---|---|
| 3025 Glenview Ave. San Bernardino CA 92407 | $377,000 | $22,620 | $180,000 | $174,380 |
| 13352 Marty Lane Garden Grove CA 92843 | $700,000 | $42,000 | $431,668 | $226,332 |
| 37472 Yorkshire Dr. Palmdale CA 93550 | $400,000 | $24,000 | $162,000 | $214,000 |
| 324 W 47th Pl. Los Angeles CA 90037 | $700,000 | $42,000 | $512,000 | $146,000 |
| 25641 Byron St. San Bernardino CA 92404 | $480,000 | $28,800 | $286,000 | $165,200 |
| 43933 30 St E Lancaster CA 93535 | $305,000 | $18,300 | $266,000 | $20,700 |

| | | | | |
|---|---|---|---|---|
| 1004 Peachwood Crt. Los Banos CA 93635 | $400,000 | $24,000 | $288,000 | $88,000 |
| 8607 Custer Rd SW Lakewood WA 98499 | $395,000 | $23,700 | $252,000 | $119,300 |
| 827 N Meridian Ave. San Bernardino CA 92410 | $460,000 | $27,600 | $286,631 | $145,769 |
| 730 E 78th St Los Angeles CA 90001 | $685,000 | $41,100 | $510,000 | $133,900 |
| 1611 151st St. San Leandro CA 94578 | $600,000 | $36,000 | $442,928 | $121,072 |
| 1016 Portal Ave. Bakersfield CA 93308 | $460,000 | $27,600 | $127,000 | $305,400 |
| 37915 Marsala Dr. Palmdale CA 93552 | $420,000 | $25,200 | $180,000 | $214,800 |
| 3122 Emery Lane, Robbins, IL | $85,000 | $5100 | $0.00 | $47,000 |
| **Totals** | $6,467,000 | $388,020 | $3,744,227 | $2,154,753 |

## I.     PROPOSED EMPLOYMENT OF BROKERS

To facilitate the sale of the Property, the Debtor in Possession seeks to employ an experienced and reputable real estate broker and proposes to employ Coldwell Banker

("Broker") and the following licensed California real estate brokers ("Co-Brokers") for the corresponding properties, pursuant to 11 U.S.C. §§ 327(a) and 328:

| Address | Broker | Listing Price |
|---|---|---|
| 3122 Emery Lane, Robbins, IL 60472 | EXP Realty | $85,000 |
| 8607 Custer Road SW, Lakewood, WA 98499 | Keller Williams Tacoma | $395,000 |

The Brokers have agreed to advertise the properties, to market and show the Property, to represent the Estate in connection with the sale of the Property, and to advise the Debtor in Possession with respect to obtaining the best offer for the sale of the Property.

The terms of the employment agreed to by the Debtor in Possession, subject to approval of the Court, as set forth in the exclusive right to sell contract, the disclosure of real estate brokerage relationships, the addendum to exclusive authorization and right to sell, and the additional broker acknowledgment (together, "Listing Agreements") attached as **Exhibit 1**, are as follows:

1.    The Brokers have exclusive listing agreement with an exclusive right to sell the property and the listing prices are reflected above.  The Listing Agreements, including the listing price, may be modified by the US Trustee or Bankruptcy Court.  The listing and sale of each Property is subject to Bankruptcy Court approval, and any sale of the Property will be "as is," without any representations, guarantees or warranties of any kind, whether expressed or implied, by the Debtor in Possession.

Upon the presentation of an acceptable purchase offers for the Properties, the Debtor in Possession will file a motion seeking authorization to sell the Property and pay the total broker's commission of six percent (6%)[1] from the sale proceeds

---

.

1216437.1

EMPLOYMENT APPLICATION

through escrow.  A commission shall be paid only if the Property is sold by the Debtor in Possession.  The Debtor in Possession's motion will contain an overbid procedure.

2.    The Agents are informed and understand that no sale may be consummated until after notice and a hearing.  Further, the Agents are aware of the provisions of 11 U.S.C. § 328(a) and understand and accept that, notwithstanding the terms and conditions of employment and compensation provided in the Listing Agreements, the Court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

The Brokers are well qualified to represent the Debtor in Possession and the Estate in connection with the marketing and sale of the Property.  The Agents' profiles are attached as **Exhibit 2**.

**II.    MEMORANDUM OF POINTS AND AUTHORITIES**

Pursuant to 11 U.S.C. § 1107, a Chapter 11 Debtor in Possession has the powers and duties of a trustee, including the right, with the Court's approval to employ professionals in the administration of its case.

It's capacity as Debtor in Possession and with the assistance of its Chief Restructuring Officer, David Goodrich, 2nd Chance Investment Group, LLC, seeks to employ Co-Brokers in the listing of several properties.

Except as provided above, to the best of the Debtor in Possession's knowledge, and based upon the attached Declarations of the Brokers:

1.    have no connection with the Debtors, the principals of the Debtors, insiders, creditors, the Debtor in Possession, or any other party in interest, or their respective attorneys and accountants, or any person employed in the Office of the United States Trustee;

2.    are not creditors, equity security holders or insiders of the Debtors;

3.    are not investment bankers for any outstanding security of the Debtors;

4.    have not been, within three years prior to the date of the filing of the petitions, investment bankers for a security of the Debtors, or attorneys for such an investment banker in connection with the offer, sale or issuance of any security of the Debtors;

5.    are not and were not, within two years before the date of the filing of the petitions, directors, officers, or employees of the Debtors or of any investment banker for any security of the Debtors;

6.    do not represent an individual or entity with an interest adverse to the Estate;

7.    are not related to the United States Trustee or to the Bankruptcy Judge assigned to this case;

8.    are disinterested within the meaning of 11 U.S.C. §§ 327(a) and 101(14);

9.    do not have any fee sharing arrangement, understanding or compensation sharing arrangement with any other entity, except for the customary division of the commission from the sale of a property between the listing broker and the selling broker, and the commission sharing between the Brokers & Co-Brokers, as provided for in the Listing Agreement; and

10.    will not receive a retainer in this case.

## III.    <u>CONCLUSION</u>

The Debtor-in-Possession believes the employment of the Brokers and the Agents on the terms and conditions provided herein is in the best interest of Creditors and the Estate.

Respectfully submitted,

Dated:  April 28, 2023                    Financial Relief Law Center, APC


By:    /s Amanda G. Billyard
       Amanda G. Billyard
       Attorneys for Debtor in Possession
       2nd Chance Investment Group, LLC

# DECLARATION OF ANNA MATSUNAGA

I, Anna Matsunaga, declare:

1.      I am a real estate agent licensed in the State of Washington.  I know each of the following facts to be true of my own personal knowledge or information and belief and, if called as a witness, I could and would competently testify with respect thereto.  I am an agent of Keller Williams Tacoma, in the state of Washington.  I am submitting this Declaration in support of the *APPLICATION OF 2nd CHANCE INVESTMENT GROUP LLC TO EMPLOY BROKERS PURSUANT TO 11 U.S.C. §§ 327 AND 328; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATIONS OF IN SUPPORT* (the "Application").

2.      Keller Williams Tacoma and I are qualified to represent the Debtor in Possession and the Estate in connection with the marketing and sale of 8607 Custer Road, Lakewood, WA 98499. A true and correct copy of the Listing Agreements is attached as Exhibit 1.  A true and correct copy of my profile is attached as Exhibit 2.

3.      On behalf of Keller Williams Tacoma, I have agreed to accept employment on the terms and conditions set forth in the Application.  The total commission for the properties is six percent (6%).  The commission will be shared with the buyer's broker offering 2.65%, and will be paid from the sale proceeds through escrow.

4.      I am not employed by the Debtor in Possession in any other matter.

5.      To the best of my knowledge, except as provided above, Keller Wiliams Tacoma and I:

    a.      have no connection with the Debtors, the principals of the Debtors, insiders, creditors, the Debtor in Possession, any other party or parties in interest, their respective attorneys and accountants, or any person employed in the Office of the United States Trustee;

    b.      are not creditors, equity security holders or insiders of the Debtors;

1216437.1                                        11                        EMPLOYMENT APPLICATION

c.      are not investment bankers for any outstanding security of the Debtors;

d.      have not been, within three (3) years before the date of the filing of the petition herein, investment bankers for a security of the Debtors, or attorneys for such an investment banker in connection with the offer, sale or issuance of any security of the Debtors;

e.      are not and were not, within two (2) years before the date of the filing of the petition herein, directors, officers or employees of the Debtors or of any investment banker for any security of the Debtors;

f.      do not represent an individual or entity which holds an interest adverse to the Estate;

g.      are not related to the United States Trustee or to the Bankruptcy Judge assigned to this case;

h.      are disinterested within the meaning of 11 U.S.C. §§ 327(a) 101(14);

i.      have no fee sharing arrangement, understanding or compensation sharing arrangement with any other entity, except for the customary division of the commission from the sale of a property between the listing broker and the selling broker, as provided for in the Listing Agreement; and

j.      will not receive a retainer in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 26th day of April, 2023 at Onalaska, California. WA.

Anna Matsunaga

1216437.1                                12                    EMPLOYMENT APPLICATION

1

## DECLARATION OF RUBI GONZALEZ

2

3        I, Rubi Gonzalez, declare:

4   1.        I am a real estate agent licensed in the State of Illinois.  I know each of the

5   following facts to be true of my own personal knowledge or information and belief and, if

6   called as a witness, I could and would competently testify with respect thereto.  I am an

7   agent of EXP Realty, 939 W. North Avenue # 750, Chicago, IL 60642.  I am submitting

8   this Declaration in support of the *APPLICATION OF 2nd CHANCE INVESTMENT GROUP*

9   *LLC TO EMPLOY BROKERS PURSUANT TO 11 U.S.C. §§ 327 AND 328;*

10  *MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATIONS OF IN*

11  *SUPPORT* (the "Application").

12  2.        EXP Realty and I are qualified to represent the Debtor in Possession and

13  the Estate in connection with the marketing and sale of 3122 Emery Lane, Robbins, IL

14  60472. A true and correct copy of the Listing Agreements is attached as Exhibit 1.  A true

15  and correct copy of my profile is attached as Exhibit 2.

16  3.        On behalf of EXP Realty, I have agreed to accept employment on the terms

17  and conditions set forth in the Application.  The total commission for the properties is six

18  percent (6%).  The commission will be shared with the buyer's broker offering 2.5%, and

19  will be paid from the sale proceeds through escrow.

20  4.        I am not employed by the Debtor in Possession in any other matter.

21  5.        To the best of my knowledge, except as provided above, Coldwell Banker

22  and I:

23        a.        have no connection with the Debtors, the principals of the Debtors,

24  insiders, creditors, the Debtor in Possession, any other party or parties in interest,

25  their respective attorneys and accountants, or any person employed in the Office of

26  the United States Trustee;

27        b.        are not creditors, equity security holders or insiders of the Debtors;

28

1    c.    are not investment bankers for any outstanding security of the

2 Debtors;

3    d.    have not been, within three (3) years before the date of the filing of

4 the petition herein, investment bankers for a security of the Debtors, or attorneys

5 for such an investment banker in connection with the offer, sale or issuance of any

6 security of the Debtors;

7    e.    are not and were not, within two (2) years before the date of the filing

8 of the petition herein, directors, officers or employees of the Debtors or of any

9 investment banker for any security of the Debtors;

10    f.    do not represent an individual or entity which holds an interest

11 adverse to the Estate;

12    g.    are not related to the United States Trustee or to the Bankruptcy

13 Judge assigned to this case;

14    h.    are disinterested within the meaning of 11 U.S.C. §§ 327(a) 101(14);

15    i.    have no fee sharing arrangement, understanding or compensation

16 sharing arrangement with any other entity, except for the customary division of the

17 commission from the sale of a property between the listing broker and the selling

18 broker, as provided for in the Listing Agreement; and

19    j.    will not receive a retainer in this case.

20 I declare under penalty of perjury that the foregoing is true and correct.

21 Executed on this 17____ day of April, 2023 at Chicago , IL

22

23    _Rubi Gonzalez_
    _____

24    Rubi Gonzalez

25

26

27

28

1216437.1

EMPLOYMENT APPLICATION

1

2    **<u>EXHIBIT 1</u>**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Form 1A
Exclusive Sale
Rev. 10/22
Page 1 of 3

**EXCLUSIVE SALE AND LISTING AGREEMENT**

©Copyright 2022
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

**2nd Chance investment Grp, Llc** _____ ("Seller") hereby grants to, 1
Seller         Seller

**Keller Williams Tacoma** _____ ("Listing Firm" or "Firm") from date hereof until midnight of 2

**11/15/2023** _____ ("Listing Term"), the exclusive right to sell the real property ("the Property") 3

commonly known as **8607**    **Custer Road SW** _____, City **Lakewood** , 4

County **Pierce** _____, WA, Zip **98499** _____; and legally described on Exhibit A. 5

1. **DEFINITIONS.** (a) "MLS" means the Northwest Multiple Listing Service; and (b) "sell" includes a contract to sell; 6
   an exchange or contract to exchange; or an option to purchase. Firm need not submit to Seller any offers to 7
   lease, rent, or enter into any agreement other than for sale of the Property. 8

2. **AGENCY/DUAL AGENCY.** Seller authorizes Listing Firm to appoint **Anna Matsunaga** _____ 9
   as Seller's Listing Broker. This Agreement creates an agency relationship with Listing Broker and any of Firm's 10
   brokers who supervise Listing Broker's performance as Seller's agent ("Supervising Broker"). No other brokers 11
   affiliated with Firm are agents of Seller, except to the extent that Firm, in its discretion, appoints other brokers to 12
   act on Seller's behalf as and when needed. If the Property is sold to a buyer represented by one of Firm's brokers 13
   other than Listing Broker ("Listing Firm's Buyer's Broker"), Seller consents to any Supervising Broker, who also 14
   supervises Listing Firm's Buyer's Broker, acting as a dual agent. If the Property is sold to a buyer who Listing 15
   Broker also represents, Seller consents to Listing Broker and Supervising Broker acting as dual agents. Seller 16
   consents to Firm receiving compensation from more than one party. Seller acknowledges receipt of the pamphlet 17
   entitled "The Law of Real Estate Agency." 18

3. **LIST DATE.** Firm shall submit this listing, including the Property information on the attached Listing Input Sheets 19
   and photographs of the Property (collectively, "Listing Data"), to be published by MLS by 5:00 p.m. on 20
   **5/4/2023** _____ ("List Date"), which date shall not be more than 30 days from the effective date of the 21
   Agreement. Seller acknowledges that exposure of the Property to the open market through MLS will increase the 22
   likelihood that Seller will receive fair market value for the Property. Accordingly, prior to the List Date, Firm and Seller 23
   shall not promote or advertise the Property in any manner whatsoever, including, but not limited to yard or other 24
   signs, flyers, websites, e-mails, texts, social media, mailers, magazines, newspapers, open houses, previews, 25
   showings, or tours. Seller shall not materially interfere with Listing Firm's marketing of the Property. 26

4. **COMPENSATION.** If during the Listing Term Seller sells the Property, and (a) the sale closes; or (b) the sale fails 27
   to close due to Seller's breach of the terms of the purchase and sale agreement, Seller shall pay compensation 28
   as follows: 29

   a. Listing Firm Compensation: **3.35** % of the sales price, or $ **395,000** . 30

      i. Unrepresented Buyer. If the buyer is not represented by a buyer brokerage firm, then the Listing Firm 31
         compensation shall be **6** % of the sales price, or $ **395,000** (equal to the amount in 32
         subsection 4(a) if not filled in). 33

   b. Buyer Brokerage Firm Compensation: **2.65** % of the sales price, or $ _____ to a cooperating 34
      member of MLS representing the buyer ("Buyer Brokerage Firm") ("Buyer Brokerage Firm Compensation"), 35
      which includes another broker affiliated with Listing Firm who represents the buyer. This offer to pay Buyer 36
      Brokerage Firm Compensation may not be withdrawn or reduced with respect to a buyer after that buyer or 37
      the Buyer Brokerage Firm has notified the Listing Firm or Seller of that buyer's intent to submit an offer (and 38
      for three calendar days thereafter) and shall be paid as set forth above, unless modified by the buyer and 39
      Buyer Brokerage Firm in a mutually accepted purchase and sale agreement. Buyer Brokerage Firm is an 40
      intended third party beneficiary of this Agreement. 41

      i. Dual Agency. If the Listing Broker is a dual agent and represents both Seller and the buyer, then the 42
         Buyer Brokerage Firm Compensation paid to Listing Firm shall be **2.65** % of the sales price, or 43
         $ **395,000** (equal to the amount in subsection 4(b) if not filled in). 44

      ii. Non-Member Buyer Brokerage Firm. If checked, ☒ the offer to pay Buyer Brokerage Firm Compensation 45
          shall extend to licensed brokerage firms that are not members of MLS. 46

_____  _____  _____  _____
Seller's Initials    Date     Seller's Initials    Date

Form 1A
Exclusive Sale
Rev. 10/22
Page 2 of 3

©Copyright 2022
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

**EXCLUSIVE SALE AND LISTING AGREEMENT**

   c.  <u>Expiration of the Listing Term</u>.  If Seller shall, within **360**___ days (180 days if not filled in) after the expiration 47
of the Listing Term, sell the Property to any person to whose attention it was brought through the signs, 48
advertising or other action of the Listing Firm, or on information secured directly or indirectly from or through 49
Firm, during the Listing Term, Seller will pay Firm and Buyer Brokerage Firm the above compensation. 50
Provided, that if Seller pays compensation to a member of MLS or a cooperating MLS in conjunction with a 51
sale, the amount of compensation payable to Firm shall be reduced by the amount paid to such other 52
member(s). Provided further, that if Seller cancels this Agreement without legal cause, Seller may be liable for 53
damages incurred by Firm as a result of such cancellation, regardless of whether Seller pays compensation to 54
another MLS member or licensed brokerage firm that is not a member of MLS. 55

**5.**  **PROPERTY ACCESS AND KEYBOX.** Listing Firm shall install a keybox on the Property that holds a key to the 56
Property. Such keybox may be opened by a key held by members of MLS, their brokers, and affiliated appraiser 57
members of MLS. Unless otherwise agreed in writing or as set forth in the attached Listing Input Sheets, Firm and 58
other members of MLS shall be entitled to show the Property at all reasonable times. 59

   <u>Property Access for Non-Member Brokers</u>.  Listing Firm may be contacted by licensed brokers who are not 60
members of MLS and do not have access to the keybox on the Property. Seller ❑ authorizes; ❑ does not 61
authorize (authorizes if not filled in) Firm to provide access to the Property to licensed brokers who are not 62
members of MLS.  If authorized, Listing Firm ❑ shall; ☒ shall not (shall if not filled in) be required to attend 63
any such showing.  If authorized, Listing Firm ❑ shall; ☒ shall not (shall if not filled in) require brokers who 64
are not members of MLS to execute an access agreement prior to any showing. 65

**6.**  **MULTIPLE LISTING SERVICE.** Seller authorizes Listing Firm and MLS to publish the Listing Data and distribute it to 66
other members of MLS and their affiliates and third parties for public display and other purposes. This authorization 67
shall survive the termination of this Agreement. Firm is authorized to report the sale of the Property (including price and 68
all terms) to MLS and to its members, financial institutions, appraisers, and others related to the sale. Firm may refer 69
this listing to any other cooperating multiple listing service at Firm's discretion or a licensed broker who is not a member 70
of a multiple listing service. Firm shall cooperate with all other members of MLS, members of a multiple listing service to 71
which this listing is referred, and any licensed brokers who are not members of a multiple listing service. MLS is an 72
intended third party beneficiary of this Agreement and will provide the Listing Data to its members and their affiliates 73
and third parties, without verification and without assuming any responsibility with respect to this Agreement. 74

**7.**  **PROPERTY CONDITION AND INSURANCE.** Neither Firm, MLS, nor any members of MLS or of any multiple 75
listing service to which this listing is referred shall be responsible for, and Seller shall indemnify and hold them 76
harmless from, any loss, theft, or damage of any nature or kind whatsoever to the Property, any personal property 77
therein, or any personal injury resulting from the condition of the Property, including entry by the key to the keybox 78
and/or at open houses, except for damage or injury caused by their gross negligence or willful misconduct. Seller 79
is advised to notify Seller's insurance company that the Property is listed for sale and ascertain that the Seller has 80
adequate insurance coverage. If the Property is to be vacant during all or part of the Listing Term, Seller should 81
request that a "vacancy clause" be added to Seller's insurance policy. Seller acknowledges that intercepting or 82
recording conversations of persons in the Property without first obtaining their consent violates RCW 9.73.030. 83

**8.**  **SELLER'S WARRANTIES AND REPRESENTATIONS.** Seller warrants that Seller has the right to sell the 84
Property on the terms herein. If Seller provides Firm with any photographs, drawings, or sketches of the Property, 85
Seller warrants that Seller has the necessary rights in the photographs, drawings, or sketches to allow Firm to use 86
them as contemplated by this Agreement. Seller agrees to indemnify and hold Firm and other members of MLS 87
harmless in the event the foregoing warranties are incorrect. Seller represents, to the best of Seller's knowledge, 88
that the Property information on the Listing Input Sheets (attached to and incorporated into this Agreement herein 89
by this reference) is correct. Seller authorizes Listing Firm to provide the property information in this Agreement 90
and in the attached Listing Input Sheets to prospective buyers, to cooperating members of MLS who do not 91
represent Seller and, in some instances, may represent the buyer, and to licensed brokers who are not members 92
of MLS, subject to any restrictions imposed by Seller. 93

**9.**  **FAIR HOUSING.** Seller acknowledges that fair housing laws prohibit discrimination based on sex, marital status, 94
sexual orientation, gender identity, race, creed, color, national origin, citizenship or immigration status, families 95

_____     _____
Seller's Initials        Date       Seller's Initials       Date

Exhibit 1 PP3

Form 1A
Exclusive Sale
Rev. 10/22
Page 3 of 3

**EXCLUSIVE SALE AND LISTING AGREEMENT**

©Copyright 2022
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

with children status, honorably discharged veteran or military status, the presence of any sensory, mental, or 96
physical disability, or the use of a support or service animal by a person with a disability. 97

10. **SHORT SALE / NO DISTRESSED HOME CONVEYANCE.** If the proceeds from the sale of the Property are 98
insufficient to cover the Seller's costs at closing, Seller acknowledges that the decision by any beneficiary or 99
mortgagee, or its assignees, to release its interest in the Property, for less than the amount owed, does not automatically 100
relieve Seller of the obligation to pay any debt or costs remaining at closing, including fees such as Firm's compensation. 101
Firm will not represent or assist Seller in a transaction that is a "Distressed Home Conveyance" as defined by Chapter 102
61.34 RCW unless otherwise agreed in writing. A "Distressed Home Conveyance" is a transaction where a buyer 103
purchases property from a "Distressed Homeowner" (defined by Chapter 61.34 RCW), allows the Distressed Homeowner 104
to continue to occupy the property, and promises to convey the property back to the Distressed Homeowner or promises 105
the Distressed Homeowner an interest in, or portion of, the proceeds from a resale of the property. 106

11. **SELLER DISCLOSURE STATEMENT.** Unless Seller is exempt under RCW 64.06, Seller shall provide to Firm 107
as soon as reasonably practicable, a completed "Seller Disclosure Statement" (Form 17 (Residential)), (Form 17C 108
(Unimproved Residential)), or (Form 17 Commercial). Seller shall indemnify, defend, and hold Firm harmless from 109
and against any and all claims that the information Seller provides on Form 17, Form 17C, or Form 17 110
Commercial is inaccurate. 111

12. **CLOSING.** Seller shall furnish and pay for a buyer's policy of title insurance showing marketable title to the 112
Property. Seller shall pay real estate excise tax and one-half of any escrow fees or such portion of escrow fees 113
and any other fees or charges as provided by law in the case of a FHA or VA financed sale. Rent, taxes, interest, 114
reserves, assumed encumbrances, homeowner fees and insurance are to be prorated between Seller and the 115
buyer as of the date of closing. Seller shall prepare and execute a certification (NWMLS Form 22E or equivalent) 116
under the Foreign Investment in Real Property Tax Act ("FIRPTA"). If Seller is a foreign person or entity, and the 117
sale is not otherwise exempt from FIRPTA, Seller acknowledges that a percentage of the amount realized from 118
the sale will be withheld for payment to the Internal Revenue Service. 119

13. **DAMAGES IN THE EVENT OF BUYER'S BREACH.** In the event Seller retains earnest money as liquidated 120
damages on a buyer's breach, any costs advanced or committed by Firm on Seller's behalf shall be paid 121
therefrom and the balance divided equally between Seller and Firm. 122

14. **ATTORNEYS' FEES.** In the event either party employs an attorney to enforce any terms of this Agreement and 123
is successful, the other party agrees to pay reasonable attorneys' fees. In the event of trial, the successful party 124
shall be entitled to an award of attorneys' fees and expenses; the amount of the attorneys' fees and expenses 125
shall be fixed by the court. The venue of any suit shall be the county in which the Property is located. 126

---

**Keller Williams Tacoma** 127

Seller's Signature                          Date          Listing Firm

_Anna_                          _4/26/23_ 128

Seller's Signature                          Date          Broker's Signature          Date

_Matsunaga_

EXHIBIT 1 PP4

NWMLS Form 1A
Copyright 2023
Northwest Multiple Listing Service
All Rights Reserved

• Indicates Required information    ( ) Indicates Maximum Choice

LISTING # 1987236

## ADDRESS

**WA**
• State

**Pierce**
• County

**Lakewood**
• City

**98499** ___ + 4
• ZIP Code

**37 - Lakewood**
• Area

**Lakewood**
• Community/District

**8607**
• Street #          Modifier          Direction

**Custer**
• Street Name

Suffix

Post Direction

Unit #

## LISTING

$ **395,000.00**
• Listing Price

**5/4/2023**
• Listing Date

**11/15/2023**
• Expiration Date

**022034-1-080**
• Tax ID#

**Yes**
• Preliminary Title Ordered

**WFG - Cyndee Shingledecker**
Title Company (60 characters maximum)

• Offers (1)
☐ Seller intends to review offers upon receipt
☑ Seller to review offers on Offer Review Date
(may review/accept sooner)

**05/09/23**
Offer Review Date
(required if 2nd "Offer" option is selected)

**No**
FIRPTA withholding required?

## LOCATION

Lot Number

Block

Plat/Subdivision/Building Name

## PROPERTY INFORMATION

**Yes**
• Prohibit Blogging

**Yes**
• Allow Automated Valuation

**Yes**
• Show Map Link

**Yes**
• Internet Advertising

**Yes**
• Show Address to Public

**2.65**
• Buyer Brkg. Comp. (BBC)

**%**
• Compensation Type

**360**
• Tail Provision (Days)

**to be approved by bankruptsy court**
Buyer Brkg. Compensation Comments (40 characters maximum)

**1948**
• Year Built

Effective Year Built

Effective Year Built Source

## SQFT INFORMATION

Approximate Square Footage = Finished SqFt + Unfinished SqFt (This value is automatically calculated for you)
(Do NOT include SqFt of garage in Finished or Unfinished SqFt fields. Approximate Square Footage should exclude garage.)

**1,200**
Finished SqFt

Unfinished SqFt

**Realist**
• SqFt Source

**10,454**
• Lot Size (SqFt)

**Realist**
• Lot Size Source

## VIRTUAL TOURS

Virtual Tour #1 URL (Please include http:// or https://)

Virtual Tour #1 Description

Virtual Tour #2 URL (Please include http:// or https://)

Virtual Tour #2 Description

Virtual Tour #3 URL (Please include http:// or https://)

Virtual Tour #3 Description

INITIALS:

Seller ___ Date ___    Seller ___ Date ___    Broker ___ 4/26/23 Date

NWMLS
Copyright 2023
Northwest Multiple Listing Service
All Rights Reserved

Exhibit 1 PP5

Case 8:22-bk-12142-SC Doc 118 Filed 04/28/23 Entered 04/28/23 17:11:33 Desc
Main Document Page 17 of 41

Listing Address: 8607 Custer, Lakewood WA 98570

LAG # 9271

## ADDITIONAL TAX IDs

| Additional Tax ID# | Additional Tax ID# | Additional Tax ID# |
|---|---|---|
| Additional Tax IDs to be listed on attached sheets | | |

## BROKER INFORMATION

| 9271 | Anna Matsunaga | 9270 | Keller Williams Tacoma |
|---|---|---|---|
| * Listing Broker - ID# | Broker Name | Listing Office - ID# | Brokerage Firm Name |

| Co-Broker - ID# | Co-Broker Name | Co-Office - ID# | Co-Brokerage Firm Name |
|---|---|---|---|

## LISTING INFORMATION

* **Possession (3)**
- ☐ Closing
- ☐ Negotiable
- ☑ See Remarks
- ☐ Sub. Tenant's Rights

* **Showing Information (10)**
- ☐ Appointment
- ☐ Call Listing Office
- ☐ Day Sleeper
- ☐ Gate Code Needed
- ☑ MLS Keybox
- ☐ Other Keybox
- ☐ Owner-Call First
- ☐ Pet in House
- ☑ Power Off
- ☐ Renter-Call First
- ☐ Security System
- ☑ See Remarks
- ☐ ShowingTime
- ☑ Vacant

* **Potential Terms (10)**
- ☐ Assumable
- ☑ Cash Out
- ☑ Conventional
- ☐ Farm Home Loan
- ☑ FHA
- ☐ Lease/Purchase
- ☐ Owner Financing
- ☐ Rehab Loan
- ☐ See Remarks
- ☐ State Bond
- ☐ USDA
- ☑ VA

| No | $ | No | No |
|---|---|---|---|
| Short Term Rental | Monthly Rent ($) - if rented | * Senior Exemption | Right of First Refusal |

| 2023 | $ 3,262.00 | Not Provided | No |
|---|---|---|---|
| * Tax Year | * Annual Taxes | * Form 17 | * Common Interest Cmty (RCW 64.90) |

## HOMEOWNER ASSOCIATION INFORMATION

| No | $ | **HOA Dues Include (15)** | |
|---|---|---|---|
| * Homeowners Association | HOA Dues | ☐ Cable TV / ☐ Central Hot Water / ☐ Common Area Maintenance / ☐ Concierge / ☐ Earthquake Ins. / ☐ Garbage / ☐ Internet / ☐ Lawn Service | ☐ Natural Gas / ☐ Road Maintenance / ☐ Security Services / ☐ See Remarks / ☐ Sewer / ☐ Snow Removal / ☐ Water |

Other Dues/Fees (see remarks)

HOA Dues Freq

| Association Contact's Name | | Association Phone No. |
|---|---|---|

## SCHOOL & OWNER INFORMATION

| Clover Park | Custer Elem | Hudtloff Mid | Clover Park High |
|---|---|---|---|
| * School District | Elementary School | Junior High/Middle School | Senior High School |

| 2nd Chance investment Grp, Llc | | (951) 454-5454 |
|---|---|---|
| * Owner's Name | Owner's Name 2 | Owner's Phone |

| Vacant | | California | none |
|---|---|---|---|
| * Occupant Type | * Phone to Show | * Owner's City and State | * Occupant's Name |

| No | * 3rd Party Approval Required (2) | No |
|---|---|---|
| * Bank / RE Owned | ☐ None  ☑ Other - See Remarks  ☐ Short Sale | * Auction |

INITIALS:

| Seller | Date | Seller | Date | Broker | Date |
|---|---|---|---|---|---|
| | | | | *(signature)* DM | 4/26/23 |

Exhibit 1 pp 6

NWMLS
Copyright 2023
Northwest Multiple Listing Service
All Rights Reserved

Listing Address: 8607 Custer, Lakewood WA 98570

LAG # 9271

**SITE INFORMATION**

**SFR**
Zoning Code

Lot Dimensions

Waterfront Footage (Feet)

Pool

City

Zoning Jurisdiction

**Lot Topo./Veg. (7)**
- ☐ Brush
- ☐ Dune
- ☐ Equestrian
- ☑ Fruit Trees
- ☑ Garden Space
- ☑ Level
- ☑ Partial Slope
- ☐ Pasture
- ☐ Rolling
- ☐ Sloped
- ☐ Steep Slope
- ☐ Terraces
- ☐ Wooded

**View (6)**
- ☐ Bay
- ☐ Canal
- ☐ City
- ☐ Golf Course
- ☐ Jetty
- ☐ Lake
- ☐ Mountain
- ☐ Ocean
- ☐ Partial
- ☐ River
- ☐ Sea
- ☐ See Remarks
- ☐ Sound
- ☐ Strait
- ☐ Territorial

• Leased Land

**Waterfront (5)**
- ☐ Bank-High
- ☐ Bank-Low
- ☐ Bank-Medium
- ☐ Bay
- ☐ Bulkhead
- ☐ Canal
- ☐ Creek
- ☐ Jetty
- ☐ Lake
- ☐ No Bank
- ☐ Ocean
- ☐ River
- ☐ Saltwater
- ☐ Sea
- ☐ Sound
- ☐ Strait

**Site Features (14)**
- ☐ Arena-Indoor
- ☐ Arena-Outdoor
- ☐ Athletic Court
- ☐ Barn
- ☐ Boat House
- ☐ Cabana/Gazebo
- ☐ Cable TV
- ☐ Deck
- ☐ Dock
- ☐ Dog Run
- ☐ Electric Car Charging
- ☑ Fenced-Fully
- ☐ Fenced-Partially
- ☐ Gas Available
- ☐ Gated Entry
- ☐ Green House
- ☐ High Speed Internet
- ☐ Hot Tub/Spa
- ☐ Irrigation
- ☐ Moorage
- ☐ Outbuildings
- ☑ Patio
- ☐ Propane
- ☐ Rooftop Deck
- ☐ RV Parking
- ☐ Shop
- ☐ Sprinkler System
- ☐ Stable

**Lot Details (8)**
- ☐ Adjacent to Public Land
- ☐ Alley
- ☐ Corner Lot
- ☐ Cul-de-sac
- ☐ Curbs
- ☐ Dead End Street
- ☐ Dirt Road
- ☐ Drought Res Landscape
- ☐ High Voltage Line
- ☐ Open Space
- ☑ Paved Street
- ☐ Secluded
- ☑ Sidewalk
- ☐ Value in Land

**Water Access (4)**
- ☐ Beach Rights
- ☐ Community Waterfront/Pvt Beach
- ☐ Deeded Access
- ☐ Non-Deeded Access
- ☐ Tideland Rights

**BUILDING INFORMATION**

• **Sewer (2)**
- ☐ Available
- ☐ None
- ☐ Septic
- ☑ Sewer Connected
- ☐ STEP System

**Basement (3)**
- ☐ Daylight
- ☐ Fully Finished
- ☑ None
- ☐ Partially Finished
- ☐ Roughed In
- ☐ Unfinished

• **Parking Type (4)**
- ☐ Carport-Attached
- ☐ Carport-Detached
- ☑ Driveway Parking
- ☑ Garage-Attached
- ☐ Garage-Detached
- ☐ None
- ☐ Off Street

1

Approved # of Bedrooms (septic)

• Total Covered Parking

Builder

• New Construction

New Construction State

Estimated Completion Date

**NW Contemporary**
Architecture

**Remodeled**
Building Condition

**10 - 1 Story**
• Style Code

Manufactured Home Serial No.

Manufactured Home Manufacturer

Manufactured Home Model Number

• **Exterior (4)**
- ☐ Brick
- ☐ Cement Planked
- ☐ Cement/Concrete
- ☐ Log
- ☐ Metal/Vinyl
- ☐ See Remarks
- ☐ Stone
- ☐ Stucco
- ☑ Wood
- ☑ Wood Products

**Foundation (3)**
- ☐ Concrete Block
- ☐ Concrete Ribbon
- ☐ Post & Block
- ☐ Post & Pillar
- ☑ Poured Concrete
- ☐ See Remarks
- ☐ Slab
- ☐ Tie down

• **Roof (3)**
- ☐ Built-up
- ☐ Cedar Shake
- ☑ Composition
- ☐ Flat
- ☐ Green (Living)
- ☐ Metal
- ☐ See Remarks
- ☐ Tile
- ☐ Torch Down

Home Faces

• **Building Information (3)**
- ☐ Attached/Zero Lot Line
- ☑ Built on Lot
- ☐ Detached
- ☐ Manufactured Home
- ☐ Modular
- ☐ Planned Unit Dev

**Accessibility Features (12)**
- ☐ Accessible Approach
- ☐ Accessible Entrance
- ☐ Accessible Central Living/Common Area
- ☐ Accessible Bedroom
- ☐ Accessible Bath
- ☐ Accessible Kitchen
- ☐ Accessible Utility
- ☐ Modifications for Hearing/Vision
- ☐ Accessible Elevator or Lift Installed
- ☐ Ceiling Track
- ☐ Smart Technology
- ☐ Other

**ACCESSORY DWELLING UNIT**

Accessory Dwelling Unit

Detached Dwelling (Finished SqFt)

ADU Bedroom(s)

ADU Bathroom(s)

INITIALS:

| Seller | Date | Seller | Date | Broker | Date |
|---|---|---|---|---|---|
| | | | | | 4/26/23 |

Exhibit 1 pp 7

NWMLS
Copyright 2023
Northwest Multiple Listing Service
All Rights Reserved

Listing Address: 8607 Custer, Lakewood WA 98570

LAG # 9271

## GREEN BUILDING INFORMATION

**Green Certification (4)**
- ☐ Built Green™
- ☐ LEED™
- ☐ Northwest ENERGY STAR®
- ☐ Other - See Remarks

Built Green™ _____  LEED™ _____  Northwest ENERGY STAR® _____

**Construction Methods (2)**
- ☐ Advanced Wall
- ☐ Double Wall
- ☐ Ins. Concrete Form (ICF)
- ☐ Post & Beam
- ☐ Standard Frame
- ☐ Steel & Concrete
- ☐ Strawbale
- ☐ Structural Ins. Panel (SIPs)
- ☐ Tilt-up

EPS Energy Score (0-99,999kWh) _____   HERS Index Score (0-150) _____

## INTERIOR FEATURES

**Lower Fireplaces** _____

**Upper Fireplaces** _____

**Main Fireplaces** 1

**Type of Fireplace (5)**
- ☐ Electric
- ☐ Gas
- ☐ Other - See Remarks
- ☐ Pellet
- ☑ Wood

**Interior Features (17)**
- ☐ 2nd Kitchen
- ☐ 2nd Primary BR
- ☐ Bath Off Primary
- ☐ Built-in Vacuum
- ☐ Ceiling Fan(s)
- ☐ Dbl Pane/Storm Windw
- ☐ Dining Room
- ☐ Elevator
- ☐ Fireplace (Primary BR)
- ☐ French Doors
- ☐ High Tech Cabling
- ☐ Hot Tub/Spa
- ☐ Jetted Tub
- ☐ Loft
- ☐ Sauna
- ☐ Security System
- ☐ Skylights
- ☐ SMART Wired
- ☐ Solarium/Atrium
- ☐ Sprinkler System
- ☐ Triple Pane Windows
- ☐ Vaulted Ceilings
- ☐ Walk-in Closet
- ☐ Walk-in Pantry
- ☐ Wet Bar
- ☐ Wine Cellar
- ☐ Wired for Generator

**Electric**
Water Heater Type

**Garage** _____
Water Heater Location _____

Leased Equipment _____

**• Energy Source (6)**
- ☑ Electric
- ☐ Geothermal
- ☐ Ground Source
- ☑ Natural Gas
- ☐ Oil
- ☐ Pellet
- ☐ Propane
- ☐ See Remarks
- ☐ Solar (Unspecified)
- ☐ Solar Hot Water
- ☐ Solar PV
- ☐ Wood

**• Heating (8)**
- ☐ 90%+ High Efficiency
- ☐ Baseboard
- ☐ Ductless HP-Mini Split
- ☑ Forced Air
- ☐ Heat Pump
- ☐ High Efficiency (Unspecified)
- ☐ Hot Water Recirc Pump
- ☐ HRV/ERV System
- ☐ Insert
- ☐ None
- ☐ Other - See Remarks
- ☐ Radiant
- ☐ Radiator
- ☐ Stove/Free Standing
- ☐ Tankless Water Heater
- ☐ Wall

**• Cooling (8)**
- ☐ 90%+ High Efficiency
- ☐ Central A/C
- ☐ Ductless HP-Mini Split
- ☐ Forced Air
- ☐ HEPA Air Filtration
- ☐ High Efficiency (Unspecified)
- ☐ Insert
- ☐ None
- ☐ Other - See Remarks
- ☐ Radiant
- ☐ Wall
- ☐ Window Unit A/C

**Floor Covering (5)**
- ☐ Bamboo/Cork
- ☐ Ceramic Tile
- ☐ Concrete
- ☐ Engineered Hardwood
- ☐ Fir/Softwood
- ☐ Granite
- ☐ Hardwood
- ☑ Laminate
- ☑ Laminate Hardwood
- ☐ Laminate Tile
- ☐ Marble
- ☐ Other Renewable
- ☐ See Remarks
- ☐ Slate
- ☐ Stone
- ☐ Travertine
- ☐ Vinyl
- ☐ Vinyl Plank
- ☑ Wall to Wall Carpet

**Appliances That Stay (10)**
- ☑ Dishwasher
- ☐ Double Oven
- ☐ Dryer
- ☐ Garbage Disposal
- ☐ Microwave
- ☐ Refrigerator
- ☐ See Remarks
- ☑ Stove/Range
- ☐ Trash Compactor
- ☐ Washer

**Excluded Items** _____

## UTILITY / COMMUNITY

**Community Features (11)**
- ☐ Age Restriction
- ☐ Airfield
- ☐ Athletic Court
- ☐ Boat Launch
- ☐ CCRs
- ☐ Clubhouse
- ☐ Gated Entry
- ☐ Golf Course
- ☐ Park
- ☐ Playground
- ☐ Trails

**• Water Source (3)**
- ☐ Community
- ☐ Individual Well
- ☐ Lake
- ☐ Private
- ☑ Public
- ☐ See Remarks
- ☐ Shared Well
- ☐ Shares
- ☐ Water Catchment System
- ☐ Well Needed

**Irrigation Comments** (Max 40 characters)

**Lakewood Water**
Water Company

**Puget Sound Energy**
Power Company

**Pierce County Sewer**
Sewer Company

Cable/TV Provider _____

Internet Service Provider _____

**Public Transit Nearby** Yes

**Transit Route** _____

INITIALS: _____

| Seller | Date | Seller | Date | Broker | Date |
|--------|------|--------|------|--------|------|
|  |  |  |  | (signature) | 4/26/23 |

Exhibit 1 PP 8

NWMLS
Copyright 2023
Northwest Multiple Listing Service
All Rights Reserved

**Listing Address: 8607 Custer, Lakewood WA 98570**

**LAG # 9271**

## ROOM LOCATION

• **Level** (1)  M for Main   L for Lower   S for Split   G for Garage   U2 for Upper (2nd Floor)   U3 for Upper (3rd Floor)   U4 for Upper (4th Floor)

| Room | Level | Room | Level | Room | Level |
|------|-------|------|-------|------|-------|
| Approved Accessory | | Extra Fin Room | | Living Room | M |
| Bonus Room | | Family Room | M | Primary Bedroom | |
| Den/Office | | Great Room | | Rec Room | |
| Dining Room | M | Kitchen with Eating Space | | Studio | |
| Entry | | Kitchen w/o Eating Space | M | Utility Room | M |

No. of Bedrooms  M **3**  L ___  U2 ___  U3 ___  U4 ___
(Excluding Primary Bedroom)

No. of Bathtubs **1**   No. of Showers **1**

No. of Full Baths  M **1**  L ___  U2 ___  U3 ___  U4 ___

No. of ½ Baths  M ___  L ___  U2 ___  U3 ___  U4 ___

No. of ¾ Baths  M ___  L ___  U2 ___  U3 ___  U4 ___

## REMARKS

**Marketing Remarks**. CAUTION! The comments you make in the following lines are limited to descriptions of the land and improvements only. These remarks will appear in the client handouts and websites. (750)

Remodeled on all one level, close to schools, parks, freeway, shopping, medical and much more. Enjoy your private back yard. Relax in front of your fireplace in the evening. Cook up a storm in your newly remodeled kitchen with lots of counter space. You'll have plenty of parking for all your guests and your back yard with large covered patio is perfect to for outdoor living or entertaining. House is ready for you to move in and call it home, colors are neutral and will match everything you have.

**Confidential Broker-Only Remarks**. Comments in this category are for broker's use only. (500)

Title ordered with WFG- Tiffney Olsen's team is at the ready for escrow. This is a Bankruptsy sale and the sale requires approval of BK court. Please read showing instructions and offers suggestions. Supra key box to right of gate at driveway, key to padlock to let you in inside. Please lock up everything and return keys when done.

• **Driving Directions to Property** (200)

From inside the Lakewood Towne Center, Turn L on Gravelly Lake Drive, L on Bridgeport, L on Steilacoom R on Custer

INITIALS: _____

| Seller | Date | Seller | Date | Broker | Date |
|--------|------|--------|------|--------|------|
| | | | | | 4/26/23 |

Form 18
Amendment to Exclusive Listing Agreement
Rev. 5/13
Page 1 of 1

©Copyright 2013
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

## AMENDMENT TO EXCLUSIVE LISTING AGREEMENT

This amends the Exclusive Listing Agreement ("Agreement") dated _____ ~~5/4/2023~~ 4/26/23 . 1

between __2nd Chance investment Grp, Llc_____ ("Seller") 2
     Seller             Seller

and, __Keller Williams Tacoma_____ ("Firm") 3

concerning the property, listing no. __1987236_____ , commonly known as __8607_____  __Custer Road SW_____ , 4

in the City of __Lakewood_____ , County of __Pierce_____ , WA, Zip __98499_____ . 5

### SELLER AND FIRM AGREE AS FOLLOWS:                  6

☐   **Price Change.** The listing price is changed to $ _____ . 7

☐   **Agreement Extended.** The Agreement is extended until midnight of _____ . 8
  If the Agreement expired prior to the parties' execution of this Amendment, the Agreement (and any prior 9
  Amendments thereto) are incorporated herein by this reference and this Amendment shall constitute a new 10
  Exclusive Listing Agreement. 11

☑   **Other:**                         12

  Listing broker certifies that she has no personal interest in the property. In addition to Attachment A as legal 13
  description, Attachment B is part of the listing agreement per the bankruptsy court in charge of the sale. 14

  Listing broker will install both a Supra key box AND a contractor box at the property. Listing broker may 15
  arrange showings with an unlicensed team member as needed and contractor box may also be used as needed for 16
  access by appraisers, professional photographers and other professionals during the course of the listing period. 17
                        18

  The actual listing date and purchase price will be determined by the councel in charge of the bankruptsy and will 19
  be added to an updated form 18 prior to listing if any changes in date or price are required. 20
                        21
                        22
                        23
                        24

**ALL OTHER TERMS AND CONDITIONS** of the Agreement remain unchanged.      25

_____     **Keller Williams Tacoma**_____ 26
Seller's Signature        Date    Real Estate Firm

                 _Anna Matsunaga_   _4/26/23_ 27
_____    
Seller's Signature        Date    Broker's Signature      Date

Exhibit 1 pp 10.

# EXHIBIT "A" to listing agreement
**LEGAL DESCRIPTION** of Purchase & Sale

BEGINNING AT A POINT 130 FEET WEST OF THE EAST LINE OF SECTION 34, TOWNSHIP 20
NORTH, RANGE 2 EAST, W, M.,AND 643.25 FEET NORTH OF THE SOUTHEAST CORNER OF
THE NORTHEAST 1/4 OF SECTION 34;
THENCE SOUTH 89"20'00" WEST A DISTANCE OF 143.7 FEET;
THENCE NORTHEASTERLY ALONG THE EAST RIGHT OF WAY LINE OF THE MANITOU-CUSTER
ROAD A DISTANCE OF 76.6 FEET;
THENCE NORTH 89"20'00" EAST FOR A DISTANCE OF 132.49 FEET;
THENCE SOUTH 00"16'00" WEST A DISTANCE OF 75 FEET TO THE POINT OF BEGINNING;

SITUATE IN THE COUNTY OF PIERCE, STATE OF WASHINGTON.

**DISCLAIMER TO RECIPIENT:**

This Legal Description is furnished as a free public service. It is not a result of a Title Search or based on a
complete examination of the public records.  WFG National Title Company disclaims any liability as to the
sufficiency and/or effect of description in this document.

Attachment B

## **ADDENDUM TO EXCLUSIVE AUTHORIZATION AND RIGHT TO SALE**

2nd Chance Investment Group, LLC ("Debtor") agrees to grant Team Momentum Real Estate and Anna Matsunaga ("Broker") the exclusive right to negotiate a sale of the real property commonly described as 8607 Custer Rd., Lakewood, Washington 98499 ("Property") upon the terms and conditions of the Exclusive Authorization and Right to Sell Property ("Exclusive Authorization"), by the following terms and conditions:

1. <u>Addendum.</u>       This Addendum applies to the Exclusive Authorization. Notwithstanding any contrary terms and conditions in the Exclusive Authorization, this Addendum shall apply.

2. <u>Termination.</u>       The Debtor may terminate the Exclusive Authorization at the Debtor's option and upon written notice to the Broker at any time, and no liability and obligations shall accrue to the estate or to the Debtor as a result of any such termination.

3. <u>Abandonment.</u>       The Debtor reserves the right, int the Debtor's sole discretion, to determine not to sell the Property and to abandon the Property by serving a notice of the Debtor's intention to abandon the Property upon the Debtor, the Debtor's counsel, the United States Debtor, all creditors, and all parties in interest. In the event of any such abandonment, the Exclusive Authorization and this Addendum shall terminate, and no liability or obligations shall accrue to the estate or to the Debtor as a result of any such abandonment and termination.

4. <u>Conditions of Sale.</u>       The Broker agrees and understands that any sale of the Property shall be subject to the following terms and conditions:

    a. If for any reason, or no reason whatsoever, the Debtor is unable to deliver possession or title to the Property to any potential purchaser, the purchaser's sole remedy shall be the return of any money that the purchaser has deposited towards the purchase of the Property.

    b. The Debtor is selling the Property in an "AS IS" condition or basis by quitclaim deed without any representation or warranties whatsoever, including without limitation representations or warranties as to title, oil and mineral rights, city or government agency notifications regarding work to be done, marketability of title, ownership, physical condition, compliance with state, city or federal statutes, codes, ordinances, or regulations, geological stability, zoning, suitability for improvements on the Property, nor any assurances regarding if the Property is subdividable.

04/14/23

c.   The sale of the Property is subject to Bankruptcy Court approval after notice to the Debtor, the Debtor's counsel, the United States Debtor, all creditors, and all parties in interest as required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules.

d.   The sale is subject to overbids.

e.   The purchaser shall, at the purchaser's sole expense, acquire any and all insurance policies that the purchaser desires to cover the Property. The Debtor does not agree to acquire or transfer any insurance policies to the purchaser.

f.   The purchaser is to arrange for all financing of the acquisition of the Property before the close of escrow.

g.   All escrow fees shall be shared and paid on a 50/50 basis by the Debtor and the purchaser.

h.   The purchaser shall, at the purchaser's sole expense, install all smoke detectors, is any, as may be required by state or local law. The Debtor is not required to deliver to the purchaser a written statement of compliance with any applicable state and local law.

i.   The purchaser shall, at purchaser's sole expense, obtain any and all pest control inspection repairs that purchaser deems appropriate.

j.   If any local ordinance requires that the Property be brought into compliance with minimum energy conservation standards as a condition of sale or transfer, the purchaser shall comply with and pay for these requirements at purchaser's sole expense.

k.   Any sale is subject to the following conditions being satisfied before the close of escrow:

   i.   the Debtor must prevail with respect to any objections to the proposed sale and obtain a court order authorizing the sale, or

 04/14/23

alternatively have an order confirming a Chapter 11 Plan of Reorganization that otherwise authorizes the Debtor to proceed; and

ii.   the Debtor reserves the right to reject any and all offers which in his/her judgement are insufficient.

l.   The Property is being sold subject to:

i.   All general and special taxes that are presently due, or may become due, regarding the Property, other than property taxes, which shall be prorated as of the close of escrow;

ii.   Any and all easements and restrictions, rights and condition of record and rights of way, against, on or regarding the Property. Title, however, is to be transferred free of secured claims of record.

5.   <u>Payment of Commission.</u>  The commission to be paid to the Broker shall only be paid from the proceeds of the sale of the Property. The payment of the commission is subject to prior approval of the Bankruptcy Court.

6.   <u>Reduction of Listing Price and Extension of Term of Listing Agreement.</u> The Debtor may, in the Debtor's sole discretion and business judgement and without further Court order, modify the Exclusive Authorization by reducing the listing price and/or extending the term of the Exclusive Authorization.

7.   <u>Entire Agreement.</u> This Addendum and the Exclusive Authorization, to the extent that such Exclusive Authorization is noy contrary to the terms and conditions herein, constitute the entire contract between the parties. All prior agreements between the parties are incorporated into the agreement. Its terms are intended by the parties as a final expression of their agreement with respect to such terms as are included herein and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. The parties further intend that this Addendum and the Exclusive Authorization constitute the complete, final, and exclusive statement of the terms of the agreement and that no extrinsic evidence whatsoever may be introduced in any judicial or arbitration proceeding., if any, involving this Addendum and the Exclusive Authorization.

8.   <u>Bankruptcy Court Jurisdiction.</u>    The Bankruptcy Court, sitting shall have exclusive jurisdiction to resolve any and all disputes relating to this Addendum and the Exclusive Authorization. This Addendum and the Exclusive Authorization and any disputes related to thereto shall be governed by Washington Law.



04/14/23



**MAINSTREET ORGANIZATION OF REALTORS®**
**RESIDENTIAL EXCLUSIVE RIGHT TO SELL MARKETING AGREEMENT**



1  **EXP REALTY**                                                     **2ND CHANCE INVESTMENT GROUP, LLC**
2  BROKERAGE (Print Listing Office Name)                  SELLER NAME (Print)
3  **Steve Rettig**
4  DESIGNATED MANAGING BROKER NAME (Print)      SELLER NAME (Print)
5  **RUBI GONZALEZ**
6  DESIGNATED AGENT(S) NAME(S) (Print)

7  Seller represents and warrants that title to the property is in the name of: **2ND CHANGE INVESTMENT GROUP, LLC**
8  and Seller has the authority to sell the Property.

9  **1. Property:**  This Agreement is between the above-mentioned Brokerage and Seller, in consideration of their acceptance of the
10  terms hereof and, efforts of Brokerage's to advertise, market, promote, and sell the real estate commonly known as:
11  Address: **3122 Emery Ln**
12  Unit No: _____, City: **ROBBINS**
13  County: **COOK COUNTY**, State: **IL**, Zip Code: **60472**
14  Permanent Index No.: **28024240170000**, hereinafter referred to as "Property."

15  **If Designated Parking is Included:**  # of space(s) ____; identified as space(s) # _____; location _____
16  *[CHECK TYPE]* ☐ deeded space, PIN: _____ ☐ limited common element ☐ assigned space.

17  **If Designated Storage is Included:**  # of space(s) ____; identified as space(s) # _____; location _____
18  *[CHECK TYPE]* ☐ deeded space, PIN: _____ ☐ limited common element ☐ assigned space.

19  **2. Term and Conditions:**  The term of this Agreement begins 12:01 A.M. Month: **MARCH**                Day: **9TH**
20  Year: **2023**      and terminates 11:59 P.M. Month: **OCTOBER**        Day: **9TH**        Year: **2023**
21  ("marketing period"). Seller gives Brokerage the exclusive right to market, sell, option, or exchange the Property to qualified
22  purchasers and to share the Property with participants in the Midwest Real Estate Database, LLC, and/or any other Multiple Listing
23  Service in which Managing Broker is a participant, in accordance with the applicable rules and regulations of that Multiple Listing Service.

24  **(____ / ____)  THE PARTIES UNDERSTAND AND AGREE THAT IT IS ILLEGAL FOR EITHER OF THEM TO**
25  *[SELLER(S) INITIALS]* **DISCRIMINATE AGAINST ANY PROSPECTIVE BUYER OR LESSEE ON THE BASIS OF RACE, AGE,**
26  **COLOR, RELIGION, SEX, ANCESTRY, ORDER OF PROTECTION STATUS, GENDER IDENTITY, MARITAL**
27  **STATUS, PHYSICAL OR MENTAL HANDICAP, FAMILIAL STATUS, PREGNANCY, NATIONAL ORIGIN, SEXUAL**
28  **ORIENTATION, MILITARY STATUS, DISHONORABLE DISCHARGE FROM THE MILITARY SERVICE, ARREST**
29  **RECORD, OR ANY OTHER CLASS PROTECTED BY THE ILLINOIS HUMAN RIGHTS ACT. THE PARTIES AGREE**
30  **TO COMPLY WITH ALL APPLICABLE FEDERAL, STATE, AND LOCAL FAIR HOUSING LAWS.**

31  **3. Marketing Price:**  The price shall be $ **85,000**

32  **4. Possession:**  Possession is to be negotiated at time of sales contract.

33  **5. Fixtures and Personal Property:**  All of the fixtures and personal property stated herein are owned by Seller and, to the best of
34  Seller's knowledge, are in operating condition unless otherwise noted. Seller agrees to transfer to buyer all fixtures, all heating,
35  electrical, and plumbing systems together with the following items of personal property by Bill of Sale (Check or enumerate applicable items):

36  ☐ Refrigerator              ☐ Wine/Beverage Refrigerator      ☐ Light Fixtures, as they exist      ☐ Fireplace Gas Log(s)
37  ☐ Oven/Range/Stove          ☐ Sump Pump(s)                    ☐ Built-in or attached shelving     ☐ Smoke Detectors
38  ☐ Microwave                 ☐ Water Softener (unless rented)  ☐ All Window Treatments & Hardware  ☐ Carbon Monoxide Detectors
39  ☐ Dishwasher                ☐ Central Air Conditioning        ☐ Satellite Dish                    ☐ Invisible Fence System, Collar & Box
40  ☐ Garbage Disposal          ☐ Central Humidifier              ☐ Wall Mounted Brackets (AV/TV)     ☐ Garage Door Opener(s)
41  ☐ Trash Compactor           ☐ Central Vac & Equipment         ☐ Security System(s) (unless rented)    with all Transmitters
42  ☐ Washer                    ☐ All Tacked Down Carpeting       ☐ Intercom System                   ☐ Outdoor Shed
43  ☐ Dryer                     ☐ Existing Storms & Screens       ☐ Electronic or Media Air Filter(s) ☐ Outdoor Playset(s)
44  ☐ Attached Gas Grill        ☐ Window Air Conditioner(s)       ☐ Backup Generator System           ☐ Planted Vegetation
45  ☐ Water Heater              ☐ Ceiling Fan(s)                  ☐ Fireplace Screens/Doors/Grates    ☐ Hardscape

46  **Other items included:** _____
47  **Items NOT included:** _____
48  Unless otherwise agreed to in writing by Seller and Buyer, Seller shall warrant to Buyer that all fixtures, systems and personal
49  property included in this Agreement shall be in operating condition at possession, except: _____
50  _____. A system or item shall be deemed to be in operating condition if it performs
51  the function for which it is intended, regardless of age, and does not constitute a threat to health or safety.

52  **6. Home Warranty:**  Seller shall agree to provide to Buyer a limited home warranty program from _____
53  _____ at a charge of $ _____. Seller acknowledges that a home
54  warranty program is a limited warranty with a deductible. (STRIKE THROUGH IF NOT OFFERED.)

55  **7. Seller's Designated Agent(s):**  Managing Broker designates and Seller accepts: **RUBI GONZALEZ**
56  ("Seller's Designated Agent(s)"), a licensee affiliated with Managing Broker, as the only legal agent of Seller to market and sell
57  Seller's Property. Managing Broker reserves the right to appoint additional designated agents for Seller when, in Managing Broker's
58  discretion, it is necessary. If additional designated agents are appointed, Seller shall be informed in writing within a reasonable time

*SR*
*Designated Managing Broker Initials*
Address: **3122 Emery Ln Robbins, IL 60472**                     _____  _____
                                                                  *Seller Initials*   *Seller Initials*
(Page 1 of 7) Rev. 6.2021 - © MAINSTREET ORGANIZATION OF REALTORS®

59  of such appointment. Seller authorizes Seller's Designated Agent(s) from time to time, to allow another licensee, who is not an
60  agent of the Seller, to conduct an open house or Seller's Property or provide similar support to Designated Agent(s) in the marketing
61  of Seller's Property. Seller understands and agrees that this Agreement is a contract for Brokerage to market and sell Seller's Property
62  and that Seller's Designated Agent(s) is the only legal agent of Seller. Seller's Designated Agent(s) will be primarily responsible for
63  the direct marketing and sale of Seller's Property. The duties owed to Seller as referred in the Illinois Real Estate License Act of
64  2000, as amended, will only be owed to Seller by the Designated Agent(s). The Managing Broker and the Designated Agent(s) will
65  have only those duties to the Seller as are required by statute.

66  **8. Possible Dual Agency:**  The above named Designated Agent(s) (hereinafter sometimes referred to as "Licensee") may undertake
67  a dual representation (represent both the seller or landlord and the buyer or tenant) for the sale or lease of the Property. Seller
68  acknowledges he was informed of the possibility of this type of representation. Before signing this document, Seller must read the following:
69  Representing more than one party to a transaction presents a conflict of interest, since both clients may rely upon Licensee's advice
70  and the clients' respective interests may be adverse to each other. Licensee will undertake this representation only with the written
71  consent of ALL clients in the transaction. Any agreement between the clients as to a final contract price and other terms is a result
72  of negotiations between the clients acting in their own best interests and on their own behalf. Seller acknowledges that Licensee has
73  explained the implications of dual representation, including the risks involved, and understands that he has been advised to seek
74  independent advice from advisors or attorneys before signing any documents in this transaction.

75  WHAT A LICENSEE CAN DO FOR CLIENTS WHEN ACTING AS A DUAL AGENT:
76  1. Treat all clients honestly.
77  2. Provide information about the Property to the buyer or tenant.
78  3. Disclose all latent material defects in the Property that are known to Licensee.
79  4. Disclose financial qualification of the buyer or tenant to the Seller or landlord.
80  5. Explain real estate terms.
81  6. Help the buyer or tenant to arrange for Property inspections.
82  7. Explain closing costs and procedures.
83  8. Help the buyer compare financing alternatives.
84  9. Provide information about comparable properties that have sold so both clients may make educated decisions on what price to
85      accept or offer.
86  WHAT A LICENSEE CANNOT DISCLOSE TO CLIENTS WHEN ACTING AS A DUAL AGENT:
87  1. Confidential information that Licensee may know about the clients, without the client's permission.
88  2. The price or terms the seller or landlord will take other than the listing price without permission of the seller or landlord.
89  3. The price or terms the buyer or tenant is willing to pay without permission of the buyer or tenant.
90  4. A recommended or suggested price or terms the buyer or tenant should offer.
91  5. A recommended or suggested price or terms the seller or landlord should counter with or accept.

92  **If Seller is uncomfortable with this disclosure and dual representation, please let Licensee know. Seller is not required to**
93  **accept this section unless Seller wants to allow the Licensee to proceed as a Dual Agent in this transaction.**

94  ☐         ☐

95  **Yes   No** (_____/_____) *[SELLER(S) INITIALS]*

96  By checking "Yes" and initialing, Seller acknowledges that Seller has read and understands this section and voluntarily consents to
97  the Licensee acting as a Dual Agent (that is, to representing BOTH the Seller or landlord and the buyer or tenant) should that become necessary.

98  **9. Seller Duties:**
99  1. To provide access to property upon reasonable notice;
100  2. To make best efforts to maintain property for showings;
101  3. To provide all communication information and to be responsive to Designated Agent within a timely fashion, when requested;
102  4. To provide any financial information that may affect the ability to provide clear title (e.g. mortgages, municipal liens, tax liens,
103     or any other liens on the property);
104  5. To provide full ownership information (e.g. direct ownership, owner(s) of record)
105  6. To provide any information related to any pending legal proceedings (e.g. eminent domain, foreclosure, divorce, tax sale)
106  7. To provide any other information regarding pending notices, or requirements from any municipality;
107  8. To comply with the disclosure requirements of Paragraph 17 of this agreement;
108  9. To refer to Managing Broker and/or Seller's Designated Agent(s) all inquiries about this Property.
109  10. To comply in all respects with the Illinois Eavesdropping Act;
110  11. To provide most recent copies of any Condominium or Homeowners' Association documents:
111     o The covenants, conditions, and restrictions and or the Declaration;
112     o HOA articles of incorporation, bylaws, and current Rules and Regulations;
113     o Policies, agreements, and notices;
114     o Minutes of any meetings for the preceding twenty-four (24) months;
115     o Proof of casualty and liability insurance;
116     o Status and amount of any reserves and anticipated capital expenditures;
117     o Statement of status of any pending suits or judgments to which the association is a party;

118 ☐ ☐

119 **Yes    No (_____/_____)** *[SELLER(S) INITIALS]*

120 By checking "Yes" and initialing, Seller acknowledges that when requested of Potential Buyer's designated agent(s), prospective
121 buyers or buyer's agents may take additional video recordings/photos of the real estate.

122 **10. Notice Regarding Buyer "Offer Letters":**  A communication written by a Potential Buyer who wants to purchase Real Estate
123 often contains personal information about that buyer or the buyer's family,  including reasons why the buyer wants to buy or reasons
124 why the buyer thinks a seller should sell to the buyer. Although they most often are sent in a multiple-offer situation, they can occur
125 at any time. Such communications (often referred to as "Offer Letters" or "Buyer Love Letters") can be persuasive and may provide
126 information to a seller in determining who ought to buy the Real Estate.

127 **Sellers need to consider that accepting Offer Letters may expose sellers to a claim of discrimination under Federal Fair**
128 **Housing laws as well as under the Illinois Human Rights Act. These laws prohibit discrimination against buyers included in**
129 **one or more protected classes, and the Offer Letter may include information indicating that a buyer is a member of such**
130 **class. If a seller elects not to sell to the buyer who wrote such a letter, that buyer may conclude, and then claim, that a seller**
131 **rejected the offer because the buyer was a member of one of those protected classes.**

132 ☐ ☐

133 **Yes    No (_____/_____)** *[SELLER(S) INITIALS]*

134 By checking "Yes" and initialing, Seller acknowledges that they will accept "Offer Letters" from Potential Buyers.

135 **11. Representation of Buyers:**  Seller acknowledges that Seller has been informed and understands that as part of Brokerage's real
136 estate business, Brokerage, from time to time, enters into representation agreements with buyers, and, as such, may designate certain
137 of its licensees as exclusive buyers' representatives for the purpose of showing and negotiating the purchase of real estate listed with
138 Brokerage or other real estate brokerage firms.

139 **12. Buyer Confidentiality:**  Seller understands that Brokerage, Managing Broker and/or Designated Agent(s) may have previously
140 represented a buyer who is interested in Seller's Property. During that representation, Managing Broker and/or Designated Agent(s)
141 may have learned material information about the Buyer that is considered confidential. Under the law, neither Managing Broker nor
142 Designated Agent(s) may disclose any such confidential information to Seller even though the Managing Broker and/or Designated
143 Agent(s) now represent the Seller.

144 **13. Managing Broker's Affiliates:**  Seller understands and agrees that other licensees affiliated with Brokerage, may represent the
145 actual or prospective buyer of Seller's Property. Further, Seller understands and agrees that if the Property is sold through the efforts
146 of a licensee affiliated with Brokerage that represents the buyer, the other licensee affiliated with Brokerage will be acting as a
147 buyer's representative.

148 **14. Consent to Represent Other Sellers:**  Seller understands and agrees that Brokerage, Managing Broker and Designated Agent(s)
149 may from time to time represent or assist other sellers who may be interested in selling their property to buyers. The Seller consents
150 to Brokerage, Managing Broker's and Designated Agent's(s') representation of such other sellers before, during, and after the
151 expiration of this Exclusive Marketing Agreement and expressly waives any claims including but not limited to breach of duty or
152 breach of contract based solely upon Brokerage, Managing Broker's or Designated Agent's(s') representation or assistance of other
153 sellers who may be interested in selling their property to buyers.

154 **15. Brokerage Fee:**  Except as provided hereafter, in consideration of the obligations of the Brokerage,  the Seller agrees:
155 a) To pay Brokerage, at the time of closing of the sale of the property, or the initial closing of an installment contract for deed, and
156 from the disbursement of the proceeds of said sale, compensation in the amount of, for Brokerage's services, $ _____
157 and/or **5.5** % of the sale price in effecting the sale by finding a Buyer ready, willing,  and able to purchase the property. In the
158 event that a cooperating brokerage as defined in Paragraph 2 above as a Participant is involved in the transaction, the commission
159 shall be distributed **2.5** % plus $ **350** _____ of the sales price to the listing brokerage and **2** % minus $ **350** _____
160 of the sales price to the cooperating brokerage. Brokerage, on a case-by-case basis with permission of the Seller, may agree to a
161 different cooperating commission to cooperating brokerages who are Participants as defined in Paragraph 2 above. If the
162 transaction shall not be closed because of refusal, failure, or inability of the Seller to perform, the Seller shall pay the sales
163 commission in full to Brokerage upon demand. Should a sale be in pending or contingent status at the expiration of this Agreement,
164 Seller shall pay Brokerage the full commission set forth upon closing of said sale.
165 b) To pay Brokerage the commission specified above if Brokerage procures a buyer, if the Property is sold within said time by Seller
166 or any other person, or if the property is sold within **30** days from the expiration date herein to any prospect to whom the said
167 listing information was submitted during the term of this exclusive agreement.  However, Seller shall not be obligated to pay said
168 commission if a valid, written listing agreement is entered into during the term of said protection period with another brokerage
169 and the sale of the Property is made during the term of the subsequent listing agreement.
170 Special Compensation Information: _____

171 **16. Cooperation and Compensation Involving Non-Participants:**
172 Seller grants permission for an Illinois real estate licensee who is not a Participant as defined in Paragraph 2 to have access to the
173 Property for purposes of showing.

174 ☐ ☐

175 **Yes    No (_____/_____)** *[SELLER(S) INITIALS]*

176 By checking "Yes" Seller permits an Illinois real estate licensee who is not a Participant as defined in Paragraph 2 to access the Property.

177  When Seller grants permission to access the Property by cooperating brokerages who are not Participants as defined in Paragraph
178  2, Seller may authorize Brokerage, on a case-by-case basis, to pay a cooperating commission to such cooperating brokerage different
179  from that set forth in Paragraph 15.

180  **17. Marketing Authorization:**  Brokerage is authorized to advertise, promote, and market the Property which shall include, but
181  not be limited to, in Managing Broker's sole discretion, the display of signs, placement of the Property in any Multiple Listing
182  Service in which Managing Broker is a participant, and promotion of the Property through any electronic medium and/or on any
183  Internet Website to which the Brokerage, Managing Broker and/or Designated Agent(s) may subscribe. Brokerage is authorized to
184  affix a keybox to the Property, and provided the owner is absent, any MLS participant or subscriber associated with the Multiple
185  Listing Service(s), or other licensees who are not Participants as defined in Paragraph 2 and authorized in the preceding paragraph,
186  whether acting as a buyer's representative or otherwise, shall have the right, through use of said keybox, to show the Property at any
187  reasonable time. It is not a requirement of the Multiple Listing Service or Brokerage that Seller allow use of a keybox. Seller
188  acknowledges that neither listing nor selling brokerage, the Mainstreet Organization of REALTORS®,  nor any Multiple Listing
189  Service is an insurer against the loss of Seller's personal property. Seller is advised to safeguard or remove valuables now located
190  on said Property. Seller is further advised to verify the existence of said valuables and obtain personal property insurance through
191  Seller's insurance agent. Further, Seller hereby grants Brokerage and Brokerage shall have the right, and Seller acknowledges that
192  Managing Broker may have an obligation under applicable Multiple Listing Service rules and regulations as a condition of placing
193  Seller's Property in such Multiple Listing Service, to release information as to the amount of selling price, type of financing, and
194  number of days to sell the Property to any Multiple Listing Service of which Managing Broker is a participant at the time the Property
195  is sold and closed.

196  **18. Office Website Policy:**  A Broker Reciprocity Internet Data Exchange ("IDX") and/or Virtual Office Website ("VOW") exist
197  for the purpose of marketing properties to consumers on the Internet who have established a brokerage-consumer relationship, as
198  defined by Illinois Real Estate License Act of 2000, as amended, giving the consumer the opportunity to search for active and closed
199  listing data, subject to Brokerage's oversight, supervision and accountability. The IDX and VOW Policy states that an IDX or a
200  VOW shall not display listings or property addresses of any seller who has affirmatively directed the brokerage to withhold the
201  seller's listing or property address from display on the Internet. An IDX and a VOW may allow third parties to write comments or
202  reviews about particular listings or display a hyperlink to such comments or review in immediate conjunction with particular listings
203  or display an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the
204  listing. The Policies allow the Brokerage to disable or discontinue, at Seller's request, either or both of the aforementioned IDX and
205  VOW features (display of listing and display of listing address and ability to make comments or display estimate of market value).

206  **WITH REGARD TO DISPLAYING THE PROPERTY ON THE INTERNET, SELLER HEREBY DIRECTS BROKERAGE AS FOLLOWS:**

207  (____/____) *[SELLER(S) INITIALS]* ☐ I do ☐ do NOT want the Property listing to be displayed on the Internet.

208  (____/____) *[SELLER(S) INITIALS]* ☐ I do ☐ do NOT want the Property address to be displayed on the Internet.

209  (____/____) *[SELLER(S) INITIALS]* ☐ I do ☐ do NOT give permission for comments or reviews on my listing.

210  (____/____) *[SELLER(S) INITIALS]* ☐ I do ☐ do NOT want any automated estimate of value on my listing.

211  Seller acknowledges that Seller has read and understands the options presented above and that, if Seller has selected do NOT want the
212  Property listing to be displayed on the Internet, consumers who conduct searches for listings on the Internet will not see information about
213  Seller's Property in response to their search.

214  **19. Title Insurance and Survey:**  Seller acknowledges that Seller has not added to nor disposed of any part of the Property, or
215  gained any easements in favor of or against the Property not disclosed in the Title Guaranty Policy except as stated herein. Prior to
216  closing, Seller agrees to furnish at Seller's expense a title insurance commitment for an Owner's Title Insurance Policy in the amount
217  of the sale price, showing good title in the owner's name. After a sales contract has been signed, arrangements must be made to
218  secure title insurance and schedule the closing. Seller understands that Seller is not required to use any particular title insurance
219  company and that Seller or Seller's attorney may select any qualified licensed company for Seller's title insurance needs. Not less
220  than one (1) business day prior to closing, except where the subject property is a condominium, Seller may be required, at Seller's
221  expense, to furnish a Plat of Survey dated not more than six (6) months prior to the date of closing, prepared by an Illinois registered
222  land surveyor, showing any encroachments, measurements of all lot lines, all easements of record, building set-back lines of record,
223  fences, all building and other improvements on the real estate and distances therefrom to the nearest two lot lines. In addition, the
224  survey to be provided shall be a boundary survey conforming to the requirements of the Illinois Department of Financial and
225  Professional Regulation found at 68 Ill. Adm. Code, Sec. 170.56. The survey shall show all corners staked and flagged or otherwise
226  monumented. The survey shall have the following statement prominently appearing near the professional land surveyor seal and
227  signature: "This professional service conforms to the current Illinois minimum standards for a boundary survey. A Mortgage
228  Inspection, as defined, is not a boundary survey and does not satisfy the necessary requirements."

229  With regard to the issuance of title insurance:

230  ☐ (____/____) *[SELLER(S) INITIALS]* Seller authorizes Brokerage to order title insurance and related services on Seller's behalf through
231  _____, an affiliate of Brokerage, for the estimated charges as disclosed in the Federal and State
232  Disclosure Statements provided Seller by Brokerage.

233  ☐ (____/____) *[SELLER(S) INITIALS]* Seller directs that _____ provide the title insurance and related services as stated above.

234  ☐ (____/____) *[SELLER(S) INITIALS]* Seller or Seller's attorney will make the necessary arrangements for title insurance and any related services.

235  **20. Disclosure:**  Seller understands that the information which Seller provides to Seller's Designated Agent(s) as marketing
236  information will be used to advertise Seller's Property to the public and submitted to the Multiple Listing Service. It is essential that

237  this information be accurate and truthful. Seller agrees to comply with the provisions of the Illinois Residential Real Property
238  Disclosure Act, the Illinois Radon Awareness Act and, if applicable, the Federal Lead Based Paint Disclosure Regulations. Seller
239  shall complete the applicable disclosure document(s) in a timely manner, shall not knowingly provide false or inaccurate information
240  therein, and shall comply with all local government ordinances. Although Seller is marketing Seller's Property in its present physical
241  condition, Seller understands that Seller may be held responsible by a buyer for any latent or hidden, undisclosed defects in the
242  Property which are known to Seller but which are not disclosed to buyer. Seller shall indemnify, save, defend and hold Brokerage,
243  Managing Broker, and Seller's Designated Agent(s) harmless from all claims, disputes, litigation, judgments and/or costs (including
244  reasonable attorney's fees), whether or not frivolous, arising from any misrepresentations made by the Seller, from any incorrect
245  information supplied by the Seller, or from any material fact concerning the Property including latent defects which the Seller fails
246  to disclose. Further, Seller shall indemnify, save, defend, and hold Brokerage, Managing Broker, and Seller's Designated Agent(s)
247  harmless from any claim, loss, damage, or injury to any person or Property while viewing the Property arising from the condition of Seller's Property.

248  The current form residential sales contract contains the following representations to be made by Seller:

249  Seller represents that with respect to the Real Estate, Seller has no knowledge of, nor has Seller received any written notice from
250  any association or governmental entity regarding:
251  a) zoning, building, fire or health code violations that have not been corrected;
252  b) any pending rezoning;
253  c) boundary line disputes;
254  d) any pending condemnation or Eminent Domain proceeding;
255  e) easements or claims of easements not shown on the public records;
256  f) any hazardous waste on the Real Estate;
257  g) real estate tax exemption(s) to which Seller is not lawfully entitled; or
258  h) any improvements to the Real Estate for which the required initial and final permits were not obtained.

259  Seller further represents that:
260  (____ / ____) *[SELLER(S) INITIALS]* There *[CHECK ONE]* ☐ are ☐ are not improvements to the Real Estate which are not included in full in
261  the determination of the most recent tax assessment.

262  (____ / ____) *[SELLER(S) INITIALS]* There *[CHECK ONE]* ☐ are ☐ are not improvements to the Real Estate which are eligible for the home
263  improvement tax exemption.

264  (____ / ____) *[SELLER(S) INITIALS]* There *[CHECK ONE]* ☐ is ☐ is not an unconfirmed pending special assessment affecting the Real Estate
265  by any association or governmental entity payable by Buyer after the date of Closing.

266  (____ / ____) *[SELLER(S) INITIALS]* The Real Estate *[CHECK ONE]* ☐ is ☐ is not located within a Special Assessment Area or Special
267  Service Area, payments for which will not be the obligation of Seller after the year in which the Closing occurs.

268  If the seller has any questions or concerns regarding the representation to be made in the sales contract, seller reserves the right to
269  obtain legal advice.

270  **21. Limitations:**   The sole duty of the Brokerage is to effect a sale of the Property. The Brokerage, Managing Broker, Seller's
271  Designated Agent(s), members of the Multiple Listing Service(s) to which the Managing Broker belongs, and the Mainstreet
272  Organization of REALTORS® are not charged with the custody of the Property, its management, maintenance, upkeep, or repair.
273  Illinois law allows licensees to prepare the sales contract using approved preprinted forms, but does not allow licensees to draft other
274  legal documents required to close the sale. Therefore, the Seller agrees to draft and furnish, or have Seller's attorney draft and furnish
275  all other legal documents necessary to close the sale.

276  **22. Minimum Services:** Illinois Real Estate License Act of 2000, as amended provides that all exclusive brokerage agreements
277  must specify that the sponsoring broker, through one or more sponsored licensees, must provide at a minimum, the following
278  services: (1) accept delivery of and present to the client offers and counter-offers to buy, sell, or lease the client's property or the
279  property the client seeks to purchase or lease; (2) assist the client in developing, communicating, negotiating, and presenting
280  offers, counter offers, and notices that relate to the offers and counteroffers until a lease or purchase agreement is signed and all
281  contingencies are satisfied or waived; and (3) answer the client's questions relating to the offers, counter-offers, notices, and contingencies.

282  **23. Taxes and Assessments:** All taxes and all usually prorated expenses shall be prorated pursuant to the terms of the sales contract.
283  Seller shall disclose any assessments or special taxes for improvements or lien for improvements, either of record or in process,
284  applicable to the Property marketed herein, and should the Seller receive any notice thereof, Seller agrees to notify the Managing
285  Broker or Designated Agent(s) immediately.
286  a) SPECIAL ASSESSMENTS: **Seller represents that there:** *[CHECK ONE]* ☐ is ☐ **is not** a proposed or pending unconfirmed
287  special assessment affecting the property not payable by Seller after the date of closing. Seller further represents that the following confirmed
288  special assessments are not due or will be due after the date of closing: _____ 20____ in the amount of $_____.
289  b) SPECIAL SERVICE AREA: **Seller represents that the property:** *[CHECK ONE]* ☐ is ☐ **is not** located within a Special Service
290  Area, payments for which will not be the obligation of Seller after the date of closing.
291  c) CONDOMINIUM OR HOMEOWNERS' ASSOCIATION(S): **The property and improvements described herein** *[CHECK ONE]*
292  ☐ **are** ☐ **are not** part of a Condominium or Homeowners' Association. If the property is part of a Condominium or Homeowners'
293  Association, the contact information for such association is:
294      Association Name: _____        Phone Number: _____
295      Management Company Name: _____        Phone Number: _____

296  d) ASSOCIATION ASSESSMENTS/FEES: Seller acknowledges a current Condominium or Homeowners' Association
297  Assessment/Fee of $_____ per _____ which includes: _____

e) ADDITIONAL ASSOCIATION ASSESSMENTS/FEES: Seller further acknowledges additional assessments/fees (such as a Master Association Fee) of $ _____ per _____ which includes: _____

## 24. Earnest Money (choose one):

**a)** ☐ (_____/_____)   **The Earnest Money shall be held by the Brokerage, as Escrowee in trust for the mutual**
*[SELLER(S) INITIALS]*   **benefit of the Buyer and Seller (hereinafter "Parties") in a manner consistent with Illinois State Law. Upon initial closing, or settlement, the Earnest Money shall be applied first to the payment of any expenses incurred by the Brokerage on Seller's behalf in the sale, and second to payment of the Brokerage's sales commission, rendering the surplus, if any, to the Seller. If a dispute arises between the Parties to a real estate transaction as to whether a default has occurred, the Escrowee shall hold the Earnest Money and implement the procedure for disbursement as agreed in writing by the Parties in the real estate contract, or pay pursuant to subsequent joint written direction to Escrowee, or as directed by a court of competent jurisdiction. Further, Seller agrees that Escrowee may deposit the funds with the clerk of the Circuit Court by an action in the nature of interpleader. Seller agrees Escrowee may be reimbursed from the Earnest Money for all costs, including reasonable attorney's fees, related to the filing of the interpleader and hereby agrees to indemnify and hold Escrowee harmless from any and all claims and demands, including the payment of reasonable attorney's fees, costs, and expenses arising out of such default, claims, and demands. If Seller defaults, Earnest Money, at the option of Buyer, shall be refunded to Buyer, but such refunding shall not release Seller from the obligation of this Marketing Agreement. Transfer of escrow money to the closing agent for the transaction may be made no sooner than two (2) business days prior to the scheduled closing date.**

**b)** ☐ (_____/_____)   **Brokerage maintains a policy of not holding earnest money or any moneys in escrow for any**
*[SELLER(S) INITIALS]*   **reason. At the written direction of the Parties to a real estate transaction, Earnest Money deposited by a Buyer in the transaction shall be held in trust by an Escrowee selected by Parties. Escrowee shall be duly licensed and authorized to hold money in escrow for the mutual benefit of the Parties in a manner consistent with Illinois Law. In that event, the terms of a written agreement between Escrowee and the Parties to the real estate transaction shall control all issues regarding the holding and the disbursement of Earnest Money. If Seller defaults, any refunding of the Earnest Money to Buyer at Buyer's direction shall not release Seller from the obligation of this Marketing Agreement.**

**25. Amendments:**  Should it be necessary to amend or modify this Agreement, facsimile or electronic signatures of all parties to this Marketing Agreement are accepted as original signatures. This Agreement may be executed in multiple copies and Seller's signature hereon acknowledges that Seller has received a signed copy.

**26. Mediation:**  Any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be mediated in accordance with rules then pertaining of the American Arbitration Association.

**27. Indemnification:**  Seller agrees to indemnify Brokerage, Managing Broker and Designated Agent(s) to save, defend, and hold them harmless on account of any and all loss, damage, cost, or expense (including reasonable attorney's fees) incurred by them arising out of this Agreement, or in the collection of fees or commissions due Brokerage pursuant to this Agreement, provided Brokerage is not found to be at fault.

**28. Disclaimer:**  Seller acknowledges that Brokerage, Managing Broker and Seller's Designated Agent(s) are acting solely as real estate professionals, and not as attorney, tax advisor, surveyor, structural engineer, home inspector, environmental consultant, architect, contractor, or other professional service provider. Seller understands that such other professional service providers are available to render advice or services to the Seller, if desired, at Seller's expense.

**29. Costs of Third-Party Services or Products:**  Seller is responsible for the costs of all third-party products or services such as surveys, soil tests, title reports, well and septic tests, etc.

**30. Lease of Property:**  Although the purpose of this Agreement is to bring about a sale, option, or exchange of the Property, Seller agrees to pay Brokerage a leasing commission of $ _____ if the Property is leased within the marketing period. If the tenant to whom the Property is leased later purchases the Property, Seller agrees to pay Brokerage a sales commission of _____ on the full sale price. If the property is to be marketed for lease, a separate exclusive listing agreement for lease will need to be agreed upon by the parties to this agreement.

**31. Severability:**  In case any one or more provisions of this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

**32. Notice:**  All notices required shall be in writing and shall be served by one party to this agreement to the other party. Notice to any one of the multiple-person party shall be sufficient notice to all. Notice shall be given in the following manner:
a) By personal delivery of such notice; or

_____ *Designated Managing Broker Initials*                                    _____ *Seller Initials* _____ *Seller Initials*
Address: **3122 Emery Ln Robbins, IL 60472**
*(Page 6 of 7) Rev. 6.2021 - © MAINSTREET ORGANIZATION OF REALTORS®*

b) By mailing of such notice to the addresses recited herein by regular mail and by certified mail, return receipt requested. Except as otherwise provided herein, notice served by certified mail shall be effective on the date of mailing; or

c) By sending facsimile transmission. Notice shall be effective as of date and time of facsimile transmission, provided that the notice transmitted shall be sent on business days during business hours (8:00 A.M. to 6:00 P.M. Chicago Time). In the event fax notice is transmitted during non-business hours, the effective date and time of notice is the first hour of the first business day after transmission; or

d) By sending e-mail transmission. Notice shall be effective as of date and time of e-mail transmission, provided that the notice transmitted shall be sent on business days during business hours (8:00 A.M. to 6:00 P.M. Chicago Time), and provided further that the **recipient provides written acknowledgment to the sender** of receipt of the transmission (by e-mail, facsimile, or by regular mail). In the event e-mail notice is transmitted during non-business hours, the effective date and time of notice is the first hour of the first business day after transmission; or

e) By commercial overnight delivery (e.g., FedEx). Such Notice shall be effective on the next Business Day following deposit with the overnight delivery company.

**33. Entire Agreement:**  This Agreement constitutes the complete understanding and entire agreement between the parties relating to the subject thereof, and any prior agreements pertaining thereto, whether oral or written, have been merged and integrated into this Agreement. **This Agreement may not be terminated or amended prior to its termination date without the express written consent of both parties to this Agreement.**

Seller hereby acknowledges receipt of a signed copy of this Agreement and all attachments. The attachments include the following:

*[HERE LIST ALL ATTACHMENTS]*: _____

*[SIGNATURES REQUIRED OF ALL WHO HAVE A LEGAL OR EQUITABLE INTEREST IN THE PROPERTY.]*

 **Steve Rettig** _____

DESIGNATED MANAGING BROKER *[PRINT]*

*Steve Rettig*

DESIGNATED MANAGING BROKER *[SIGNATURE]*

 **3/9/2023** _____

DATE

*Rubi Gonzalez*

DESIGNATED AGENT *[SIGNATURE]*

 **3/9/2023** _____

DATE

 **939 W. North Avenue, # 750** _____

OFFICE ADDRESS

 **Chicago IL  60642** _____

 **708-653-6831** _____

DESIGNATED AGENT PHONE        FAX

_____

OFFICE  PHONE

 **RUBI.REALESTATEBROKER@GMAIL.COM** _____

E-MAIL ADDRESS

_____

SELLER *[SIGNATURE]*

_____

SELLER *[SIGNATURE]*

_____

CURRENT MAILING ADDRESS *[REQUIRED]*

_____

_____

DATE                        DATE

_____

_____

PHONE                        FAX

_____

E-MAIL ADDRESS

*FOR INFORMATION ONLY:*

_____

SELLER'S ATTORNEY NAME

_____

PHONE/E-MAIL ADDRESS

## ADDENDUM TO EXCLUSIVE AUTHORIZATION AND RIGHT TO SALE

2nd Chance Investment Group, LLC ("Debtor") agrees to grant EXP REALTY , designated Broker Steve Reddig,                    ("Broker") the exclusive right to negotiate a sale of the real property commonly described as 3122 Emery Lane, Robbins, IL 60472 ("Property") upon the terms and conditions of the Exclusive Authorization and Right to Sell Property ("Exclusive Authorization"), by the following terms and conditions:

1.    Addendum.    This Addendum applies to the Exclusive Authorization. Notwithstanding any contrary terms and conditions in the Exclusive Authorization, this Addendum shall apply.

3.    Termination.    The Debtor may terminate the Exclusive Authorization at the Debtor's option and upon written notice to the Broker at any time, and no liability or obligations shall accrue to the estate or to the Debtor as a result of any such termination.

4.    Abandonment.    The Debtor reserves the right, in the Debtor's sole discretion, to determine not to sell the Property and to abandon the Property by serving a notice of the Debtor's intention to abandon the Property upon the Debtor, the Debtor's counsel, the United States Debtor, all creditors, and all parties in interest.    In the event of any such abandonment, the Exclusive Authorization and this Addendum shall terminate, and no liability or obligations shall accrue to the estate or to the Debtoras a result of any such abandonment and termination.

5.    Conditions of Sale.    The Broker agrees and understands that any sale of the Property shall be subject to the following terms and conditions:

b.    If for any reason, or no reason whatsoever, the Debtor is unable to deliver possession or title to the Property to any potential purchaser, the purchaser's sole remedy shall be the return of any money that the purchaser has deposited towards the purchase of the Property.

c.    The Debtor is selling the Property in an "AS IS" condition or basis by quitclaim deed without any representations or warranties whatsoever, including without limitation representations or warranties as to title, oil and mineral

124805.1    9937176A

rights, city or government agency notifications regarding work to be done, marketability of title, ownership, physical condition, compliance with state, city or federal statutes, codes, ordinances, or regulations, geological stability, zoning, suitability for improvement, and fire insurance policies to cover any improvements on the Property, nor any assurances regarding if the property is subdividable.

       d.   The sale of the Property is subject to Bankruptcy Court approval after notice to the Debtor, the Debtor's counsel, the United States Debtor, all creditors, and all parties in interest as required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules.

       e.   The sale is subject to overbids.

       f.   The purchaser shall, at the purchaser's sole expense, acquire any and all insurance policies that the purchaser desires to cover the Property. The Debtor does not agree to acquire or transfer any insurance policies to the purchaser.

       g.   The purchaser is to arrange for all financing of the acquisition of the Property before the close of escrow.

       h.   All escrow fees shall be shared and paid on a 50/50 basis by the Debtor and the purchaser.

       i.   The purchaser shall, at the purchaser's sole expense, install all smoke detectors, if any, as may be required by state or local law. The Debtor is not required to deliver to the purchaser a written statement of compliance with any applicable state and local law.

       j.   The purchaser shall, at purchaser's sole expense, obtain any and all pest control inspection repairs that purchaser deems appropriate.

       k.   If any local ordinance requires that the Property be brought into compliance with minimum energy conservation standards as a condition of sale or transfer, the purchaser shall comply with and pay for these requirements at purchaser's sole expense.

       l.   Any sale is subject to the following conditions being satisfied before the close of escrow:

124805.1    9937176A                                2

(1)    the Debtor must prevail with respect to any objections to the proposed sale and obtain a court order authorizing the sale, or alternatively have an order confirming a Chapter 11 Plan of Reorganization that otherwise authorizes the Debtor to proceed; and

(2)    the Debtor reserves the right to reject any and all offers which in his/her judgment are insufficient.

m.    The Property is being sold subject to:

(1)    All general and special taxes that are presently due, or may become due, regarding the Property, other than property taxes, which shall be prorated as of the close of escrow;

(2)    Any and all easements, restrictions, rights and conditions of record and rights of way, against, on or regarding the Property.  Title, however, is to be transferred free of secured claims of record.

6.    <u>Payment of Commission</u>. The commission to be paid to the Broker shall only be paid from the proceeds of the sale of the Property.  The payment of the commission is subject to prior approval of the Bankruptcy Court.

7.    <u>Reduction of Listing Price and Extension of Term of Listing Agreement</u>.  The Debtor may, in the Debtor's sole discretion and business judgment and without further Court order, modify the Exclusive Authorization by reducing the listing price and/or extending the term of the Exclusive Authorization.

8.    <u>Entire Agreement</u>.  This Addendum and the Exclusive Authorization, to the extent that such Exclusive Authorization is not contrary to the terms and conditions herein, constitute the entire contract between the parties.  All prior agreements between the parties are incorporated into this agreement.  Its terms are intended by the parties as a final expression of their agreement with respect to such terms as are included herein and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement.  The parties further intend that this Addendum and the Exclusive Authorization constitute the complete, final, and exclusive statement of the terms of the agreement and that no extrinsic evidence whatsoever may be

introduced in any judicial or arbitration proceeding, if any, involving this Addendum and the Exclusive Authorization.

9.  <u>Bankruptcy Court Jurisdiction</u>. The Bankruptcy Court, sitting shall have exclusive jurisdiction to resolve any and all disputes relating to this Addendum and the Exclusive Authorization.  This Addendum and the Exclusive Authorization and any disputes related thereto shall be governed by Illinois law.

124805.1    9937176A                             4



## ILLINOIS REALTORS®
## DISCLOSURE OF INFORMATION AND ACKNOWLEDGEMENT
LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS



### Lead Warning Statement

*Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.*

**Property Address:** <u>3122 EMERY LN  Robbins, IL 60472</u>

### Seller's Disclosure (initial)

_____ (a) Presence of lead-based paint and/or lead-based paint hazards (check one below):

    ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain):

    _____

    _____

    ☒ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

_____ (b) Records and Reports available to the seller (check one below):

    ☐ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below): _____

    _____

    ☒ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

### Purchaser's Acknowledgment (initial)

_____ (c) Purchaser has received copies of all information listed above.

_____ (d) Purchaser has received the pamphlet *Protect Your Family From Lead in Your Home*.

_____ (e) Purchaser has (check one below):

    ☐ Received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection of the presence of lead-based paint or lead-based paint hazards; or

    ☐ Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

### Agent's Acknowledgment (initial)

_____ (f) Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

### Certification of Accuracy

The following parties have reviewed the information above and certify to the best of their knowledge, that the information they have provided is true and accurate.

Seller _____ Date _____  Purchaser _____ Date _____

Seller _____ Date _____  Purchaser _____ Date _____

Agent *Rubi Gonzalez* Date <u>3/9/2023</u>  Agent _____ Date _____

(This disclosure form should be attached to the Contract to Purchase.)
FORM 420 (05/2021) COPYRIGHT ILLINOIS REALTORS®                                1/1




## ILLINOIS REALTORS®
## DISCLOSURE OF INFORMATION ON RADON HAZARDS
### (For Residential Real Property Sales or Purchases)

**Radon Warning Statement**

*Every buyer of any interest in residential real property is notified that the property may present exposure to dangerous levels of indoor radon gas that may place the occupants at risk of developing radon-induced lung cancer. Radon, a Class-A human carcinogen, is the leading cause of lung cancer in non-smokers and the second leading cause overall. The seller of any interest in residential real property is required to provide the buyer with any information on radon test results of the dwelling showing elevated levels of radon in the seller's possession.*

*The Illinois Emergency Management Agency (IEMA) strongly recommends ALL homebuyers have an indoor radon test performed prior to purchase or taking occupancy, and mitigated if elevated levels are found. Elevated radon concentrations can easily be reduced by a qualified, licensed radon mitigator.*

### Seller's Disclosure (initial each of the following which applies)

_____ (a)  Elevated radon concentrations (above EPA or IEMA recommended Radon Action Level) are known to be present within the dwelling. (Explain).

_____ (b)  Seller has provided the purchaser with the most current records and reports pertaining to elevated radon concentrations within the dwelling.

_____ (c)  Seller either has no knowledge of elevated radon concentrations in the dwelling or prior elevated radon concentrations have been mitigated or remediated.

_____ (d)  Seller has no records or reports pertaining to elevated radon concentrations within the dwelling.

### Purchaser's Acknowledgment (initial each of the following which applies)

_____ (e)  Purchaser has received copies of all information listed above.

_____ (f)  Purchaser has received the IEMA approved Radon Disclosure Pamphlet.

### Agent's Acknowledgement (initial IF APPLICABLE)

_____ (g)  Agent has informed the seller of the seller's obligations under Illinois law.

### Certification of Accuracy

The following parties have reviewed the information above and each party certifies, to the best of his or her knowledge, that the information he or she has provided is true and accurate.

Seller _____     Date _____

Seller _____     Date _____

Purchaser _____     Date _____

Purchaser _____     Date _____

Agent *Rubi Gonzalez*_____     Date _3/9/2023_____

Agent _____     Date _____

**Property Address: 3122 Emery Ln**_____

**City, State, Zip Code:  Robbins, IL 60472**_____

FORM 422 (05/2021) COPYRIGHT ILLINOIS REALTORS®                                    1/1

1
2
3
**<u>EXHIBIT 2</u>**
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



To Whom It May Concern:

RE:  Details of Anna Matsunaga's qualifications and training.


*Started Real Estate Investing mentorship in 2002

*Realtor® /Licensed Agent since 2003

*Became Partner at Keller Williams Tacoma in 2005

* Certified at a Negotiations Expert in 2008

*Licensed as a Managing Broker in 2011

*Has completed over 3 years of weekly coaching

*Has completed courses in Listing Properties, Selling Properties, Prospecting, Real Estate Law, Landlord Tenant Law, Statistics, Lending, Building Construction, Appraisal, Title Issues, Escrow Procedures, Consulting, 1031 Exchange, Investing, Fair Housing, Marketing Via Email, Marketing Via Social Media, Photography, Sales and much more.


*Consistently in top 10% of agents in local office & NWMLS


*Supported by 1 full time administrator with over 5 years of real estate experience & 2 Showing brokers/ property specialists as well as a full suite of tools to smoothly bring transactions to closing.

*Vendor list of several hundred contacts that have been vetted for serving client needs.

*Managing Broker of Team Momentum @ Keller Williams Tacoma


-References available upon request.



# eXp
### REALTY



## RUBI GONZALEZ
LOAN OFFICER/ REALTOR

2616 Cochran Street, Blue Island, 60406, United States

17086536831

Rubi.realestatebroker@gmail.com

## WORK EXPERIENCE

**NATIONS LENDING**
Palos Heights
Oct 2022 - Present

### Loan Officer
- I assisted with Spanish leads and gathering informa on from clients.
- Gather all the pieces to create a loan applica on and follow up with the client.
- Study the new updates on different types of loans available.

**EXP REALTY**
Chicago
Jul 2022 - Present

### Realtor
- Create and plan social and business events.
- The leader of my Her Group.
- Created Social Content and Videos.
- Gather sponsors for Events and build business rela onships.
- Help customers with buying and selling.
- Help my investors find proper es for their next investments.
- Gather Ideas on the next phase of business.

**CROSSCOUNTRY MORTGAGE**
Palos Height
Feb 2022 - Sep 2022

### Loan Officer
- Help with the Spanish-speaking Clients.
- Gather clientele and convert them into leads.
- Assist the Branch Manager with Leads and communicate with their client.
- Help with the social media and design the next adver sing posts.
- Plan and organize profitable events.

## EDUCATION

**WESTWOO D COLLEGER**
Calumet City

### Some College (no degree)
- Criminal Jus ce.

**EISENHOWER HIGH SCHCOOL**
Blue Island , IL
2005

### High school diploma