Andy C. Warshaw SBN 263880
Amanda G. Billyard SBN 256838
Rich Sturdevant SBN 269088
Financial Relief Law Center, APC
1200 Main St., Suite C
Irvine, CA 92614
Telephone: (714) 442-3319
Facsimile: (714) 361-5380
Email: awarshaw@bwlawcenter.com

Attorneys for Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>2nd CHANCE INVESTMENT GROUP, LLC<br><br>     Debtor in Possession. | Case No. 8:22-bk-12142-SC<br><br>Chapter 11<br><br>**DEBTOR IN POSSESSION'S MOTION FOR ORDER: (1) AUTHORIZING SALE OF ESTATE'S RIGHT, TITLE AND INTEREST IN REAL PROPERTY; (2) APPROVING OVERBID PROCEDURE; (3) APPROVING PAYMENT OF COMMISSIONS; 4) FINDING PURCHASERS ARE GOOD FAITH PURCHASERS; AND (5) WAIVING STAY UNDER RULE 6004(h); MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS IN SUPPORT THEREOF**<br><br>[8607 Custer Road, Lakewood, WA 98499]<br><br>Date: September 27, 2023<br>Time: 1:30 p.m.<br>Place: Courtroom 5C<br>    411 West Fourth Street<br>    Santa Ana, CA 92701 |

1

**TO THE HONORABLE SCOTT CLARKSON, UNITED STATES BANKRUPTCY JUDGE**:

2nd Chance Investments, LLC (the "Debtor") the chapter 11 debtor and debtor-in-possession in the above-captioned bankruptcy case, respectfully moves this Court, pursuant to 11 U.S.C. §§ 105(a), 363(b), (f), and (m), and Rules 6004(a) and 6007 of the Federal Rules of Bankruptcy Procedure, for an order (1) authorizing the Debtor to sell the estate's right, title, and interest in that certain real property located at 8607 Custer Road, Lakewood, WA 98499 (the "Property"); (2) approving the overbid procedure set forth in this motion; (3) approving the payment of the real estate brokers' commissions; (4) finding that the purchasers are good faith purchasers; and (5) waiving the stay under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Motion").

The Debtor received an offer to purchase the Property from Gustavo Alverez and Gabriela Yerena (the "Purchasers") for $400,500 (the "Purchase Price"). This Motion is brought to authorize the sale of the Property to the Purchasers. Furthermore, the Debtor moves the Court for an order authorizing the following overbid procedures: (1) any person interested in submitting an overbid on the Property must attend the hearing on the Motion or be represented by an individual with authority to participate in the overbid process; (2) an overbid will be defined as an initial overbid of $10,000 above the Purchase Price, with each additional bid in $5,000 increments; (3) overbidders (except for the Purchasers) must deliver a deposit to the Debtor's counsel by way of cashier's check made payable to "2nd Chance Investment Group, LLC," in the amount of $20,000 (the "Deposit") and proof of ability to close escrow unconditionally in a form acceptable to the Debtor at least seven days prior to the hearing on the Motion; (4) overbidders must purchase the Property on the same terms and conditions as the Purchasers; (5) the Deposit of the successful overbidder shall be forfeited if such party is thereafter unable to complete the purchase of the Property within 15 calendar days of entry of an order confirming the sale; and (6) in the event the successful overbidder cannot timely complete the purchase of the Property, the Debtor shall be authorized to proceed with the sale to the next highest overbidder.

In support of this Motion, the Debtor will rely on these moving papers, the Memorandum of Points and Authorities and Declarations of David M. Goodrich, Anna Matsunaga, Gustavo Alverez, and Gabriela Yerena attached hereto, the other pleadings and orders already on file in this case, and on such other argument and evidence as may be presented by counsel at the time of the hearing.

DATED: September 6, 2023                    FINANCIAL RELIEF LAW CENTER, APC

By:/s/ Richard Sturdevant
                                           Richard Sturdevant
                              Attorneys for 2nd Chance Investment Group, LLC
                                        Debtor in Possession

### MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS AND OVERBID PROCEDURES

**A.  Background on Case**

A Voluntary Petition was filed by 2nd Chance Investment Group, LLC, the debtor in possession ("Debtor"), on December 21, 2022. On March 1, 2023, the court approved David Goodrich ("Goodrich") to serve in the capacity of the Debtor's chief restructuring officer. Goodrich is authorized to manage and oversee the affairs of the Debtor, including supervising the Debtor's financial affairs and outside consultants.

**B.      Employment of Broker**

On April 24, 2023, the Debtor filed its application to employ Keller Williams Realty Tacoma ("Broker") to market and sell the Property [Doc# 118].  The application was approved by Court order entered on May 19, 2023 [Doc# 157]. The Broker Order provides for a total broker's commission aggregating six percent (6%) of the sales price of the Property upon close of escrow.

**C.      Value and Marketing of the Property**

The Broker has extensive experience in marketing and selling real properties.  Based on an investigation of surrounding property values, the length of the listing, and the lack of other offers, the Broker believes the proposed purchase price represents the current fair market value of the Property.  *See* attached Matsunaga Declaration.  The Broker has actively marketed the Property since May 2023 and has listed the Property for sale in the Northwest Multiple Listing Service ("MLS").  The listing is also available on various real estate websites.  The Broker has received and responded to a few inquiries regarding the Property and is continuing to market the Property for overbids.  As a result of these efforts, the Broker obtained the Buyer's offer of $400,500.00 for the Property.  Prior to the sale hearing, the Broker will publish the details of the hearing and the overbid procedures in the MLS.  *See* Matsunaga Decl.

4

**D.      Liens and Interests**

A preliminary title report on the Property (the "Title Report"), a true and correct copy of which is attached hereto as <u>Exhibit 2</u> and incorporated herein by reference, has been obtained from Orange Coast Title Company.  The Title Report indicates that the following liens have been recorded against the Property:

| Item No. on Title Report | Lienholder | Nature and Amount of Lien |
|---|---|---|
| 1 | County Assessor's Office | General and Special taxes for the fiscal year 2023. Current Payoff Amount: $3,310.88. |
| 2 | County Assessor's Office | Delinquent taxes for 2022. Current Payoff Amount: $2,020.28. |
| 6 | Loan Funder LLC | Mortgage Deed of Trust recorded on 10/01/2021. Current Payoff Amount: $252,000 |

**E.      Terms of the Proposed Sale**

After the commencement of marketing by the Broker, the Broker presented an acceptable offer to the Debtor.

Subject to Court approval, the Debtor proposes to sell the Property, pursuant to the terms of the Residential Purchase and Sale Agreement thereto between the parties, true and correct copies of which are attached hereto as <u>Exhibit 1</u> and incorporated herein by reference.

The essential terms of the proposed sale are as follows:

· <u>Purchaser</u>: Gustavo Alverez and Gabriela Yerena ("Purchaser").

· <u>Purchase Price</u>: $400,500 ("Purchase Price").

· <u>Condition of Property</u>: Property purchased "as-is" without any representations or warranties of any kind; and Buyer waived inspections of property.

· <u>Brokers' Commissions</u>: six percent (6%).

5

**F.      The Proposed Overbid Procedures**

While the Debtor is prepared to consummate the sale with the Purchasers, it is also interested in obtaining the maximum price for the Property.  Therefore, the Debtor seeks approval of the following overbid procedures: (1) any person interested in submitting an overbid on the Property must attend the hearing on the Motion or be represented by an individual with authority to participate in the overbid process; (2) an overbid will be defined as an initial overbid of $10,000 above the Purchase Price, with each additional bid in $5,000 increments; (3) overbidders (except for the Purchasers) must deliver a deposit to the Debtor's counsel by way of cashier's check made payable to "2nd Chance Investment Group, LLC," in the amount of $20,000 (the "Deposit") and proof of ability to close escrow unconditionally in a form acceptable to the Debtor at least seven days prior to the hearing on the Motion; (4) overbidders must purchase the Property on the same terms and conditions as the Purchasers; (5) the Deposit of the successful overbidder shall be forfeited if such party is thereafter unable to complete the purchase of the Property within 15 calendar days of entry of an order confirming the sale; and (6) in the event the successful overbidder cannot timely complete the purchase of the Property, the Debtor shall be authorized to proceed with the sale to the next highest overbidder.

The Debtor believes that the proposed overbid procedure, notice of which has been given to all creditors and interested parties, will maximize the price ultimately obtained for the Property as well as protect the estate from parties who may wish to participate in the overbid procedure, but who are ultimately unable to consummate the sale transaction. Accordingly, the Debtor requests that the Court authorize the overbid procedure discussed above.

**G.      Distribution To The Estate**

Upon closing of Escrow, the estate shall receive certain funds from the sale as follows:

| | |
|---|---|
| $400,500.00 | Sale price |
| ($252,000) | Deed of Trust held by Loan Funder LLC |
| ($24,030.00) | Broker commissions |
| ($20,529.24) | Title/Taxes/Recording Charges |

6

$104,678.05      Net sale proceeds

| Purchase Price | $400,500.00 |
|---|---|
| Mortgage Deed of Trust | ($252,000) |
| Brokers Commission | ($24,030.00) |
| Escrow, title and related fees | ($8,241.90) |
| Prorated property taxes & utilities | ($5,137.05[1]) |
| Government Recording and Transfer Charges | ($6,413) |
| Net proceeds: | $104,678.05 |

A true and correct copy of the Seller's Estimated Settlement Statement ("Seller's Statement") is attached hereto as Exhibit 3 and incorporated herein by reference. The Seller's Statement provides more detailed confirmation of all debits and credits of the sale.

**H**.      **Brokers Commission**

The brokers' commission is six percent (6%) of the gross sale price and is to be paid directly from escrow upon closing. Seller's broker Keller Williams is to receive 3.35% and buyer's broker Blue Summit Realty LLC is to receive 2.65%.

**I.**      **Notice To Creditors**

Notice of this Motion has been transmitted to the Office of the United States Trustee, all creditors, all potential overbidders, and all other parties receiving ECF and special notice in this case  in accordance with Fed. R. Bankr. P. 2002(a)(2), 6004(a), and is being filed concurrently herewith. Further, the Property is subject to overbid, and the ability of other potentially interested parties to provide competing offers for the Property ensures that the proposed sale will not result in a lucrative "windfall" to the Buyer at the expense of creditor of the Estate.  See *In re Onouli Kona Land Co.*, 846 F.2d 1170 (9th Cir. 1988).

///

///

---

[1] $5,874.34 minus a credit of $737.29.

**J.**     **The Sale is Made in "As-Is" Condition**

Buyer has waived the inspection contingency. The Buyer has acknowledged that the Debtor is selling the property in an "as-is" condition or basis by quitclaim deed without any representation or warranties whatsoever, including without limitation representations or warranties as to title, oil and mineral rights, city or government agency notifications regarding work to be done, marketability of title, ownership, physical condition, compliance with state, city or federal statues, codes, ordinances, or regulations, geological stability, zoning, suitability for improvements on the Property, nor any assurances regarding if the Property is subdivisible.

**K.**     **Tax Consequences of the Proposed Sale**

The capital gains are estimated to be $40,952. The total tax on the capital gains is estimated to be $12,879. The estimated capital gains will be paid by the Debtor's principals Rayson and Sonja Foster, as the Debtor passes through all income to its principals. Rayshon Foster owns 52% of the Debtor and will be allocated 52% of the capital gains taxes. Sonja Foster owns 48% and will be allocated 48% of the capital gains taxes. See Exhibit 4.

**II.**

**ARGUMENT**

**A.**     **The Proposed Sale Is In The Best Interest Of The Estate**

Section 363(b)(1) of the Bankruptcy Code provides that:

> The Debtor, after notice and a hearing, may  use, sell, or lease, other than in the ordinary course of business, property of the estate.

The standard of review used in determining approval of a proposed sale of property is whether sound business reasons support the sale outside the ordinary course of business. In re Walter, 83 B.R. 14, 19 (9th Cir. BAP 1988); In re Lionel Corp., 722 F.2d 1063, 1066 (2d Cir. 1983).  In order for a sale to be approved under section 363 of the Bankruptcy Code, the purchase price must be fair and reasonable.  In re Coastal Indus., Inc., 63 B.R. 361 (Bankr. N.D. Ohio 1986).

In the present case, the Debtor believes that the sale of the Property under the terms and conditions set forth above is supported by sound business reasons and is in the best interest of the estate. Based upon the current real estate market and the other sale transactions in the area, the Debtor believes that the sale price represents the fair market value of the Property. Further, from the net sale proceeds of the Property, the estate is expected to receive $51,161.14 to be held in trust for the allowed unsecured claimants of the bankruptcy estate.

Thus, the proposed sale of the property represents a sound exercise of the Debtor's business judgment. Accordingly, the Debtor should be authorized to sell the Property.

**B.** **The Court Should Find That The Purchaser Is a Purchaser In "Good Faith" In Accordance With Bankruptcy Code Section 363(m)**

As noted above, the Debtor requests as part of the approval of the proposed sale transaction that the Court find that the Purchaser is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. As set forth in the Declarations of Gustavo Alverez, and Gabriela Yerena attached hereto, there is no affiliation between the Purchaser and the Debtor, David M. Goodrich in his capacity as Chief Restructuring Officer, or the estate.

Section 363(m) provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith . . . ." 11 U.S.C. § 363(m). Under section 363(m) of the Bankruptcy Code, "an appeal of a bankruptcy court's ruling on a foreclosure action [or sale] generally cannot affect the rights of a good faith purchasers of the foreclosed property, unless the Debtor [or other complaining party] stays the foreclosure [or other] sale pending an appeal." In re Mann, 907 F.2d 923, 926 (9th Cir. 1990). "[T]he primary goal of the mootness rule [embodied in section 363(m)] 'is to protect the interest of a good faith purchasers . . . of the property,' thereby assuring finality of sales." In re Onouli-Kona Land Co., 846 F.2d 1170, 1173 (9th Cir. 1988) (quoting In re Suchy, 786 F.2d 900, 901-02 (9th Cir. 1985) ); In re Ewell, 958 F.2d 276, 280 (9th Cir. 1992). That goal is important in this case because the Purchaser needs

1    assurance that the purchase of the Property will not be subject to future attack by objecting

2    creditors or a frivolous appeal.

3    **C.**      **The Debtor May Sell Property Free and Clear of Liens, Claims, and**

4              **Interests**

5         The Debtor seeks this Court's authority to sell the Property free and clear of liens

6    pursuant to 11 U.S.C. §§ 363(b) and  (f) of the Bankruptcy Code.  Section 363(b) of the

7    Bankruptcy Code provides that:

8
9
> [t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

10   In addition, 11 U.S.C. § 363(f) provides that:

11

12
13
> [t]he trustee may sell property. . . free and clear of any interest in such property of an entity other than the estate, only if _. . .

14
15
> (1)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;. . .

16
> (2)      such entity consents;. . .

17
18
> (3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

19
> (4)       such interest is in bona fide dispute; or

20
21
> (5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

22        Because subsections (1) through (5) of Bankruptcy Code § 363(f) are written in

23   the disjunctive, authority to sell the Property free and clear of any and all interests

24   therein should be granted if, with respect to each lien holder, any of the conditions are

25   met.

26        Any real property liens and current real estate taxes owed are undisputed unless

27   the payoff demands contains fees, costs, or interests that appear unsubstantiated.  These

28

1  taxes will be paid through escrow at the close of the sale, with the remaining balance

2  paid to the Estate. The Property can be sold free and clear of these liens under § 363(f)

3  (1) and (3) because these liens will be paid in full. The Debtor is not aware of any

4  disputed liens.

5     **D.      The Price is Reasonable Based upon the Debtor's Marketing Efforts**

6     On or about May 2023, the Debtor listed the Property for sale at $400,500.00.  To

7  date, a few parties have inquired about the Property.  The Buyer's offer is the only

8  written offer the Debtor has received for the Property.

9     Based on the Debtor's marketing efforts, the length of time on the market, and the

10 lack of other offers, the Buyer's offer is fair and reasonable.

11    **E.      Waiver Of The Fourteen-Day Waiting Period Set Forth In Bankruptcy**

12          **Rule 6004(h) Is Appropriate In This Case.**

13    Rule 6004(h) of the Federal Rules of Bankruptcy Procedure provides, among other

14 things, that an order authorizing the sale of property is stayed until the expiration of fourteen

15 days after entry of the order, unless the Court orders otherwise.  Here, all parties with a

16 potential lien, claim or interest in the Property have been served with notice of the sale and an

17 opportunity to object and the fourteen-day waiting period could only operate to delay the

18 closing of escrow and receipt by the estate of the estimated net proceeds as detailed above.

19 Under these circumstances, the Court should waive the fourteen-day stay of Bankruptcy Rule

20 6004(h) to permit the Purchasers to proceed with the close of escrow on the sale as soon as

21 possible.

22                    **III**.

23               **CONCLUSION**

24    In light of the foregoing, the Debtor respectfully requests that the Court enter an order

25 as follows:

26    1.      Granting the Motion;

27    2.      Approving the terms of the Purchase Agreement attached as Exhibit 1

28 and authorizing the Trustee to sell the Property to the Successful Bidder, or the Back-Up

Bidder, "as is," "where is," "with all faults," and without warranty or recourse, but free and clear of any and all liens, claims, and interests, together with all improvements, as well as all easements and appurtenances, pursuant to 11 U.S.C. § 363(b) and (f), free and clear of any and all liens.

3.    Authorizing the Debtor to pay, through escrow, from the proceeds of the sale of the Property and without further order of the Court, real property taxes and assessments prorated as of the close of escrow, the above-described broker's commission of 6% of the sales price, and any escrow fees, title insurance premiums and other ordinary and typical closing costs and expenses payable by the Debtor pursuant to the Purchase Agreement or in accordance with local custom, with the remaining balance to be placed in the Debtor's DIP account;

4.    Finding that the Purchaser or the successful overbidder purchased the Property in "good faith," as defined in 11 U.S.C. § 363(m);

5.    Authorizing the return of any Overbid Deposit without further court order to those whose bids are not deemed to be the Successful Bid;

6.    Providing that the Debtor is authorized and empowered to execute and deliver on behalf of the estate any and all documents as reasonably may be necessary to implement the terms of the proposed sale;

7.    Providing that the notice given by the Debtor in connection with the sale and the hearing thereon is adequate, sufficient, proper and complies with all applicable provisions of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure;

8.    Approving the overbid procedure described herein;

9.    Authorizing the payment of unpaid property taxes, valid liens, real estate brokers' commissions, and related sale costs directly from escrow;

10.    Approving the Debtor to take any and all necessary actions to consummate the sale of the Property;

11.    Approving the total broker's commission of six percent (6%) of the sales price of the Property;

12

12. Waiving any requirements for lodging periods of the order approving this Motion imposed by Local Bankruptcy Rule 9021-1 and any other applicable bankruptcy rules;

13. Waiving the 14-day stay prescribed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure; and

14. Granting such other and further relief as is just and appropriate.

DATED: September 6, 2023                    FINANCIAL RELIEF LAW CENTER, APC

By: */s/ Richard Sturdevant*
Richard Sturdevant
Attorneys for 2nd Chance Investment Group, LLC
Debtor in Possession

# <u>DECLARATION OF DAVID M. GOODRICH</u>

I, David M. Goodrich, declare as follows:

1.      I am the duly-appointed, qualified, and acting Chief Restructuring Officer for 2nd Chance Investment Group, LLC (the "Debtor").  I make this declaration in support of the foregoing motion (the "Motion").  Each of the following facts is of my own knowledge, and if called upon and sworn as a witness, I could and would competently testify thereto.  Capitalized terms will have the same meanings as stated in the Motion.

2.      The Debtor filed a voluntary petition on December 21, 2022.

3.      On February 10, 2023, the Debtor filed a motion seeking court approval for the Debtor's services agreement with me to serve as the Debtor's Chief Restructuring Officer [Doc# 42].

4.      On March 1, 2023, the court entered an order approving the Debtor's services agreement with me to serve as the Debtor's chief Restructuring Officer [Doc# 61].

5.      On May 25, 2023, Debtor filed an application to employ Keller Williams Realty Tacoma as real estate broker to market and sell the Property [Doc# 80].  The application was approved by Court order entered on April 13, 2023 [Doc# 102].

6.      After the commencement of marketing by the Brokers, the Broker presented an acceptable offer to Debtor.

7.      Debtor proposes to sell the estate's interest in the Property to Gustavo Alvarez and Gabriela Yerena for $400,500 pursuant to the terms of the Purchase Agreement, a true and correct copy of which are attached hereto as <u>Exhibit 1</u> and incorporated herein by reference.

8.      I believe that the overbid procedure proposed in the Motion, notice of which has been given to all creditors and interested parties, will maximize the price ultimately obtained for the Property as well as protect the estate from parties who may wish to participate in the overbid procedure, but who are ultimately unable to consummate the sale transaction.

9. The Title Report on the Property was obtained from Orange Coast Title Company. A true and correct copy of the Title Report is attached hereto as Exhibit 2 and incorporated herein by reference.

10. The Seller's Estimated Settlement Statement was obtained by American Land Title Association. A true and correct copy of the Seller's Estimated Settlement Statement is attached hereto as Exhibit 3 and incorporated herein by reference.

11. As detailed in the Motion, the estate is estimated to receive $104,678.05 from the net sale proceeds of sale of the Property, which shall be held in trust for the allowed unsecured claimants of this estate. Accordingly, I believe the proposed sale of the Property is in the best interest of the estate.

12. The capital gains are estimated to be $40,952. The total tax on the capital gains is estimated to be $12,879. The estimated capital gains will be paid by the Debtor's principals Rayson and Sonja Foster, as the Debtor passes through all income to its principals. Rayshon Foster owns 52% of the Debtor and will be allocated 52% of the capital gains taxes. Sonja Foster owns 48% and will be allocated 48% of the capital gains taxes.

13. Grobstein Teeple are the employed by the estate as the Debtor's financial advisors. At my request, Grobstein Teeple prepared a report analyzing the property capital gains tax. Attached hereto as Exhibit 4 is a true and correct copy of capital gains tax analysis report.

I declare under penalty of perjury, under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on ~~August 30~~, September 5 2023, at Costa Mesa, California.

David M. Goodrich

15

EXHIBIT 1





©Copyright 2022
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

# RESIDENTIAL PURCHASE AND SALE AGREEMENT
## Specific Terms

Residential PSA
Rev. 10/22
Page 1 of 6

1.  Date: May 29, 2023          MLS No.: 2071523          Offer Expiration Date: 6/8/2023

2.  Buyer: Gustavo Alverez                Gabriela Verena              A married couple
            Buyer                          Buyer                        Status

3.  Seller: 2nd Chance investment Grp, Llc      David Goodrich (Signer)
            Seller                              Seller

4.  Property: Legal Description attached as Exhibit A.  Tax Parcel No(s).: 022034-1-080

    8607    Custer              Lakewood        Pierce              WA    98499
    Address                     City            County              State  Zip

5.  Included Items: ☑ stove/range; ☑ refrigerator; ☑ washer; ☑ dryer; ☑ dishwasher; ☑ hot tub; ☐ fireplace insert;
    ☑ wood stove; ☑ satellite dish; ☐ security system; ☐ attached television(s); ☐ attached speaker(s); ☐ microwave;
    ☑ generator; ☐ other

6.  Purchase Price: $ 400,500.00        Four Hundred Thousand Five Hundred                        Dollars

7.  Earnest Money: $ 20,000.00          ☑ Check; ☐ Note; ☐ Wire; ☐ Other
    Delivery Date 3    days after mutual acceptance; to be held by ☐ Buyer Brokerage Firm; ☑ Closing Agent.

8.  Default: (check only one) ☑ Forfeiture of Earnest Money; ☐ Seller's Election of Remedies.

9.  Title Insurance Company: sellers choice

10. Closing Agent: sellers choice                            sellers choice
                    Company                                  Individual (optional)

11. Closing Date: 7/4/2023                    ; Possession Date: ☑ on Closing; ☐ Other

12. Services of Closing Agent for Payment of Utilities: ☑ Requested (attach NWMLS Form 22K) ☐ Waived

13. Charges/Assessments Levied Before but Due After Closing: ☐ assumed by Buyer; ☑ prepaid in full by Seller at Closing

14. Seller Citizenship (FIRPTA): Seller ☐ is; ☑ is not a foreign person for purposes of U.S. income taxation

15. Agency Disclosure: Buyer represented by: ☑ Buyer Broker; ☐ Buyer/Listing Broker (dual agent); ☐ unrepresented
                        Seller represented by: ☑ Listing Broker; ☐ Listing/Buyer Broker (dual agent); ☐ unrepresented

16. Buyer Brokerage Firm Compensation: %    2.65        ☑ Pay as Offered or ☐ Other – See Addendum
                                        $ or %   Amount Offered in Listing

17. Addenda: 22A(Financing)        22D(Optional Clauses)    22T(Title Contingency)    35W(Inspection Waiver)


GA                              6/5/23                              6/5/23
Buyer Signature                 Date        Seller Signature        Date

GVM                             6/5/23
Buyer Signature                 Date        Seller Signature        Date

Buyer Address                               Seller Address

City, State, Zip                            City, State, Zip
                                            (951) 454-5454
Buyer Phone No.          Fax No.            Seller Phone No.          Fax No.
gustavo-alv@outlook.com
Buyer E-mail Address                        Seller E-mail Address

Blue Summit Realty LLC              2749    Keller Williams Tacoma            9271
Buyer Brokerage Firm         MLS Office No. Listing Brokerage Firm    MLS Office No.
Jared Mausten                     114813    Anna Matsunaga                   37828
Buyer Broker (Print)          MLS LAG No.   Listing Broker (Print)     MLS LAG No.
(360) 688-4073    (253) 579-4964  (360) 528-8197    (253) 460-8640   (253) 212-1252
Firm Phone No.    Broker Phone No.  Firm Fax No.    Firm Phone No.   Broker Phone No.   Firm Fax No.
offers@bluesummitrealty.com                 Tacomadb@benkinney.com
Firm Document E-mail Address                Firm Document E-mail Address
jaredmausten@gmail.com                      anna@teammomentumrealestate.com
Buyer Broker E-mail Address                 Listing Broker E-mail Address

Form 21
Residential PSA
Rev. 10/22
Page 2 of 6

**RESIDENTIAL PURCHASE AND SALE AGREEMENT**
General Terms

©Copyright 2022
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

a.  **Purchase Price.** Buyer shall pay to Seller the Purchase Price, including the Earnest Money, in cash at Closing, unless otherwise specified in this Agreement. Buyer represents that Buyer has sufficient funds to close this sale in accordance with this Agreement and is not relying on any contingent source of funds, including funds from loans, the sale of other property, gifts, retirement, or future earnings, except to the extent otherwise specified in this Agreement. The parties shall use caution when wiring funds to avoid potential wire fraud. Before wiring funds, the party wiring funds shall take steps to confirm any wire instructions via an independently verified phone number and other appropriate measures.

b.  **Earnest Money.** Buyer shall deliver the Earnest Money by the Delivery Date listed in Specific Term No. 7 (2 days after mutual acceptance if not filled in) to the party holding the Earnest Money (Buyer Brokerage Firm or Closing Agent). If sent by mail, the Earnest Money must arrive at Buyer Brokerage Firm or Closing Agent by the Delivery Date. If the Earnest Money is held by Buyer Brokerage Firm and is over $10,000.00 it shall be deposited into an interest bearing trust account in Buyer Brokerage Firm's name provided that Buyer completes an IRS Form W-9. Interest, if any, after deduction of bank charges and fees, will be paid to Buyer. Buyer shall reimburse Buyer Brokerage Firm for bank charges and fees in excess of the interest earned, if any. If the Earnest Money held by Buyer Brokerage Firm is over $10,000.00 Buyer has the option to require Buyer Brokerage Firm to deposit the Earnest Money into the Housing Trust Fund Account, with the interest paid to the State Treasurer, if both Seller and Buyer so agree in writing. If the Buyer does not complete an IRS Form W-9 before Buyer Brokerage Firm must deposit the Earnest Money or the Earnest Money is $10,000.00 or less, the Earnest Money shall be deposited into the Housing Trust Fund Account. Buyer Brokerage Firm may transfer the Earnest Money to Closing Agent at Closing. If all or part of the Earnest Money is to be refunded to Buyer and any such costs remain unpaid, the Buyer Brokerage Firm or Closing Agent may deduct and pay them therefrom. The parties instruct Closing Agent to provide written verification of receipt of the Earnest Money and notice of dishonor of any check to the parties and Brokers at the addresses and/or fax numbers provided herein.

Upon termination of this Agreement, a party or the Closing Agent may deliver a form authorizing the release of Earnest Money to the other party or the parties. The party(s) shall execute such form and deliver the same to the Closing Agent. If either party fails to execute the release form, a party may make a written demand to the Closing Agent for the Earnest Money. Pursuant to RCW 64.04, Closing Agent shall deliver notice of the demand to the other party within 15 days. If the other party does not object to the demand within 20 days of Closing Agent's notice, Closing Agent shall disburse the Earnest Money to the party making the demand within 10 days of the expiration of the 20 day period. If Closing Agent timely receives an objection or an inconsistent demand from the other party, Closing Agent shall commence an interpleader action within 60 days of such objection or inconsistent demand, unless the parties provide subsequent consistent instructions to Closing Agent to disburse the earnest money or refrain from commencing an interpleader action for a specified period of time. Pursuant to RCW 4.28.080, the parties consent to service of the summons and complaint for an interpleader action by first class mail, postage prepaid at the party's usual mailing address or the address identified in this Agreement. If the Closing Agent complies with the preceding process, each party shall be deemed to have released Closing Agent from any and all claims or liability related to the disbursal of the Earnest Money. If either party fails to authorize the release of the Earnest Money to the other party when required to do so under this Agreement, that party shall be in breach of this Agreement. For the purposes of this section, the term Closing Agent includes a Buyer Brokerage Firm holding the Earnest Money. The parties authorize the party commencing an interpleader action to deduct up to $500.00 for the costs thereof.

c.  **Included Items.** Any of the following items, including items identified in Specific Term No. 5 if the correct ending box is checked, located in or on the Property are included in the sale: built-in appliances; wall-to-wall carpeting; curtains, drapes and all other window treatments; window and door screens; awnings; storm doors and windows; installed television antennas; ventilating, air conditioning and heating fixtures; trash compactor; garbage disposal; fireplace doors, gas logs and gas log lighters; irrigation fixtures; electric garage door openers; water heaters; installed electrical fixtures; lighting fixtures; shrubs, plants and trees planted in the ground; and other fixtures; and all associated operating remote controls. Unless otherwise agreed, if any of the above items are leased or encumbered, Seller shall acquire clear title before Closing.

d.  **Condition of Title.** Unless otherwise specified in this Agreement, title to the Property shall be marketable at Closing. The following shall not cause the title to be unmarketable: rights, reservations, covenants, conditions and restrictions, presently of record and general to the area; easements and encroachments, not materially affecting the value of or unduly interfering with Buyer's reasonable use of the Property; and reserved oil and/or mining rights. Seller shall not convey or reserve any oil and/or mineral rights after mutual acceptance without Buyer's written consent. Monetary encumbrances or liens not assumed by Buyer, shall be paid or discharged by Seller on or before Closing. Title shall be conveyed by a Statutory Warranty Deed. If this Agreement is for conveyance of a buyer's interest in a Real Estate Contract, the Statutory Warranty Deed shall include a buyer's assignment of the contract sufficient to convey after acquired title.

Buyer's Initials _____ Date _____  Buyer's Initials _____ Date _____  Seller's Initials _____ Date _____  Sellers Initials _____ Date _____

Form 21
Residential PSA
Rev. 10/22
Page 3 of 6

**RESIDENTIAL PURCHASE AND SALE AGREEMENT**
General Terms

©Copyright 2022
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

e. **Title Insurance.** Seller authorizes Buyer's lender or Closing Agent, at Seller's expense, to apply for the then-current 56
ALTA form of Homeowner's Policy of Title Insurance for One-to-Four Family Residence, from the Title Insurance 57
Company. If Seller previously received a preliminary commitment from a Title Insurance Company that Buyer declines 58
to use, Buyer shall pay any cancellation fees owing to the original Title Insurance Company. Otherwise, the party 59
applying for title insurance shall pay any title cancellation fee, in the event such a fee is assessed. If the Title Insurance 60
Company selected by the parties will not issue a Homeowner's Policy for the Property, the parties agree that the Title 61
Insurance Company shall instead issue the then-current ALTA standard form Owner's Policy, together with 62
homeowner's additional protection and inflation protection endorsements, if available. The Title Insurance Company 63
shall send a copy of the preliminary commitment to Seller, Listing Broker, Buyer and Buyer Broker. The preliminary 64
commitment, and the title policy to be issued, shall contain no exceptions other than the General Exclusions and 65
Exceptions in the Policy and Special Exceptions consistent with the Condition of Title herein provided. If title cannot be 66
made so insurable prior to the Closing Date, then as Buyer's sole and exclusive remedy, the Earnest Money shall, 67
unless Buyer elects to waive such defects or encumbrances, be refunded to the Buyer, less any unpaid costs described 68
in this Agreement, and this Agreement shall thereupon be terminated. Buyer shall have no right to specific performance 69
or damages as a consequence of Seller's inability to provide insurable title. 70

f. **Closing and Possession.** This sale shall be closed by the Closing Agent on the Closing Date. If the Closing Date falls 71
on a Saturday, Sunday, legal holiday as defined in RCW 1.16.050, or day when the county recording office is closed, 72
the Closing Agent shall close the transaction on the next day that is not a Saturday, Sunday, legal holiday, or day when 73
the county recording office is closed. "Closing" means the date on which all documents are recorded and the sale 74
proceeds are available to Seller. Seller shall deliver keys and garage door remotes to Buyer on the Closing Date or on 75
the Possession Date, whichever occurs first. Buyer shall be entitled to possession at 9:00 p.m. on the Possession Date. 76
Seller shall maintain the Property in its present condition, normal wear and tear excepted, until the Buyer is provided 77
possession. Seller shall either repair or replace any system or appliance (including, but not limited to plumbing, heat, 78
electrical, and all included items) that becomes inoperative or malfunctions prior to Closing with a system or appliance 79
of at least equal quality. Buyer reserves the right to walk through the Property within 5 days of Closing to verify that 80
Seller has maintained the Property and systems/appliances as required by this paragraph. Seller shall not enter into or 81
modify existing leases or rental agreements, service contracts, or other agreements affecting the Property which have 82
terms extending beyond Closing without first obtaining Buyer's consent, which shall not be unreasonably withheld. If 83
possession transfers at a time other than Closing, the parties shall execute NWMLS Form 65A (Rental 84
Agreement/Occupancy Prior to Closing) or NWMLS Form 65B (Rental Agreement/Seller Occupancy After Closing) (or 85
alternative rental agreements) and are advised of the need to contact their respective insurance companies to assure 86
appropriate hazard and liability insurance policies are in place, as applicable. 87

RCW 19.27.530 requires the seller of any owner-occupied single-family residence to equip the residence with a carbon 88
monoxide alarm(s) in accordance with the state building code before a buyer or any other person may legally occupy 89
the residence following the sale. RCW 43.44.110 requires the seller of a dwelling unit, that does not have at least one 90
smoke detection device, to provide at least one smoke detection device in the unit before the buyer or any other person 91
occupies the unit following a sale. The parties acknowledge that the Brokers are not responsible for ensuring that Seller 92
complies with RCW 19.27.530 or RCW 43.44.110. Buyer and Seller shall hold the Brokers and their Firms harmless 93
from any claim resulting from Seller's failure to install a carbon monoxide alarm(s) or smoke detector(s) in the Property. 94

g. **Section 1031 Like-Kind Exchange.** If either Buyer or Seller intends for this transaction to be a part of a Section 1031 95
like-kind exchange, then the other party shall cooperate in the completion of the like-kind exchange so long as the 96
cooperating party incurs no additional liability in doing so, and so long as any expenses (including attorneys' fees and 97
costs) incurred by the cooperating party that are related only to the exchange are paid or reimbursed to the cooperating 98
party at or prior to Closing. Notwithstanding the Assignment paragraph of this Agreement, any party completing a 99
Section 1031 like-kind exchange may assign this Agreement to its qualified intermediary or any entity set up for the 100
purposes of completing a reverse exchange. 101

h. **Closing Costs and Prorations and Charges and Assessments.** Seller and Buyer shall each pay one-half of the 102
escrow fee unless otherwise required by applicable FHA or VA regulations. Taxes for the current year, rent, interest, and 103
liensable homeowner's association dues shall be prorated as of Closing. Buyer shall pay Buyer's loan costs, including credit 104
report, appraisal charge and lender's title insurance, unless provided otherwise in this Agreement. If any payments are 105
delinquent on encumbrances which will remain after Closing, Closing Agent is instructed to pay such delinquencies at 106
Closing from money due, or to be paid by, Seller. Buyer shall pay for remaining fuel in the fuel tank if, prior to Closing, 107
Seller obtains a written statement from the supplier as to the quantity and current price and provides such statement to the 108
Closing Agent. Seller shall pay all utility charges, including unbilled charges. Unless waived in Specific Term No. 12, Seller 109
and Buyer request the services of Closing Agent in disbursing funds necessary to satisfy unpaid utility charges in 110
accordance with RCW 60.80 and Seller shall provide the names and addresses of all utilities providing service to the 111
Property and having lien rights (attach NWMLS Form 22K Identification of Utilities or equivalent). 112

G.A   6/5/23        G.M   6/5/23        [signature]   6/5/23
Buyer's Initials   Date   Buyer's Initials   Date   Seller's Initials   Date   Seller's Initials   Date

Form 21
Residential PSA
Rev. 10/22
Page 4 of 6

**RESIDENTIAL PURCHASE AND SALE AGREEMENT**
General Terms

©Copyright 2022
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

Buyer is advised to verify the existence and amount of any local improvement district, capacity or impact charges or 113
other assessments that may be charged against the Property before or after Closing. Seller will pay such charges that 114
are or become due on or before Closing. Charges levied before Closing, but becoming due after Closing shall be paid 115
as agreed in Specific Term No. 13. 116

i.   **Sale Information.** Listing Broker and Buyer Broker are authorized to report this Agreement (including price and all 117
terms) to the Multiple Listing Service that published it and to its members, financing institutions, appraisers, and anyone 118
else related to this sale. Buyer and Seller expressly authorize all Closing Agents, appraisers, title insurance companies, 119
and others related to this Sale, to furnish the Listing Broker and/or Buyer Broker, on request, any and all information 120
and copies of documents concerning this sale. 121

j.   **Seller Citizenship and FIRPTA.** Seller warrants that the identification of Seller's citizenship status for purposes of U.S. 122
income taxation in Specific Term No. 14 is correct. Seller shall execute a certification (NWMLS Form 22E or equivalent) 123
under the Foreign Investment in Real Property Tax Act ("FIRPTA") and provide the certification to the Closing Agent 124
within 10 days of mutual acceptance. If Seller is a foreign person for purposes of U.S. income taxation, and this 125
transaction is not otherwise exempt from FIRPTA, Closing Agent is instructed to withhold and pay the required amount 126
to the Internal Revenue Service. 127

If Seller fails to provide the FIRPTA certification to the Closing Agent within 10 days of mutual acceptance, Buyer may 128
give notice that Buyer may terminate the Agreement at any time 3 days thereafter (the "Right to Terminate Notice"). If 129
Seller has not earlier provided the FIRPTA certification to the Closing Agent, Buyer may give notice of termination of 130
this Agreement (the "Termination Notice") any time following 3 days after delivery of the Right to Terminate Notice. If 131
Buyer gives the Termination Notice before Seller provides the FIRPTA certification to the Closing Agent, this Agreement 132
is terminated and the Earnest Money shall be refunded to Buyer. 133

k.   **Notices and Delivery of Documents.** Any notice related to this Agreement (including revocations of offers or 134
counteroffers) must be in writing. Notices to Seller must be signed by at least one Buyer and shall be deemed delivered 135
only when the notice is received by Seller, by Listing Broker, or at the licensed office of Listing Broker. Notices to Buyer 136
must be signed by at least one Seller and shall be deemed delivered only when the notice is received by Buyer, by 137
Buyer Broker, or at the licensed office of Buyer Broker. Documents related to this Agreement, such as NWMLS Form 138
17, Information on Lead-Based Paint and Lead-Based Paint Hazards, Public Offering Statement or Resale Certificate, 139
and all other documents shall be delivered pursuant to this paragraph. Buyer and Seller must keep Buyer Broker and 140
Listing Broker advised of their whereabouts in order to receive prompt notification of receipt of a notice. 141

Facsimile transmission of any notice or document shall constitute delivery. E-mail transmission of any notice or 142
document (or a direct link to such notice or document) shall constitute delivery when: (i) the e-mail is sent to both Buyer 143
Broker and Buyer Brokerage Firm or both Listing Broker and Listing Brokerage Firm at the e-mail addresses specified 144
on page one of this Agreement; or (ii) Buyer Broker or Listing Broker provide written acknowledgment of receipt of the 145
e-mail (an automatic e-mail reply does not constitute written acknowledgment). At the request of either party, or the 146
Closing Agent, the parties will confirm facsimile or e-mail transmitted signatures by signing an original document. 147

l.   **Computation of Time.** Unless otherwise specified in this Agreement, any period of time measured in days and stated in 148
this Agreement shall start on the day following the event commencing the period and shall expire at 9:00 p.m. of the last 149
calendar day of the specified period of time. Except for the Possession Date, if the last day is a Saturday, Sunday or legal 150
holiday as defined in RCW 1.16.050, the specified period of time shall expire on the next day that is not a Saturday, 151
Sunday or legal holiday. Any specified period of 5 days or less, except for any time period relating to the Possession Date, 152
shall not include Saturdays, Sundays or legal holidays. If the parties agree that an event will occur on a specific calendar 153
date, the event shall occur on that date, except for the Closing Date, which, if it falls on a Saturday, Sunday, legal holiday 154
as defined in RCW 1.16.050, or day when the county recording office is closed, shall occur on the next day that is not a 155
Saturday, Sunday, legal holiday, or day when the county recording office is closed. When counting backwards from 156
Closing, any period of time measured in days shall start on the day prior to Closing and if the last day is a Saturday, 157
Sunday or legal holiday as defined in RCW 1.16.050, the specified period of time shall expire on the next day, moving 158
forward, that is not a Saturday, Sunday or legal holiday (e.g. Monday or Tuesday). If the parties agree upon and attach a 159
legal description after this Agreement is signed by the offeree and delivered to the offeror, then for the purposes of 160
computing time, mutual acceptance shall be deemed to be on the date of delivery of an accepted offer or counteroffer to 161
the offeror, rather than on the date the legal description is attached. Time is of the essence of this Agreement. 162

m.  **Integration and Electronic Signatures.** This Agreement constitutes the entire understanding between the parties and 163
supersedes all prior or contemporaneous understandings and representations. No modification of this Agreement shall 164
be effective unless agreed in writing and signed by Buyer and Seller. The parties acknowledge that a signature in 165
electronic form has the same legal effect and validity as a handwritten signature. 166

GA    6/5/23        GYM    6/5/23        [signature]    6/5/23

| Buyer's Initials | Date | Buyer's Initials | Date | Seller's Initials | Date | Seller's Initials | Date |

©Copyright 2022
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

Form 21
Residential PSA
Rev. 10/22
Page 6 of 6

**RESIDENTIAL PURCHASE AND SALE AGREEMENT**
General Terms

**n.** **Assignment.** Buyer may not assign this Agreement, or Buyer's rights hereunder, without Seller's prior written consent, unless the parties indicate that assignment is permitted by the addition of "and/or assigns" on the line identifying the Buyer on the first page of this Agreement.

**o.** **Default.** In the event Buyer fails, without legal excuse, to complete the purchase of the Property, then the following provision, as identified in Specific Term No. 8, shall apply:

    **i.** **Forfeiture of Earnest Money.** That portion of the Earnest Money that does not exceed five percent (5%) of the Purchase Price shall be forfeited to the Seller as the sole and exclusive remedy available to Seller for such failure.

    **ii.** **Seller's Election of Remedies.** Seller may, at Seller's option, (a) keep the Earnest Money as liquidated damages as the sole and exclusive remedy available to Seller for such failure, (b) bring suit against Buyer for Seller's actual damages, (c) bring suit to specifically enforce this Agreement and recover any incidental damages, or (d) pursue any other rights or remedies available at law or equity.

**p.** **Professional Advice and Attorneys' Fees.** Buyer and Seller are advised to seek the counsel of an attorney and a certified public accountant to review the terms of this Agreement. Buyer and Seller shall pay their own fees incurred for such review. However, if Buyer or Seller institutes suit against the other concerning this Agreement, or if the party holding the Earnest Money commences an interpleader action, the prevailing party is entitled to reasonable attorneys' fees and expenses.

**q.** **Offer.** This offer must be accepted by 9:00 p.m. on the Offer Expiration Date, unless sooner withdrawn. Acceptance shall not be effective until a signed copy is received by the other party, by the other party's broker, or at the licensed office of the other party's broker pursuant to General Term k. If this offer is not so accepted, it shall lapse and any Earnest Money shall be refunded to Buyer.

**r.** **Counteroffer.** Any change in the terms presented in an offer or counteroffer, other than the insertion of or change to Seller's name and Seller's warranty of citizenship status, shall be considered a counteroffer. If a party makes a counteroffer, then the other party shall have until 9:00 p.m. on the counteroffer expiration date to accept that counteroffer, unless sooner withdrawn. Acceptance shall not be effective until a signed copy is received by the other party, the other party's broker, or at the licensed office of the other party's broker pursuant to General Term k. If the counteroffer is not so accepted, it shall lapse and any Earnest Money shall be refunded to Buyer.

**s.** **Offer and Counteroffer Expiration Date.** If no expiration date is specified for an offer/counteroffer, the offer/counteroffer shall expire 2 days after the offer/counteroffer is delivered by the party making the offer/counteroffer, unless sooner withdrawn.

**t.** **Agency Disclosure.** Buyer Brokerage Firm, Buyer Brokerage Firm's Designated Broker, Buyer Broker's Branch Manager (if any) and Buyer Broker's Managing Broker (if any) represent the same party that Buyer Broker represents. Listing Brokerage Firm, Listing Brokerage Firm's Designated Broker, Listing Broker's Branch Manager (if any), and Listing Broker's Managing Broker (if any) represent the same party that the Listing Broker represents. If Buyer Broker and Listing Broker are different persons affiliated with the same Firm, then both Buyer and Seller confirm their consent to Designated Broker, Branch Manager (if any) and Managing Broker (if any) representing both parties as dual agents. If Buyer Broker and Listing Broker are the same person representing both parties then both Buyer and Seller confirm their consent to that person and his/her Designated Broker, Branch Manager (if any), and Managing Broker (if any) representing both parties as dual agents. All parties acknowledge receipt of the pamphlet entitled "The Law of Real Estate Agency."

**u.** **Brokerage Firm Compensation.** Seller and Buyer shall pay compensation in accordance with any listing or compensation agreement to which they are a party. The Listing Brokerage Firm's compensation shall be paid as specified in the listing agreement. The Buyer Brokerage Firm's compensation offered in the listing shall be paid by Seller as set forth in this Agreement or any Addendum hereto. If there is any inconsistency between the Buyer Brokerage Firm's compensation offered in the listing and the description of the offered compensation stated in Specific Term No. 16, the terms of the listing shall supersede and control. Seller and Buyer hereby consent to Listing Brokerage Firm or Buyer Brokerage Firm receiving compensation from more than one party. Seller and Buyer hereby assign to Listing Brokerage Firm and Buyer Brokerage Firm, as applicable, a portion of their funds in escrow equal to such compensation and irrevocably instruct the Closing Agent to disburse the compensation directly to the Firm(s). In any action by Listing or Buyer Brokerage Firm to enforce this paragraph, the prevailing party is entitled to court costs and reasonable attorneys' fees. Seller and Buyer agree that the Firms are intended third party beneficiaries under this Agreement.

**v.** **Cancellation Rights/Lead-Based Paint.** If a residential dwelling was built on the Property prior to 1978, and Buyer receives a Disclosure of Information on Lead-Based Paint and Lead-Based Paint Hazards (NWMLS Form 22J) after mutual acceptance, Buyer may rescind this Agreement at any time up to 3 days thereafter.

_G.A. 6/5/23_    _G.Y.A. 6/5/23_    _[signature] D. 4/5/23_

Buyer's Initials   Date    Buyer's Initials   Date    Seller's Initials   Date    Seller's Initials   Date

Form 21
Residential PSA
Rev. 10/22
Page 6 of 6

**RESIDENTIAL PURCHASE AND SALE AGREEMENT**
**General Terms**

©Copyright 2022
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

w. **Information Verification Period.** Buyer shall have 10 days after mutual acceptance to verify all information provided 219
from Seller or Listing Brokerage Firm related to the Property. This contingency shall be deemed satisfied unless Buyer 220
gives notice identifying the materially inaccurate information within 10 days of mutual acceptance. If Buyer gives timely 221
notice under this section, then this Agreement shall terminate and the Earnest Money shall be refunded to Buyer. 222

x. **Property Condition Disclaimer.** Buyer and Seller agree, that except as provided in this Agreement, all representations 223
and information regarding the Property and the transaction are solely from the Seller or Buyer, and not from any Broker. 224
The parties acknowledge that the Brokers are not responsible for assuring that the parties perform their obligations 225
under this Agreement and that none of the Brokers has agreed to independently investigate or confirm any matter 226
related to this transaction except as stated in this Agreement, or in a separate writing signed by such Broker. In 227
addition, Brokers do not guarantee the value, quality or condition of the Property and some properties may contain 228
building materials, including siding, roofing, ceiling, insulation, electrical, and plumbing, that have been the subject of 229
lawsuits and/or governmental inquiry because of possible defects or health hazards. Some properties may have other 230
defects arising after construction, such as drainage, leakage, pest, rot and mold problems. In addition, some properties 231
may contain soil or other contamination that is not readily apparent and may be hazardous. Brokers do not have the 232
expertise to identify or assess defective or hazardous products, materials, or conditions. Buyer is urged to use due 233
diligence to inspect the Property to Buyer's satisfaction and to retain inspectors qualified to identify the presence of 234
defective or hazardous materials and conditions and evaluate the Property as there may be defects and hazards that 235
may only be revealed by careful inspection. Buyer is advised to investigate whether there is a sufficient water supply to 236
meet Buyer's needs. Buyer is advised to investigate the cost of insurance for the Property, including, but not limited to 237
homeowner's, fire, flood, earthquake, landslide, and other available coverage. Buyer acknowledges that local 238
ordinances may restrict short term rentals of the Property. Buyer and Seller acknowledge that home protection plans 239
may be available which may provide additional protection and benefit to Buyer and Seller. Brokers may assist the 240
parties with locating and selecting third party service providers, such as inspectors or contractors, but Brokers cannot 241
guarantee or be responsible for the services provided by those third parties. The parties shall exercise their own 242
judgment and due diligence regarding third-party service providers. 243

Form 22A
Financing Addendum
Rev. 9/21
Page 1 of 3

**FINANCING ADDENDUM TO
PURCHASE & SALE AGREEMENT**

©Copyright 2021
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

The following is part of the Purchase and Sale Agreement dated ___May 29, 2023___    1

between  __Gustavo Alverez__ _____ __Gabriela Verena__ _____ ("Buyer")  2
                  Buyer                                                    Buyer

and __2nd Chance investment Grp, Llc__ _____ __David Goodrich (Signer)__ _____ ("Seller")  3
              Seller                                              Seller

concerning __8607      Custer__ _____ __Lakewood__ _____ __WA__ __98499__ (the "Property").  4
                    Address                                  City                State  Zip

## 1. LOAN APPLICATION.                                                                   5

    **a. Loan Application.** This Agreement is contingent on Buyer obtaining the following type of loan or loans to  6
purchase the Property (the "Loan(s)"): ☑ Conventional First; ☐ Conventional Second; ☐ Bridge; ☐ VA; ☐ FHA;  7
☐ USDA; ☐ Home Equity Line of Credit; ☐ Other _____  8
(the "Financing Contingency"). Buyer shall pay ☐ $ _____; or ☑ __20__ % of the Purchase  9
Price down, in addition to the Loans. Buyer shall make application for the Loans to pay the balance of the  10
Purchase Price and pay the application fee, if required, for the subject Property within _____ days (5 days if  11
not filled in) after mutual acceptance of this Agreement. For the purposes of this Addendum, "application" means  12
the submission of Buyer's financial information for the purposes of obtaining an extension of credit including  13
Buyer's name, income, social security number (if required), the Property address, purchase price, and the loan  14
amount. If not waived, the Financing Contingency shall survive the Closing Date.  15

    **b. Waiver of Financing Contingency.** If Buyer (i) fails to make application for financing for the Property within  16
the agreed time; (ii) changes the type of loan at any time without Seller's prior written consent; or (iii) changes  17
the lender without Seller's prior written consent after the agreed upon time to apply for financing expires, then  18
the Financing Contingency shall be deemed waived. Buyer's waiver of the Financing Contingency under this  19
Paragraph 1(b) also constitutes waiver of Paragraph 5 (Appraisal Less Than Sales Price). For purposes of this  20
Addendum, "lender" means either the party to whom the application was submitted or the party funding the  21
loan. Buyer authorizes Listing Broker and Seller to inquire about the status of Buyer's loan approval with lender  22
any time prior to Closing. Buyer will execute an authorization form, if required by lender, to accomplish the  23
same.  24

## 2. FINANCING CONTINGENCY. Select "a" or "b" ("a" if neither is selected).                 25

    **a.** ☐  **Seller's Notice to Perform.**                                              26

        **i. Notice to Perform.** At any time _____ days (21 days if not filled in) after mutual acceptance, Seller  27
may give "Notice to Perform" requesting that Buyer waive the Financing Contingency and that Seller may  28
give notice to terminate the Agreement at any time 3 days after delivery of that notice if Buyer does not  29
earlier waive the Financing Contingency. NWMLS Form 22AR shall be used for this notice.  30

        **ii. Notice of Termination.** If Buyer has not previously waived the Financing Contingency, Seller may give  31
"Notice of Termination" of this Agreement any time 3 days after delivery of Notice to Perform. If Seller gives  32
Notice of Termination and Buyer has waived the Financing Contingency, this Agreement is terminated  33
and the Earnest Money shall be refunded to Buyer. NWMLS Form 22AR shall be used for this notice.  34

        **iii. Appraisal Less Than Sales Price.** Buyer's waiver of the Financing Contingency under this Paragraph 2(a)  35
☐ will; or ☐ will not (will not, if not filled in) constitute waiver of Paragraph 5 (Appraisal Less Than Sales Price).  36

    **b.** ☐  **Automatic Waiver of Financing Contingency.**                                    37

        **i. Waiver.** The Financing Contingency shall conclusively be deemed waived unless within _____ days (21  38
days if not filled in) after mutual acceptance, Buyer gives notice of termination of this Agreement. If Buyer  39
gives timely notice of termination, the Earnest Money shall be refunded to Buyer after Buyer delivers written  40
confirmation from Buyer's lender as required by Paragraph 4.  41

        **ii. Appraisal Less Than Sales Price.** Buyer's waiver of the Financing Contingency under this Paragraph 2(b)  42
☐ will; or ☐ will not (will not, if not filled in) constitute waiver of Paragraph 5 (Appraisal Less Than Sales Price).  43

_GA_  _5/29/23_      _GVA_  _5/29/23_      X_____  _6/1/23_      _____  _____
Buyer's Initials  Date      Buyer's Initials  Date      Seller's Initials  Date      Seller's Initials  Date

hentisign ID:1028E49C-8DFE-ED11-807A-6045BDD47FEA

Form 22A
Financing Addendum
Rev. 3/21
Page 2 of 3

**FINANCING ADDENDUM TO
PURCHASE & SALE AGREEMENT**

©Copyright 2021
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

3. **LOAN COST PROVISIONS.** Seller shall pay up to ☒ $ __0__ ; or ☐ ____% of the Purchase Price  44
($0.00 if not filled in), which shall be applied to Buyer's Loan(s) and settlement costs, including prepaids, loan  45
discount, loan fee, interest buy down, financing, closing or other costs allowed by lender. That amount shall include  46
the following costs that lender is prohibited from collecting from Buyer: (a) up to $300.00 for Buyer's Loan(s) and  47
settlement costs for FHA/USDA/VA loans; and (b) unless agreed otherwise below, Buyer's share of the escrow fee  48
for a VA loan. Seller shall pay the costs for (a) and (b), even if the amount agreed upon in this Paragraph 3 is  49
insufficient to pay for those costs. If checked, ☐ Buyer shall pay Buyer's share of the escrow fee for the VA loan  50
(note that VA regulations prohibit Buyer from paying loan and settlement costs exceeding one percent of the amount  51
of the loan).  52

4. **EARNEST MONEY.** If Buyer has not waived the Financing Contingency, and is unable to obtain financing by  53
Closing after a good faith effort then, on Buyer's notice, this Agreement shall terminate. The Earnest Money shall  54
be refunded to Buyer after lender confirms in writing (a) the date Buyer's loan application for the Property was  55
made, including a copy of the loan estimate that was provided to Buyer; (b) that Buyer possessed sufficient funds  56
to close (e.g. down payment, closing costs, etc.); and (c) the reasons Buyer was unable to obtain financing by  57
Closing. If Seller terminates this Agreement, the Earnest Money shall be refunded without need for such  58
confirmation.  59

5. **APPRAISAL LESS THAN SALE PRICE.**  60

   a. **Notice of Low Appraisal.** If lender's appraised value of the Property is less than the Purchase Price, Buyer  61
   may, within 3 days after receipt of a copy of lender's appraisal, give notice of low appraisal, which shall include  62
   a copy of lender's appraisal. NWMLS Form 22AN may be used for the notices in this Paragraph 5.  63

   b. **Seller's Response.** Seller shall, within 10 days after Buyer's notice of low appraisal, give notice of:  64

      i. A reappraisal or reconsideration of value, at Seller's expense, by the same appraiser or another appraiser  65
      acceptable to lender, in an amount not less than the Purchase Price. Buyer shall promptly seek lender's  66
      approval of such reappraisal or reconsideration of value. The parties are advised that lender may elect not  67
      to accept a reappraisal or reconsideration of value;  68

      ii. Seller's consent to reduce the Purchase Price to an amount not more than the amount specified in the  69
      appraisal or reappraisal by the same appraiser, or an appraisal by another appraiser acceptable to lender,  70
      whichever is higher. (This provision is not applicable if this Agreement is conditioned on FHA, VA, or USDA  71
      financing. FHA, VA, and USDA financing does not permit the Buyer to be obligated to buy if the Seller reduces  72
      the Purchase Price to the appraised value. Buyer, however, has the option to buy at the reduced price.);  73

      iii. Seller's proposal to reduce the Purchase Price to an amount more than the amount specified in the  74
      appraisal and for Buyer to pay the necessary additional funds (the amount the reduced Purchase Price  75
      exceeds the appraised value) to close the sale; or  76

      iv. Seller's rejection of Buyer's notice of low appraisal.  77

   If Seller timely delivers notice of (i) reappraisal or reconsideration of value; or (ii) consent to reduce the Purchase  78
   Price to an amount not more than the amount specified in the appraisal (except for FHA, VA, or USDA  79
   financing), and lender accepts Seller's response, then Buyer shall be bound by Seller's response.  80

   c. **Buyer's Reply.**  81

      i. Buyer shall have 3 days from either Seller's notice of rejection of low appraisal or, if Seller fails to respond,  82
      the day Seller's response period ends, whichever is earlier, to (a) waive the Financing Contingency; or (b)  83
      terminate the Agreement, in which event the Earnest Money shall be refunded to Buyer.  84

      ii. If Seller proposes to reduce the Purchase Price to an amount more than the appraised value, Buyer shall  85
      have 3 days to (a) accept and represent that Buyer has sufficient funds to close the sale in accordance with  86
      this provision; or (b) terminate the Agreement, in which event the Earnest Money shall be refunded to Buyer.  87

      iii. If Seller consents to reduce the Purchase Price to an amount not more than the appraised value for FHA, VA,  88
      or USDA financing, Buyer shall have 3 days to (a) give notice that Buyer will buy at the reduced price; or (b)  89
      terminate the Agreement, in which event the Earnest Money shall be refunded to Buyer.  90

   Buyer's inaction during this reply period shall result in termination of the Agreement and return of the Earnest  91
   Money to Buyer. The Closing Date shall be extended as necessary to accommodate the foregoing times for  92
   notices.  93

| Buyer's Initials | Date | Buyer's Initials | Date | Seller's Initials | Date | Seller's Initials | Date |
|---|---|---|---|---|---|---|---|
| G-A | 5/29/23 | G-A | 5/29/23 | | 6/6/23 | | |

hentisign ID: 1028E49C-6DFE-ED11-907A-6045BDD47FEA

Form 22A
Financing Addendum
Rev. 3/21
Page 3 of 3

**FINANCING ADDENDUM TO
PURCHASE & SALE AGREEMENT**

©Copyright 2021
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

6. **INSPECTION.** Seller shall permit inspections required by lender, including but not limited to structural, pest, heating, plumbing, roof, electrical, septic, and well inspections. Seller is not obligated to pay for such inspections unless otherwise agreed.    94 / 95 / 96

7. **FHA/VA/USDA - Appraisal Certificate.** If this Agreement is contingent on Buyer obtaining FHA, VA, or USDA financing, notwithstanding any other provisions of this Agreement, Buyer is not obligated to complete the purchase of the Property unless Buyer has been given in accordance with HUD/FHA, VA, or USDA requirements a written statement by FHA, VA, USDA or a Direct Endorsement lender, setting forth the appraised value of the Property (excluding closing costs). Seller and Buyer shall execute a document setting forth the prior provision, or similar provision, known as the FHA, VA, or USDA amendatory clause, as required by lender. Buyer shall pay the costs of any appraisal. If the appraised value of the Property is less than the Purchase Price, Buyer may give the notice of low appraisal in Paragraph 5.    97 / 98 / 99 / 100 / 101 / 102 / 103 / 104

**Purpose of Appraisal.** The appraised valuation is arrived at only to determine the maximum mortgage FHA, VA, or USDA will insure. FHA, VA, or USDA do not warrant the value or the condition of the Property. Buyer agrees to satisfy himself/herself that the price and condition of the Property are acceptable.    105 / 106 / 107

8. **VA Amendatory Clause.** If the Buyer is obtaining VA financing, it is expressly agreed that, notwithstanding any other provisions of this contract, the purchaser shall not incur any penalty by forfeiture of earnest money or otherwise be obligated to complete the purchase of the property described herein, if the contract purchase price or cost exceeds the reasonable value of the property established by the Department of Veterans Affairs. The purchaser shall, however, have the privilege and option of proceeding with the consummation of this contract without regard to the amount of the reasonable value established by the Department of Veterans Affairs.    108 / 109 / 110 / 111 / 112 / 113

9. **EXTENSION OF CLOSING.** If, through no fault of Buyer, lender is required by 12 CFR 1026 to give corrected disclosures to Buyer due to (a) a change in the Annual Percentage Rate ("APR") of Buyer's Loan(s) by .125% or more for a fixed rate loan or .250% or more for an adjustable rate loan; (b) a change in the loan product; or (c) the addition of a prepayment penalty, then upon notice from Buyer, the Closing Date shall be extended for up to 4 days to accommodate the requirements of Regulation Z of the Truth in Lending Act. This paragraph shall survive Buyer's waiver of this Financing Contingency.    114 / 115 / 116 / 117 / 118 / 119

| _G.A_ 5/29/23 | _G-A_ 5/29/23 | _X_ 4/1/24 | |
|---|---|---|---|
| Buyer's Initials   Date | Buyer's Initials   Date | Seller's Initials   Date | Seller's Initials   Date |

Form 22D
Optional Clauses Addendum
Rev. 3/21
Page 1 of 2

©Copyright 2021
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

## OPTIONAL CLAUSES ADDENDUM TO
## PURCHASE & SALE AGREEMENT

The following is part of the Purchase and Sale Agreement dated ___May 29, 2023_____ 1

between __Gustavo Alverez_____ __Gabriela Yerena_____ ("Buyer")  2
          Buyer                          Buyer

and __2nd Chance Investment Grp, Llc____ __David Goodrich (Signer)_____ ("Seller")  3
      Seller                            Seller

concerning __8607   Custer_____ __Lakewood____ __WA__ __98499__ (the "Property").  4
     Address                 City         State   Zip

**CHECK IF INCLUDED:**                                                             5

1. ☑ **Square Footage/Lot Size/Encroachments.** The Listing Broker and Buyer Broker make no representations 6
concerning: (a) the lot size or the accuracy of any information provided by the Seller; (b) the square footage of 7
any improvements on the Property; (c) whether there are any encroachments (fences, rockeries, buildings) on 8
the Property, or by the Property on adjacent properties. Buyer is advised to verify lot size, square footage and 9
encroachments to Buyer's own satisfaction. 10

2. **Title Insurance.** The Title Insurance clause in the Agreement provides Seller is to provide the then-current ALTA 11
form of Homeowner's Policy of Title Insurance. The parties have the option to provide less coverage by selecting 12
a Standard Owner's Policy or more coverage by selecting an Extended Coverage Policy: 13

     ☐ **Standard Owner's Coverage.** Seller authorizes Buyer's lender or Closing Agent, at Seller's expense, to 14
         apply for the then-current ALTA form of Owner's Policy of Title Insurance, together with homeowner's 15
         additional protection and inflation protection endorsements, if available at no additional cost, rather than 16
         the Homeowner's Policy of Title Insurance. 17

     ☐ **Extended Coverage.** Seller authorizes Buyer's lender or Closing Agent, at Seller's expense to apply for 18
         an ALTA or comparable Extended Coverage Policy of Title Insurance, rather than the Homeowner's 19
         Policy of Title Insurance. Buyer shall pay the increased costs associated with the Extended Coverage 20
         Policy, including the excess premium over that charged for Homeowner's Policy of Title Insurance and 21
         the cost of any survey required by the title insurer. 22

3. ☐ **Seller Cleaning.** Seller shall clean the interiors of any structures and remove all trash, debris and rubbish 23
from the Property prior to Buyer taking possession. 24

4. ☑ **Personal Property.** Unless otherwise agreed, Seller shall remove all personal property from the Property 25
not later than the Possession Date. Any personal property remaining on the Property thereafter shall become 26
the property of Buyer, and may be retained or disposed of as Buyer determines. 27

5. ☑ **Utilities.** To the best of Seller's knowledge, Seller represents that the Property is connected to: 28
☑ public water main; ☑ public sewer main; ☐ septic tank; ☐ well (specify type) _____ ; 29
☐ irrigation water (specify provider) _____ ; ☑ natural gas; ☐ telephone; ☑ electricity; 30
☐ cable (specify provider) _____ ; ☐ internet (specify provider) _____ ; 31
☐ other _____ . 32

6. ☐ **Insulation – New Construction.** If this is new construction, Federal Trade Commission Regulations require 33
the following to be filled in. If insulation has not yet been selected, FTC regulations require Seller to furnish 34
Buyer the information below in writing as soon as available: 35

WALL INSULATION: TYPE: _____ THICKNESS: _____ R-VALUE: _____ 36

CEILING INSULATION: TYPE: _____ THICKNESS: _____ R-VALUE: _____ 37

OTHER INSULATION DATA: _____ 38

_G-A_ _5/29/23_    _G-Y_ _5/29/23_    _XXX_ _6/1/23_           
Buyer's Initials   Date     Buyer's Initials    Date     Seller's Initials    Date     Seller's Initials    Date

Authentisign ID: 1026E49C-6DFE-ED11-907A-9045BDD47FEA

Form 22D
Optional Clauses Addendum
Rev. 3/21
Page 2 of 2

©Copyright 2021
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

## OPTIONAL CLAUSES ADDENDUM TO
## PURCHASE & SALE AGREEMENT
*Continued*

**7. ☐ Leased Property Review Period and Assumption.** Buyer acknowledges that Seller leases the following 39
items of personal property that are included with the sale: ☐ propane tank; ☐ security system; ☐ satellite 40
dish and operating equipment; ☐ other _____ 41

Seller shall provide Buyer a copy of the lease for the selected items within _____ days (5 days if not filled 42
in) of mutual acceptance. If Buyer, in Buyer's sole discretion, does not give notice of disapproval within 43
_____ days (5 days if not filled in) of receipt of the lease(s) or the date that the lease(s) are due, whichever 44
is earlier, then this lease review period shall conclusively be deemed satisfied (waived) and at Closing, Buyer 45
shall assume the lease(s) for the selected item(s) and hold Seller harmless from and against any further 46
obligation, liability, or claim arising from the lease(s), if the lease(s) can be assumed. If Buyer gives timely 47
notice of disapproval, then this Agreement shall terminate and the Earnest Money shall be refunded to Buyer. 48

**8. ☐ Homeowners' Association Review Period.** If the Property is subject to a homeowners' association or any 49
other association, then Seller shall, at Seller's expense, provide Buyer a copy of the following documents (if 50
available from the Association) within _____ days (10 days if not filled in) of mutual acceptance: 51
   a. Association rules and regulations, including, but not limited to architectural guidelines; 52
   b. Association bylaws and covenants, conditions, and restrictions (CC&Rs); 53
   c. Association meeting minutes from the prior two (2) years; 54
   d. Association Board of Directors meeting minutes from the prior six (6) months; and 55
   e. Association financial statements from the prior two (2) years and current operating budget. 56

If Buyer, in Buyer's sole discretion, does not give notice of disapproval within _____ days (5 days if not 57
filled in) of receipt of the above documents or the date that the above documents are due, whichever is 58
earlier, then this homeowners' association review period shall conclusively be deemed satisfied (waived). If 59
Buyer gives timely notice of disapproval, then this Agreement shall terminate and the Earnest Money shall be 60
refunded to Buyer. 61

**9. ☐ Homeowners' Association Transfer Fee.** If there is a transfer fee imposed by the homeowners' association 62
or any other association (e.g. a "move-in" or "move-out" fee), the fee shall be paid by the party as provided for 63
in the association documents. If the association documents do not provide which party pays the fee, the fee 64
shall be paid by ☐ Buyer; ☐ Seller (Seller if not filled in). 65

**10. ☐ Excluded Item(s).** The following item(s), that would otherwise be included in the sale of the Property, is 66
excluded from the sale ("Excluded Item(s)"). Seller shall repair any damage to the Property caused by the 67
removal of the Excluded Item(s). Excluded Item(s): 68

_____ 69
_____ 70

**11. ☐ Home Warranty.** Buyer and Seller acknowledge that home warranty plans are available which may provide 71
additional protection and benefits to Buyer and Seller. Buyer shall order a one-year home warranty as follows: 72
   a. Home warranty provider: _____ 73
   b. Seller shall pay up to $_____ ($0.00 if not filled in) of the cost for the home warranty, together 74
     with any included options, and Buyer shall pay any balance. 75
   c. Options to be included: _____ 76
   _____ (none, if not filled in). 77
   d. Other: _____, 78

**12. ☐ Other.** 79

80
81
82
83
84
85

___G.A.___ _5/29/23_   ___G.A.___ _5/29/23_   __X___ _4/6/23_   _____ _____
Buyer's Initials   Date   Buyer's Initials   Date   Seller's Initials   Date   Seller's Initials   Date

uthansign ID: 1025E49C-6DFE-ED11-907A-6045BDD47FEA

Form 35W
Inspection Waiver Addendum
Rev. 3/21
Page 1 of 1

**INSPECTION WAIVER ADDENDUM TO**
**PURCHASE AND SALE AGREEMENT**

©Copyright 2021
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

The following is part of the Purchase and Sale Agreement dated ___May 29, 2023___ 1

between __Gustavo Alverez__                    __Gabriela Yerena__                    ("Buyer") 2
               Buyer                                              Buyer

and __2nd Chance investment Grp, Llc__          __David Goodrich (Signer)__          ("Seller") 3
               Seller                                            Seller

concerning __8607        Custer__          __Lakewood__        __WA   98499__    (the "Property"). 4
                    Address                        City              State   Zip

1. ☒ **WAIVER OF INSPECTION.** Buyer has been advised to obtain inspections of the Property including, but not  5
limited to, the structural, mechanical and general condition of the improvements on the Property, compliance  6
with building and zoning codes, an inspection of the Property for hazardous materials, a pest inspection, and  7
a soils/stability inspection. Buyer elects to waive the right to obtain inspections of the Property and purchase  8
the Property in its present condition. Buyer has not relied on representations by Seller, Listing Broker, or Buyer  9
Broker with regard to the condition of the Property, the suitability of the Property for Buyer's intended use, or  10
Buyers decision to forego inspections.  11

2. ☐ **PRE-INSPECTION CONDUCTED.** Buyer, prior to mutual acceptance of this Agreement, conducted  12
inspections of the Property and the improvements on the Property including, but not limited to, the structural,  13
mechanical and general condition of the improvements on the Property, compliance with building and zoning  14
codes, an inspection of the Property for hazardous materials, a pest inspection, and a soils/stability inspection.  15
This Agreement is not conditioned on the results of such inspections and Buyer acknowledges that the decision  16
to purchase the Property is based on Buyer's prior inspection and that Buyer has not relied on representations  17
by Seller, Listing Broker or Buyer Broker with regard to the condition of the Property or the suitability of the  18
Property for Buyer's intended use. Buyer shall not provide the inspection report, or portions of the report, to  19
Seller, unless Seller requests otherwise.  20

3. ☐ **MODIFICATIONS/REPAIRS.** Based upon the results of Buyer's pre-inspection of the Property, Seller shall  21
make the following modifications and/or repairs to the Property described below or on the attached pages.  22

_____  23

_____  24

_____  25

_____  26

_____  27

The modifications and/or repairs shall be accomplished at Seller's expense in a commercially reasonable  28
manner and in accordance with all applicable laws no fewer than _____ days (3 days if not filled in) prior to  29
the Closing Date. In the case of hazardous materials, "repair" means removal or treatment (including but not  30
limited to removal or, at Seller's option, decommissioning of any oil storage tanks) of the hazardous material  31
at Seller's expense as recommended by and under the direction of a professional selected by Seller. Seller's  32
repairs are subject to re-inspection and approval, prior to Closing, by the inspector who recommended the  33
modifications and/or repairs, if Buyer elects to order and pay for such re-inspection. If Buyer agrees to pay for  34
any repairs prior to Closing, the parties are advised to seek the counsel of an attorney to review the terms of  35
that agreement.  36

4. **ON-SITE SEWAGE DISPOSAL SYSTEMS ADVISORY.** Buyer is advised that on-site sewage disposal  37
systems, including "septic systems," are subject to strict governmental regulation and occasional malfunction  38
and even failure. Buyer is advised to consider conducting an inspection of any on-site sewage system by  39
including an appropriate on-site sewage disposal inspection contingency such as NWMLS Form 22S (Septic  40
Addendum).  41

__G-A  5/29/23__     __GY  5/29/23__     __R__     __6/5/23__     _____  _____
Buyer's Initials   Date    Buyer's Initials   Date    Seller's Initials   Date    Seller's Initials   Date

Authentisign ID: 1026E49C-6DFE-ED11-907A-6045BDD47FEA

Form 22T
Title Contingency Addendum
Rev. 3/21
Page 1 of 1

©Copyright 2021
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

## TITLE CONTINGENCY ADDENDUM TO
## PURCHASE & SALE AGREEMENT

The following is part of the Purchase and Sale Agreement dated ___May 29, 2023___    1

between __Gustavo Alverez__    __Gabriela Yerena__    ("Buyer")  2
     Buyer             Buyer

and __2nd Chance Investment Grp, Llc__    __David Goodrich (Signer)__    ("Seller")  3
     Seller             Seller

concerning __8607     Custer__    __Lakewood__    __WA   98499__    (the "Property").  4
     Address          City        State  Zip

1. **Title Contingency.** This Agreement is subject to Buyer's review of a preliminary commitment for title insurance,  5
together with any easements, covenants, conditions and restrictions of record. Buyer shall have _____  6
days (5 days if not filled in) from ☐ the date of Buyer's receipt of the preliminary commitment for title insurance;  7
or ☐ mutual acceptance (from the date of Buyer's receipt, if neither box checked) to give notice of Buyer's  8
disapproval of exceptions contained in the preliminary commitment. If Buyer receives the preliminary  9
commitment before mutual acceptance, Buyer's time to review shall begin on mutual acceptance.  10

Seller shall have _____ days (5 days if not filled in) after Buyer's notice of disapproval to give Buyer  11
notice that Seller will clear all disapproved exceptions. Seller shall have until the Closing Date to clear all  12
disapproved exceptions.  13

If Seller does not give timely notice that Seller will clear all disapproved exceptions, Buyer may terminate this  14
Agreement within 3 days after the deadline for Seller's notice. In the event Buyer elects to terminate the  15
Agreement, the Earnest Money shall be returned to Buyer. If Buyer does not timely terminate the Agreement,  16
Buyer shall be deemed to have waived all objections to title, which Seller did not agree to clear.  17

2. **Supplemental Title Reports.** If supplemental title reports disclose new exception(s) to the title commitment,  18
then the above time periods and procedures for notice, correction, and termination for those new exceptions  19
shall apply to the date of Buyer's receipt of the supplemental title report. The Closing date shall be extended as  20
necessary to accommodate the foregoing times for notices.  21

3. **Marketable Title.** This Addendum does not relieve Seller of the obligation to provide marketable title at Closing  22
as provided for in the Agreement.  23

---

G.A  5/29/23     G.Y.  5/29/23     X ____  4/5/23     _____  _____
Buyer's Initials   Date   Buyer's Initials   Date   Seller's Initials   Date   Seller's Initials   Date

# Attachment 'A'

BEGINNING AT A POINT 130 FEET WEST OF THE EAST LINE OF SECTION 34, TOWNSHIP 20 NORTH, RANGE 2 EAST, W, M., AND 843.25 FEET NORTH OF THE SOUTHEAST CORNER OF THE NORTHEAST 1/4 OF SECTION 34;
THENCE SOUTH 89°20'00" WEST A DISTANCE OF 143.7 FEET;
THENCE NORTHEASTERLY ALONG THE EAST RIGHT OF WAY LINE OF THE MANITOU-CUSTER ROAD A DISTANCE OF 70.8 FEET;
THENCE NORTH 89°20'00" EAST FOR A DISTANCE OF 132.49 FEET;
THENCE SOUTH 00°16'00" WEST A DISTANCE OF 75 FEET TO THE POINT OF BEGINNING;.

SITUATE IN THE COUNTY OF PIERCE, STATE OF WASHINGTON.

This legal description was obtained from the last deed of record and is provided as a courtesy only. It has not been examined for insurability or legal effect and no liability is assumed by this Company for reliance thereon. Reference should be made to the Commitment for Title Insurance issued in connection with the title order.

uthentisign ID: 1028E49C-8DF6-ED11-907A-6045BDD47FEA

## <u>ATTACHMENT B TO PURCHASE AND SALE AGREEMENT</u>

1. <u>Conditions of Sale.</u>    The Broker agrees and understands that any sale of the Property shall be subject to the following terms and conditions:

   a. If for any reason, or no reason whatsoever, the Debtor is unable to deliver possession or title to the Property to any potential purchaser, the purchaser's sole remedy shall be the return of any money that the purchaser has deposited towards the purchase of the Property.

   b. The Debtor is selling the Property in an "AS IS" condition or basis by quitclaim deed without any representation or warranties whatsoever, including without limitation representations or warranties as to title, oil and mineral rights, city or government agency notifications regarding work to be done, marketability of title, ownership, physical condition, compliance with state, city or federal statutes, codes, ordinances, or regulations, geological stability, zoning, suitability for improvements on the Property, nor any assurances regarding if the Property is subdividable.

   c. The sale of the Property is subject to Bankruptcy Court approval after notice to the Debtor, the Debtor's counsel, the United States Debtor, all creditors, and all parties in interest as required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules.

   d. The sale is subject to overbids.

   e. The purchaser shall, at the purchaser's sole expense, acquire any and all insurance policies that the purchaser desires to cover the Property. The Debtor does not agree to acquire or transfer any insurance policies to the purchaser.

   f. The purchaser is to arrange for all financing of the acquisition of the Property before the close of escrow.

   g. All escrow fees shall be shared and paid on a 50/50 basis by the Debtor and the purchaser.

h. The purchaser shall, at the purchaser's sole expense, install all smoke detectors, is any, as may be required by state or local law. The Debtor is not required to deliver to the purchaser a written statement of compliance with any applicable state and local law.

i. The purchaser shall, at purchaser's sole expense, obtain any and all pest control inspection repairs that purchaser deems appropriate.

j. If any local ordinance requires that the Property be brought into compliance with minimum energy conservation standards as a condition of sale or transfer, the purchaser shall comply with and pay for these requirements at purchaser's sole expense.

k. Any sale is subject to the following conditions being satisfied before the close of escrow:

  i. the Debtor must prevail with respect to any objections to the proposed sale and obtain a court order authorizing the sale, or alternatively have an order confirming a Chapter 11 Plan of Reorganization that otherwise authorizes the Debtor to proceed; and

  ii. the Debtor reserves the right to reject any and all offers which in his/her judgement are insufficient.

l. The Property is being sold subject to:

  i. All general and special taxes that are presently due, or may become due, regarding the Property, other than property taxes, which shall be prorated as of the close of escrow;

  ii. Any and all easements and restrictions, rights and condition of record and rights of way, against, on or regarding the Property. Title, however, is to be transferred free of secured claims of record.

2. **Payment of Commission.** The commission to be paid to the Broker shall only be paid from the proceeds of the sale of the Property. The payment of the commission is subject to prior approval of the Bankruptcy Court.

3. **Reduction of Listing Price and Extension of Term of Listing Agreement.** The Debtor may, in the Debtor's sole discretion and business judgement and without further

Court order, modify the Exclusive Authorization by reducing the listing price and/or extending the term of the Exclusive Authorization.

4. **Entire Agreement.** This Addendum and the Exclusive Authorization, to the extent that such Exclusive Authorization is not contrary to the terms and conditions herein, constitute the entire contract between the parties. All prior agreements between the parties are incorporated into the agreement. Its terms are intended by the parties as a final expression of their agreement with respect to such terms as are included herein and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. The parties further intend that this Addendum and the Exclusive Authorization constitute the complete, final, and exclusive statement of the terms of the agreement and that no extrinsic evidence whatsoever may be introduced in any judicial or arbitration proceeding, if any, involving this Addendum and the Exclusive Authorization.

5. **Bankruptcy Court Jurisdiction.**    The Bankruptcy Court, sitting shall have exclusive jurisdiction to resolve any and all disputes relating to this Addendum and the Exclusive Authorization. This Addendum and the Exclusive Authorization and any disputes related to thereto shall be governed by Washington Law.

EXHIBIT 2

Order No. 960-2371538-06



**Orange Coast Lender Services**

1551 N. Tustin Ave #300
Santa Ana, CA  92705
Phone:  (714) 558-2836

www.octitle.com

| | **PRELIMINARY REPORT** | |
|---|---|---|

Orange Coast Title - LSG Sale Escrows
1551 N. Tustin Ave., Suite 840
Santa Ana, CA 92705

| **Attention:** | .Martha Quirino | **Your no.:** | 2371538 |
|---|---|---|---|
| **Property address:** | 8607 Custer Road, in an unincorporated area known as Lakewood, County of Pierce, State of WA 98499. | **Order no.:** | 960-2371538-06 |

**Dated:**         June 15, 2023

In response to the above referenced application for a policy of title insurance, **Orange Coast Lender Services** hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies for Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception below or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Exhibit B attached. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit B. Copies of the policy forms should be read. They are available from the office which issued this report.

**Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit B of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters, which are not covered under the terms of the title insurance policy and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.**

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

Dated as of June 5, 2023 at 7:30 AM

_____

Steve Fernando, Sr. Title Officer
Email: stevef@octitle.com
Ph: 412-788-2923
Fax: 412-788-2925

**The form of policy of title insurance contemplated by this report is:**

A.L.T.A Homeowner's Policy (2/03/10) and A.L.T.A. Loan Policy (06-17-06)

**The Policy of Title Insurance, if issued, will be underwritten by:**  Real Advantage Title Insurance Company
**NOTE: The premium for a policy of Title Insurance, if issued, will be based on:**

**A liability of    TBD    Subject to any filed rate increases and/or changes in the liability.**

## Schedule "A"

**The estate or interest in the land hereinafter described or referred to covered by this report is:**

A Fee

**Title to said estate or interest at the date hereof is vested in:**

 2nd Chance Investment Group, LLC, a California limited liability company

**The land referred to in this report is situated in an unincorporated area known as Lakewood, the County of Pierce, State of Washington, and is described as follows:**

Beginning at a point 130 feet West of the East line of Section 34, Township 20 North, Range 2 East, W. M., and 643.25 feet North of the Southeast corner of the Northeast 1/4 of Section 34;
Thence South 89º 20' 00" West a distance of 143.7 feet;
Thence Northeasterly along the East right of way line of the Manitou-Custer Road a distance of 76.6 feet;
Thence North 89º 20' 00" East for a distance of 132.49 feet;
Thence South 00º 16' 00" West a distance of 75 feet to the point of beginning.

Assessor's Parcel Numbers(s):

Order No. 960-2371538-06

## Schedule "B"

**At the date hereof exceptions to coverage in addition to the printed exceptions and exclusions contained in said policy form would be as follows:**

1    General and Special taxes for the fiscal year 2023, including any assessments collected with current taxes.

| | |
|---|---|
| Total amount | $3,310.88 |
| 1st installment | $1,679.90, delinquent |
| Penalty | $not shown (after 4/30/2023) |
| 2nd installment | $1,561.01, open |
| Penalty | $not shown (after not shown) |
| Code area | 760 |
| Parcel No. | 0220341080 |
| Exemption | $not shown |

2    NOTE:  DEFAULTED TAX shown below:

Delinquent Tax Year(s) and Installment(s): 2022/Both
Total Amount to redeem if paid by:
                06/2023, $2,020.28
                07/2023, $not shown
                08/2023, $not shown

3    Prior to close this company will require the Tax Collector's Office be contacted to verify open and delinquent taxes.

4    Covenants, conditions and restrictions, reservations, easements, assessments, liens and charges set forth in a Declaration of Restrictions, recorded 10/1/2021, as Instrument No. 202110010892, Official Records; but omitting any covenants, or restrictions, if any, but not limited to those based on race, color, religion, sex, sexual orientation, familial status, marital status, disability handicap, national origin, ancestry, or source of income as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.

An instrument declaring a modification thereof was recorded 10/1/2021 as Instrument No. 202110010892, Official Records

5    Notice by Pierce County that the property contains wetlands or wetland buffers and may be subject to restriction on use or alterations of wetlands or wetland buffers due to natural conditions.

Recording Date: November 15, 1993
Recording No. 9311151077

6    A Construction Deed of Trust to secure an indebtedness of

| | |
|---|---|
| Amount: | **$252,000.00** |
| Trustor: | **2nd Chance Investment Group, LLC, a California limited liability company** |
| Trustee: | Chicago Title Company of Washington |
| Beneficiary: | Loan Funder LLC, Series , a Delaware limited liability company, Serviced by Mortgage Electronic Registration Systems, Inc. (MERS) |
| Dated: | 9/28/2021 |
| Recorded: | **10/1/2021** as Instrument No. **202110010893**, Official Records. |

7    An Assignment of rents, royalties, issues and profits accruing from said land as additional security for the payment of the indebtedness secured by the Deed of Trust shown in paragraph 6 of schedule B

| | |
|---|---|
| Recorded: | 10/1/2021, as Instrument No. 202110010894 of Official Records |
| Executed by: | 2nd Chance Investment Group, LLC, a California limited liability company |
| In favor of: | Loan Funder LLC, Series , a Delaware limited liability company |

The beneficial interest under said Deed of Trust was assigned

| | |
|---|---|
| To: | Loan Funder LLC Series 24788 |
| By Assignment Recorded: | 1/19/2023, as Instrument No. 202301190047, Official Records. |

The trustee in said Deed of Trust was substituted by an instrument

Recorded:                          2/14/2023 as Instrument No. 202302140013, Official Records.
New trustee:                       Law Offices of Jason C. Tatman

8    A financing statement recorded 10/1/2021 as Instrument No. 202110010895, of Official Records.
Dated:                             not shown
Debtor:                            2nd Chance Investment Group, LLC
Secured party:                     Loan Funder LLC Series 24788

9    A financing statement recorded 10/1/2021 as Instrument No. 202110010896, of Official Records.
Dated:                             not shown
Debtor:                            2nd Chance Investment Group, LLC
Secured party:                     Loan Funder LLC Series 24788

10    The requirement that we be provided:

(1)  A copy of the filed articles of organization of 2nd Chance Investment Group, LLC, a California limited liability company

(2)  A  current list of the names of said limited liability company members

(3)  A copy of said limited liability company's operating agreement, with a verified certificate that the operating agreement is a true and correct copy of the agreement now in effect.

11    The requirement that a Notice of Completion be recorded and that the statutory lien period expire or that a satisfactory indemnity be established with this company to eliminate said lien period.

12    Any claims for Mechanic's Liens on said land that may be recorded by reason of a work of improvement, disclosed by an inspection of said land.

13    Rights of parties in possession of said land by reason of unrecorded leases, if any.  Please forward said leases for our examination.

14    Any facts, rights, interest or claims which may be shown by an inspection of the land or which may be disclosed by inquiry of persons in possession of said land.

**End of Schedule B**

## "NOTES AND REQUIREMENTS SECTION"

**NOTE NO. 1**

 Note does not apply to this transaction.

**NOTE NO. 2 PAYOFF INFORMATION:**

Note: this company does require current beneficiary demands prior to closing.
If the demand is expired and a correct demand cannot be obtained, our requirements will be as follows:

A.      If this company accepts a verbal update on the demand, we may hold an amount equal to one monthly mortgage payment. The amount of this hold will be over and above the verbal hold the lender may have stipulated.

B.      If this company cannot obtain a verbal update on the demand, will either pay off the expired demand or wait for the amended demand, at the discretion of the escrow.

C.      In the event that a payoff is being made to a servicing agent for the beneficiary, this company will require a complete copy of the servicing agreement prior to close.

**NOTE NO. 3**

If this company is requested to disburse funds in connection with this transaction, chapter 598, statutes of 1989 mandates hold periods for checks deposited to escrow or sub-escrow accounts. The mandatory hold is one business day after the day deposited. Other checks require a hold period from three to seven business days after the day deposited.

### Notice Regarding Your Deposit of Funds

California Insurance Code Sections 12413 *et. Seq.* Regulates the disbursement of escrow and sub-escrow funds by title companies. The law requires that funds be deposited in the title company escrow and sub-escrow accounts and be available for withdrawal prior to disbursement. Funds deposited with the Company by wire transfer may be disbursed upon receipt. Funds deposited with the Company via cashier's checks drawn on a California based bank may be disbursed the next business day after the day of deposit. If funds are deposited with by other methods, recording or disbursement may be delayed. All escrow and sub-escrow funds received by the Company will be deposited with other funds in one or more non-interest bearing escrow accounts of the Company in a financial institution selected by the Company. The Company and/or its parent company may receive certain direct or indirect benefits from the financial institution by reason of the deposit of such funds or the maintenance of such accounts with the financial institution, and the Company shall have no obligation to account to the depositing party in any manner for the value of, or to pay such party, any benefit received by the Company and/or its parent Company. Those benefits may include, without limitation, credits allowed by such financial institution on loans to the Company and/or its parent company and earnings on investments made on the proceeds of such loans, accounting, reporting and other services and products of such financial institution. Such benefits shall be deemed additional compensation of the Company for its services in connection with the escrow or sub-escrow.

Order No. 960-2371538-06



# Orange Coast Lender Services

1551 N. Tustin Ave #300
Santa Ana, CA  92705
Phone:  (714) 558-2836

www.octitle.com

Orange Coast Title
1551 N. Tustin Ave., Suite 840
Santa Ana, CA 92705

**Attention:**     **Annette Soto**
**Borrower:**     **Alverez\Yerena**

**Lenders supplemental report**

The above numbered report (including any supplements or amendments thereto) is hereby modified and/or supplemented in order to reflect the following additional items relating to the issuance of an A.L.T.A Homeowner's Policy (2/03/10) and A.L.T.A. Loan Policy (06-17-06) form as follows:

A.     This report is preparatory to this issuance of an American Land Title Association loan policy of title insurance. This report discloses nothing, which would preclude the issuance of said American land title association loan policy of title insurance with endorsement no. 100 attached thereto.

B.     The improvements on said land are designated as:

A single family residence

8607 Custer Road, in an unincorporated area known as Lakewood, County of Pierce, State of Washington.

C.     Our search of the public records revealed conveyance(s) affecting said land recorded within 24 months of the date of this report are as follows:

None.

Order No. 960-2371538-06

# Attention

Please note that this preliminary report now has an extra copy of the legal description on a separate sheet of paper. There are no markings on the page. The idea is to provide you with a legal description that can be attached to other documents as needed.  That legal description page immediately follows this page.

Thank you for your support of **Orange Coast Lender Services**. We hope that this makes your job a little easier.

Order No. 960-2371538-06

## Exhibit "A"

Beginning at a point 130 feet West of the East line of Section 34, Township 20 North, Range 2 East, W. M., and 643.25 feet North of the Southeast corner of the Northeast 1/4 of Section 34;

Thence South 89º 20' 00" West a distance of 143.7 feet;

Thence Northeasterly along the East right of way line of the Manitou-Custer Road a distance of 76.6 feet;

Thence North 89º 20' 00" East for a distance of 132.49 feet;

Thence South 00º 16' 00" West a distance of 75 feet to the point of beginning.

# CLTA Preliminary Report Form – Exhibit B (06-03-11)

### CLTA STANDARD COVERAGE POLICY – 1990
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy. (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters: (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant; (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy; (c) resulting in no loss or damage to the insured claimant; (d) attaching or created subsequent to Date of Policy; or (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:
1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.
6. Any lien or right to a lien for services, labor or material not shown by the public records.

### CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (02/03/10)
### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:
1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning: a. building, b. zoning, c.land use d. improvements on the Land, e.land division; and ,f. environmental protection. This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.
2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3. The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.
4. Risks: a. that are created, allowed, or agreed to by You, whether or not they recorded in the Public Records; b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date; c. that result in no loss to You; or d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e, 25, 26, 27, or 28.
5. Failure to pay value for Your Title.
6. Lack of a right: a. to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and b. in streets, alleys, or waterways that touch the Land. This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7. The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.

### LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
• For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

| | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1 % of Policy Amount shown in Schedule A or $ 2,500 (whichever is less) | $ 10,000 |
| Covered Risk 18: | 1 % of Policy Amount shown in Schedule A or $ 5,000 (whichever is less) | $ 25,000 |
| Covered Risk 19: | 1 % of Policy Amount shown in Schedule A or $ 5,000 (whichever is less) | $ 25,000 |
| Covered Risk 21: | 1 % of Policy Amount shown in Schedule A or $ 2,500 (whichever is less) | $ 5,000 |

### ALTA RESIDENTIAL TITLE INSURANCE POLICY (6-1-87)
### EXCLUSIONS

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:
1. Governmental police power, and the existence or violation of any law or government regulation. This includes building and zoning ordinances and also laws and regulations concerning: * land use * improvements on the land * land division * environmental protection. This exclusion does not apply to violations or the enforcement of these matters which appear in the public records at Policy Date. This exclusion does not limit the zoning coverage described in Items 12 and 13 of Covered Title Risks.
2. The right to take the land by condemning it, unless: *a notice of exercising the right appears in the public records *on the Policy Date *the taking happened prior to the Policy Date and is binding on you if you bought the land without knowing of the taking
3. Title Risks: *that are created, allowed, or agreed to by you *that are known to you, but not to us, on the Policy Date - unless they appeared in the public records *that result in no loss to you *that first affect your title after the Policy Date -- this does not limit the labor and material lien coverage in Item 8 of Covered Title Risks.
4. Failure to pay value for your title.
5. Lack of a right: *to any land outside the area specifically described and referred to in Item 3 of Schedule A OR *in streets, alleys, or waterways that touch your land. This exclusion does not limit the access coverage in Item 5 of Covered Title Risks.

### 2006 ALTA LOAN POLICY (06-17-06)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
1. (a) Any law, ordinance or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement erected on the Land; (iii) the subdivision of land; or (iv) environmental protection; or the effect of any violation of these laws, ordinances or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims or other matters:(a)created, suffered, assumed or agreed to by the Insured Claimant; (b)not known to the Company, not recorded in the Public Records at Date of Policy, but known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy; (c) resulting in no loss or damage to the Insured Claimant; (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13 or 14);or(e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state in which the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is (a ) a fraudulent conveyance or fraudulent transfer, or (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b):

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:
1.(a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2.Any facts, rights, interests or claims which are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3.Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4.Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5.(a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the Public Records.

### 2006 ALTA OWNER'S POLICY (06-17-06)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees or expenses that arise by reason of:

Order No. 960-2371538-06

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting. or relating to: (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions, or location of any improvement erected on the Land; (iii) the subdivision of land; or (IV) environmental protection; or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5. (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims, or other matters: (a) created, suffered, assumed, or agreed to by the Insured Claimant; (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;(c) resulting in no loss or damage to the Insured Claimant; (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is (a) a fraudulent conveyance or fraudulent transfer; or (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by  persons in possession of the Land.

3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and that are not shown by the Public Records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

6.  Any lien or right to a lien for services, labor or material not shown by the public records.

## ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (07-26-10)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys fees or expenses which arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including but not limited to building and zoning) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions or location of any improvement erected on the Land; (iii) the subdivision of the land; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14, and 16.(b) Any governmental police power. This Exclusion 1(b)does not modify or limit the coverage provided under Covered Risks 5, 6, 13(c), 13(d), 14, and 16.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims or other matters (a) created, suffered, assumed or agreed to by the Insured Claimant; (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;(c) resulting in no loss or damage to the Insured Claimant;(d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risks  11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 26); or (e)resulting in loss or damage which would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of the Insured to comply with applicable doing-business laws of the state in which the Land is situated.

5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth in lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.

6. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no

longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.

7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy in accordance with applicable building codes.  This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6..

8. The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes.  This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.

9.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is (a) a fraudulent conveyance or fraudulent transfer, or (b) a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.

Order No. 960-2371538-06

# Orange Coast Lender Services
## PRIVACY POLICY

### We Are Committed to Safeguarding Customer Information

In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information – particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information that you provide to us. Therefore, we have adopted this Privacy Policy to govern the use and handling of your personal information.

### Applicability

This Privacy Policy governs our use of the information which you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from a public record or from another person or entity.

### Types of Information

Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:

- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means.

- Information we receive from providers of services to us, such as appraisers, appraisal management companies, real estate agents and brokers and insurance agencies (this may include the appraised value, purchase price and other details about the property that is the subject of your transaction with us).

- Information about your transactions with us, our Affiliated Companies, or others; and

- Information we receive from a consumer reporting agency.

**Your California Rights (immediately following this Privacy Policy) or you may visit our website at https://www.titleadvantage.com/privacypolicy.htm or call toll-free at (866) 241-7373. Only applies to CA residents**

### Use of Information

We request information from you for our own legitimate business purposes and not for benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis.

### Former Customers

**Even if you are no longer our customer, our Privacy Policy will continue to apply to you.**

### Confidentiality and Security

We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

### Other Important Information

We reserve the right to modify or supplement this Privacy Policy at any time. If our Privacy Policy changes, we will provide the new Privacy Policy before the new policy becomes effective.

Last Revision 12/26/2019
Effective on 1/01/2020

## Your California Rights

*If you are a California resident, you may have certain rights under California law, including but not limited to the California Consumer Privacy Act ("CCPA"). All phrases used herein shall have the same meaning as those phrases used under relevant California law, including but not limited to the CCPA.*

**Right to Know**
You have the right to know:

- The categories of personal information we have collected about or from you;

- The categories of sources from which we collected your personal information;

- The business or commercial purpose for collecting or sharing your personal information;

- The categories of third parties with whom we have shared your personal information; and

- The specific pieces of your personal information we have collected.

*Process to Submit a Request*. To submit a verified request for this information you may visit our website at https://www.titleadvantage.com/privacypolicy.htm or call toll-free at (866) 241-7373. You may also designate an authorized agent to submit a request on your behalf by visiting our website https://www.titleadvantage.com/privacypolicy.htm or calling toll-free at (866) 241-7373 and then also submitting written proof of such authorization via e-mail to dataprivacy@octitle.com.

*Verification Method.* In order to ensure your personal information is not disclosed to unauthorized parties, and to protect against fraud, we will verify your identity before responding to your request. To verify your identity, we will generally match the identifying information provided in your request with the information we have on file about you. Depending on the sensitivity of the personal information requested, we may also utilize more stringent verification methods to verify your identity, including but not limited to requesting additional information from you and/or requiring you to sign a declaration under penalty of perjury.

**Right of Deletion**
You have a right to request that we delete the **personal information** we have collected from or about you.

*Process to Submit a Request.* To submit a verified request to delete you information you may visit our website at https://www.titleadvantage.com/privacypolicy.htm or call toll-free at (866) 241-7373. You may also designate an authorized agent to submit a request on your behalf by clicking here or calling toll-free at (866) 241-7373 and then also submitting written proof of such authorization via e-mail to dataprivacy@octitle.com.

*Verification Method.* In order to ensure we do not inadvertently delete your **personal information** based on a fraudulent request, we will verify your identity before we respond to your request. To verify your identity, we will generally match the identifying information provided in your request with the information we have on file about you. Depending on the sensitivity of the **personal information** requested to be deleted, we may also utilize more stringent verification methods to verify your identity, including but not limited to requesting additional information from you and/or requiring you to sign a declaration under penalty of perjury.

**Right to Opt-Out**
We do not sell your **personal information** to third parties, and do not plan to do so in the future.

**Right of Non-Discrimination**
You have a right to exercise your rights under the CCPA without suffering discrimination. Accordingly, OC Title & family of Companies will not discriminate against you in any way if you choose to exercise your rights under the CCPA.

**California Minors**
If you are a California resident under the age of 18, California Business and Professions Code § 22581 permits you to request and obtain removal of content or information you have publicly posted on any of our Applications or Websites. To make such a request, please send an email with a detailed description of the specific content or information to dataprivacy@octitle.com. Please be aware that such a request does not ensure complete or comprehensive removal of the content or information you have posted and there may be circumstances in which the law does not require or allow removal even if requested.

**Collection Notice**
The following is a list of the categories of **personal information** we may have collected about California residents in the twelve months preceding the date this Privacy Notice was last updated, including the business or commercial purpose for said collection, the

categories of sources from which we may have collected the **personal information**, and the categories of third parties with whom we may have shared the **personal information**:

## Categories of Personal Information Collected

The categories of **personal information** we have collected include, but may not be limited to:

- real name
- Signature
- Alias
- SSN
- physical characteristics or description, including protected characteristics under federal or state law
- address

- telephone number
- passport number
- driver's license number
- state identification card number
- IP address
- policy number
- file number
- employment history

- bank account number
- credit card number
- debit card number
- financial account numbers
- commercial information
- professional or employment information

## Categories of Sources

Categories of sources from which we've collected **personal information** include, but may not be limited to:

- the consumer directly
- public records
- governmental entities
- non-affiliated third parties
- affiliated third parties

## Business Purpose for Collection

The business purposes for which we've collected **personal information** include, but may not be limited to:

- completing a transaction for our Products
- verifying eligibility for employment
- facilitating employment
- performing services on behalf of affiliated and non-affiliated third parties
- protecting against malicious, deceptive, fraudulent, or illegal activity

## Categories of Third Parties Shared

The categories of third parties with whom we've shared **personal information** include, but may not be limited to:

- service providers
- government entities

- operating systems and platforms

- non-affiliated third parties
- affiliated third parties

### Sale Notice

We have not sold the **personal information** of California residents to any third party in the twelve months preceding the date this Privacy Notice was last updated, and we have no plans to sell such information in the future. We also do not, and will not sell the **personal information** of minors under sixteen years of age without affirmative authorization.

### Disclosure Notice

The following is a list of the categories of **personal information** of California residents we may have disclosed for a business purpose in the twelve months preceding the date this Privacy Notice was last updated.

- real name
- Signature
- Alias
- SSN
- physical characteristics or description, including protected characteristics under federal or state law

- telephone number
- passport number
- driver's license number
- state identification card number
- IP address
- policy number
- file number

- bank account number
- credit card number
- debit card number
- financial account numbers
- commercial information
- professional or employment information

- address
- employment history

If you have any questions and/or comments you may contact us:

**Call Us** at our toll free number (866) 241-7373

**Email Us** at dataprivacy@octitle.com

Mail:

Orange Coast Title

Attn: Privacy Officer

1551 N. Tustin Ave., Ste. 300

Santa Ana, CA 92705

Effective on 1/1/2019
Revised on 12/23/2019



PublicGIS

EXHIBIT 3

| American Land Title Association | ESTIMATED ALTA Settlement Statement - Combined |
|---|---|
| | Adopted 05-01-2015 |

File No./Escrow No.: 792904
Officer/Escrow Officer: Richard Yaria

**Real Advantage LLC dba Orange
Coast Lender Services
1000 Commerce Drive
Suite 520
Pittsburgh, PA 15275
(877) 788-2923**

| Property Address: | 8607 CUSTER ROAD |
|---|---|
| | LAKEWOOD, WA 98499 (PIERCE) |
| Borrower: | GUSTAVO ALVEREZ AND GABRIELA YERENA |
| Seller: | 2ND CHANCE INVESTMENT GROUP, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY |
| Lender: | |
| Settlement Date: | 7/20/2023 |
| Disbursement Date: | 7/20/2023 |

| Seller | | Description | Borrower | |
|---|---|---|---|---|
| Debit | Credit | | Debit | Credit |
| | | **Deposits, Credits, Debits** | | |
| | $400,500.00 | Sale Price of Property | $400,500.00 | |
| | | Deposit | | $20,000.00 |
| | | **Prorations** | | |
| | $737.29 | County Taxes 7/20/2023 to 1/1/2024 @ $1,630.98/Year | $737.29 | |
| | | **Payoffs** | | |
| $252,000.00 | | Payoff of First Mortgage Loan to : | | |
| | | Principal: $252,000.00 | | |
| | | **Commissions** | | |
| $13,215.50 | | Real Estate Commission to Team Momentum LLC | | |
| $10,613.25 | | Real Estate Commission to Jared Mausten | | |
| $201.25 | | Real Estate Commission to KELLER WILLIAMS REALTY TACOMA | | |
| | | **New Loans** | | |
| | | Loan Amount | | $320,400.00 |
| | | **Title Charges** | | |
| | | Title - Lender's Title Insurance to Real Advantage, LLC dba Orange Coast Lender Services | $250.00 | |
| $1,379.00 | | Title - Owner's Title Insurance to Real Advantage, LLC dba Orange Coast Lender Services | | |
| | | Title - Endorsement(s) to Real Advantage, LLC dba Orange Coast Lender Services | | |
| | | Title - ALTA 8.1 Environmental Protection Lien (6-17-06) Endorsement(s) to Real Advantage, LLC dba Orange Coast Lender Services | | |
| | | Title - ALTA 9.0 Restrictions, Encroachments, Minerals, Loan Policy (4-2-12) Endorsement(s) to Real Advantage, LLC dba Orange Coast Lender Services | | |
| | | Title - Recording Submission Fee to Orange Coast Lender Services - Recording Account | $25.00 | |
| $1,100.00 | | Settlement or closing fee to Real Advantage, LLC dba Orange Coast Lender Services | $1,100.00 | |
| $125.00 | | Title - Signing Fee to Real Advantage, LLC dba Orange Coast Lender Services | $175.00 | |
| $137.90 | | Title - Owner's Premium Tax to Real Advantage, LLC dba Orange Coast Lender Services | | |
| | | Title - Lender's Premium Tax to Real Advantage, LLC dba Orange Coast Lender Services (Orange Coast Lender Services - Remittance Account: $0.00) | $25.00 | |
| $500.00 | | Title - to Real Advantage, LLC dba Orange Coast Lender Services | | |
| $5,000.00 | | Title - Risk Rate to Real Advantage, LLC dba Orange Coast Lender Services | | |
| | | **Government Recording and Transfer Charges** | | |
| $2,007.50 | | County Deed Tax/Stamps to Orange Coast Lender Services - Recording Account | | |
| | | Recording fees: Deed $207.50 | $207.50 | |
| | | Mortgage $233.50 | $233.50 | |
| $4,405.50 | | State Deed Tax/Stamps to Orange Coast Lender Services - Recording Account | | |
| | | **Additional Settlement Charges** | | |
| $5,374.34 | | Property Taxes to Pierce County Treasurer | | |
| $500.00 | | UTILITIES - WATER, SEWER, LIGHT to | | |

File # 792904

Printed on 7/17/2023 at 2:20 PM

| Seller | | | | Borrower | |
|---|---|---|---|---|---|
| **Debit** | **Credit** | | | **Debit** | **Credit** |
| $296,559.24 | $401,237.29 | **Subtotals** | | $403,253.29 | $340,400.00 |
| | | Due From Borrower | | | $62,853.29 |
| $104,678.05 | | Due To Seller | | | |
| $401,237.29 | $401,237.29 | **Totals** | | $403,253.29 | $403,253.29 |

---

## Acknowledgement

We/I have carefully reviewed the ALTA Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction and further certify that I have received a copy of the ALTA Settlement Statement. We/I authorize Real Advantage LLC dba Orange Coast Lender Services to cause the funds to be disbursed in accordance with this statement.

**BORROWER(S)**

_____
GUSTAVO ALVEREZ


_____
GABRIELA YERENA

**SELLER(S)**

2ND CHANCE INVESTMENT GROUP, LLC, a California limited liability company


By:_____
    David Goodrich,  Manager

**Settlement Agent or Escrow Officer**

_____
Richard Yaria

File # 792904

Printed on 7/17/2023 at 2:20 PM

EXHIBIT 4



**In Re: 2nc Chance Investment Group LLC**
**Sale of 2nd Chance Investment Group Property Gain and Tax Analysis**
**Sale of 8607 Custer Rd. (Estimate)**

**Assumptions/Facts:**

Date of Estimate    **A-1**    8/31/2023

| Fed Taxes: | Total Gain | Tax Rate | Est Tax | Rayshon Foster 52.00% Gain | Est Tax | Sonja Foster 48.00% Gain | Est Tax |
|---|---|---|---|---|---|---|---|
| Section 1231 Gain - Land | 19,714 | **20.0%** | 3,943 | 10,251 | 2,050 | 9,463 | 1,893 |
| CAP/Section 1231 Gain - Building | 11,830 | **20.0%** | 2,366 | 6,152 | 1,230 | 5,679 | 1,136 |
| Section 1250 Gain - Building | 9,408 | **25.0%** | 2,352 | 4,892 | 1,223 | 4,516 | 1,129 |
| NIT | - | | - | - | | - | |
| Total Gain | 40,952 | | | 21,295 | 4,504 | 19,657 | 4,157 |

| CA Taxes: | | | | | | | |
|---|---|---|---|---|---|---|---|
| Estimated Taxes (MFJ) | | | | | | | |
| California Income Tax | | **10.3%** | | 4,218 | 2,193 | | 2,025 |
| Mental Health Tax - Income > $1M | | **NA** | | - | - | | - |
| Total Taxes | | | | 12,879 | 6,697 | | 6,182 |
| Effective Tax Rate | | | | 31% | 31% | | 31% |

**Note:**

Based on an analysis of the 2020 and 2021 debtor tax returns, 2nd Chance Investment Group LLC is taxed as a partnership. As such, 2nd Chance Investment Group, LLC does not pay federal income taxes. Instead the Debtor passes through all income to its partners. Per the 2021 debtor return, Rayshon Foster owns a 52% interest in the partnership and Sonja Foster owns a 48% interest. The total taxable gain is estimated to be $40,952 and 52% of the taxable gain or $21,295, will be allocated to Rayshon and 48%  or $19,657 will be allocated to Sonja.

The taxes owed by the partners related to the liquidation of the Debtor's real estate assets are estimated to be a total of $12,879 with Rayshon owing $6,697 and Sonja owing $6,182. The debtor will be responsible for the $800 CA minimum tax and any applicable LLC fee once income exceeds $250,000.

**GROBSTEIN TEEPLE**

**In Re: 2nc Chance Investment Group Inc**
**Sale of 2nd Chance Investment Group Property Tax Analysis and Cash Flow**
**Sale of 8607 Custer Rd. (Estimate)**

**Assumptions/Facts:**

| | | |
|---|---|---|
| Date of Estimate | | 8/31/2023 |
| Estimated Sale Price | B-08.1 | 400,500 |

**Analysis:**

| | | 8 - 8607 Custer Rd | |
|---|---|---|---|
| | | Gain Analysis | Cash flow |
| Estimated Sales Price | B-08.1 | 400,500 | 400,500 |
| | | | |
| Basis | | | |
| Land | [1] | (215,565) | |
| Building | [1] | (129,361) | |
| Depreciation | [2] | 9,408 | |
| | | | |
| Total Basis | | (335,518) | - |
| | | | |
| Cost of Sale | [3] | (24,030) | (24,030) |
| Security Claim | A-1 | | (252,000) |
| Admin Claims | | | - |
| **Taxable Gain/(Loss)** | | **40,952** | |
| **Net Cash Flow** | | | **124,470** |

**Breakdown of Gain:**

| | Land | Building |
|---|---|---|
| % of Cost | 62.50% | 37.50% |
| Alloc of Sales Price | 250,296 | 150,204 |
| Basis - Purchase price | (215,565) | (119,953) |
| Alloc of Other Costs | (15,018) | (9,012) |
| Admin Claims | | |
| **Total Gain** | **19,714** | **21,238** |

**Allocation of Gain**

| | | |
|---|---|---|
| 1231 Gain | 19,714 | 11,830 |
| 1250 Gain | | 9,408 |
| **Total Allocation of Gain** | **19,714** | **21,238** |
| | | - |

**Notes:**

[1] Basis value, as listed on the debtor's 2021 tax return, have been allocated for land and building based on the local county assessor's allocation as of the first subsequent assessment following the date of original purchase ( B-08.1, B-08.2).

[2] Depreciation was not listed on the debtor's 2021 tax return. However, we have estimated the amount of allowable depreciation deductible between the date of purchase and the estimated sale date.

[3] Per Appraiser's Employment App (Doc. 80), the cost of sale was listed as $28,800, or 6% of the estimated FMV of $480,000. As such, the cost of sale has been adjusted to reflect 6% of the estimated sale price ( A-1).