**Geoff Trapp**
**Athena Lee**
(661) 214-4412
CloteeHasAlzheimers@gmail.com
2551 East Avenue S, Suite G-166
Palmdale, CA 93550
*Next Friends to, and [proposed] Co-Guardians Ad Litem for, Plaintiff Clotee Downing*

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| IN RE:<br><br>2nd CHANCE INVESTMENT GROUP, LLC,<br><br>     Debtor<br><br>────────────────────────<br><br>CLOTEE DOWNING, an incompetent individual,<br><br>     Plaintiff<br><br>v.<br><br>2ND CHANCE INVESTMENT GROUP; RAYSHON ANDREW FOSTER a.k.a. RAY FOSTER, an individual; SONJA FOSTER, an individual; DOES 1 – 100,<br><br>     Defendants | Case No.: 8:22-bk-12142-SC<br>Chapter 11 Case<br><br>Adv. Case No.: 8:23-ap_____-SC<br><br>**NOTICE OF EMERGENCY MOTION AND EMERGENCY MOTION TO ALTER OR AMEND ORDER, AND/OR FOR RELIEF FROM ORDER, AUTHORIZING SALE OF REAL PROPERTY, ETC. (DOC 313)**<br><br>[37472 Yorkshire Drive, Palmdale, CA 93550; APN: 3019-047-055]<br><br>**F.R.Civ.P. Rule 59 *and/or* 60(b) or (d) *et seq.* / F.R.Bnk.P. Rule 9023 *and/or* 9024**<br><br>Date Order Entered: Nov. 20, 2023<br>Date Motion Filed:   Dec. 4, 2023<br><br>Hearing Date: December _____, 2023<br>Hearing Time: _____ AM / PM<br>Hearing Place: Courtroom 5C<br>                411 West Fourth Street<br>                Santa Ana, CA 92701<br>***IN PERSON HEARING REQUESTED*** |

**TO ALL INTERESTED PARTIES, AND TO THE CLERK OF THE COURT, PLEASE TAKE NOTICE** that as soon as can be practically arranged by the clerk of the court, in Courtroom 5C of the courthouse at 411 West Fourth Street, Santa Ana, CA 92701, Plaintiff Clotee Downing intends to move this Court for relief from this Court's November 20, 2023 Order authorizing the sale of her home at 37472 Yorkshire Drive in Palmdale, CA 93550, pursuant to F.R.Civ.P. Rule 59 and/or 60(b) or (d) et seq. / F.R.Bnk.P. Rule 9023 and/or 9024.

This Motion is based upon the memorandum of points and authorities contained herein, and supporting declarations that will be filed.

# **TABLE OF CONTENTS**

A.  LEGAL STANDARDS ...........................................................12

B.  Debtor never owned the Yorkshire PROPERTY, and committed a FRAUD UPON THE COURT BY claiming otherwise. ...........................................13

C.  The COURT was TRICKED INTO ACTING IN EXCESS OF ITS stAtutory and constitutional JURISDICTIONAL AUTHORITY, and the mere statutory protections of 11 U.S.C. § 363(m) cannot stand, or act to bar relief......................15

D.  THE CONTRACT IS void DUE TO DOWNING'S INCOMPETENCE, AND DOWNING IS Entitled to THE return of home as function of law under CALIFORNIA'S elder abuse act ...............................................................18

E.  THE CONTRACT IS void as a function of State law because the representative of the DEbtor who solicited, induced and caused Downing to sign the contract had no Real Estate Sales license......................................19

F.  Criminal act under 1695.8: Completely misrepresented nature of transaction (1695.6(d)). Also, Never left paperwork or gave downing cancelation notice prior to TRANSFERRING deed (1695.6(A / B)). ...............................................21

G.  VOID NO CONSIDERATION, and CRIMINAL ACT UNDER 1695.13. Beyond knowingly contracting with ALZHEIMER'S patient, Never actually paid downing one cent, so contract never perfected (SUSPECT CLAIMED 300K purchase price is part of defrauding financial institution/investors / creditors). ..21

H.  VOIDABLE under 1695.14 Unconscionable advantage; two-year statute FOR RECESSION – if DOWNING CHOSE THE RECESSION ROUTE - is tolled due to downing's incompetence ...............................................................21

I.  debtor Cannot claim breach of "lease" payments voided contract and created right to selL ...............................................................21

J.  COUNSEL for DEBTOR and CRO Goodrich advised by family of facts. ......21

K.  DOWNING's tenancy never lawfully QUIT OR terminated. Buyer defrauded – bought house with existing tenancy rights............................................22

L.  Manifest injustice ...................................................................................22

M.  BALANCE OF EQUITIES REQUIRES CANCELATION OF SALE, despite
363(m) protections. ...................................................................................22

N.  Buyer's PROPER remedy to recover FINANCIAL losses is TO (i) file AP
suIT against Debtor, Principals of debtor, and counsel for debtor and principals.
Alternatively, (ii) move for summary sanctions against debtor and their counsel.
23

## MEMORANDUM OF POINTS AND AUTHORITIES
## I.  TIMELINESS OF DOWNING'S APPEARANCE AND MOTION

Downing arriving late to proceedings due to unconscionable elder abuse, neglect and abandonment by debtor, debtor's counsel, and family members. Guardians had no ability to file sooner: did not have custody of Downing, and were being bullied and denied access to information by those who did. Only got custody of Downing in mid-October, and learned of proceeding on Nov. 9 2023. AP and motion being filed in reasonable time after that.

Downing has no understanding of the situation, and no capacity to exercise her own legal rights, or hire someone to do so for her. Debtor, debtor's counsel, and CRO all knew of situation. They had ethical duty of candor with the court. Yet despite their knowledge, instead conspired to terrorize Downing's unsophisticated and naive adult children into violate Downing's legal and civil rights, and commit felony elder financial abuse and neglect against her (lawyers & kids).

But Downing had no capacity to waive her legal rights, nor are her legal rights voidable due to felony elder abuse, neglect or abandonment committed against her by her children. Downing has protections under 5th and 14th amendment that cannot be waived on her behalf by ignorant, incompetent, abusive and neglectful children who have no lawful POA or conservatorship over her. Downing's guardians respectfully submit that both the Debtor and its counsel had an ethical duty to not permit elder abuse to be

committed against Downing. Having done so anyway, Debtor and their counsel come to this Court with unclean hands, and therefore cannot complain about untimeliness of Downing's appearance.

## II.  FACTUAL BACKGROUND

On November 20, 2023, this Court entered an Order (Doc. 313), approving the sale of the real property at 37472 Yorkshire Drive in Palmdale, CA 93550 ("Yorkshire property"). For the reasons stated in the Argument section below, this Court should and must reverse this sale, and cause the Yorkshire property to be returned to its true lawful owner, even if it means ordering the Debtor, the Debtor's principals and/or their counsel to repurchase it from the Buyer approved by this Court in its November 20, 2023 order.

The Debtor, by and through multiple documents signed by its co-principal Defendant Rayshon Foster ("R. Foster") and/or Debtor's counsel, repeatedly told this Court that the Debtor possessed a lawful right and title to the Yorkshire property, and listed it as real property owned by the Debtor's estate that was lawfully subject to sale.

The Debtor and its counsel mislead this Court, and selectively withheld documents that would have revealed the truth. As a function of law under Cal. Civ. Code §1695.12, the Debtor never possessed any lawful title to the Yorkshire property, because the Debtor allegedly "acquired" the Yorkshire property from a homeowner in foreclosure, and the Home Equity Sales Contract the Debtor's principal had that owner sign included a clause giving that homeowner the right to repurchase her home. This Court can and should take notice of the Debtor's occlusive judicial admission of this fact at the bottom of pg. 101 of Doc. 271 (Debtor's Motion for Order Authorizing Sale of Real Property). Therefore, even assuming *arguendo* that the Debtor ever had any lawfully cognizable interest in the Yorkshire property, that interest was at best a security interest as a loan or mortgage provider to the property owner, who was never in any contractual arrears to the Debtor.

The true lawful owner of the Yorkshire property is Clotee Downing ("Downing"), an 80-year-old African American great grandmother who only has a fourth grade education, a comparable literacy level, and is now in the end stages of Alzheimer's

disease. Downing started showing symptoms of Alzheimer's in 2014, and was medically diagnosed in 2017. By 2018, Downing legally qualified as a person of unsound mind under Cal. Civ. Code § 39(b), in that she was substantially unable to manage her own financial resources, and had been repeatedly unable to resist innumerable acts of fraud and undue influence stretching back to 2015.

Despite Downing's growing mental incapacitation, and expressions of concern by various family members that Downing could no longer take care of herself, the family members in direct and sustained contact with Downing all neglected to take any action to actually protect her best interests. No one ever took responsibility to ensure Downing signed a Power of Attorney agreement, or initiated a conservatorship proceeding. Downing was instead allowed to neglectfully slip past the threshold of legal competency to contract in 2019, without ever having someone legally appointed to make decisions on her behalf to protect her best interests.

By late 2019, as a direct result of her repeated inability to resist fraud, undue influence, manage her own financial affairs, or comprehend the facts or responsibilities surrounding her home ownership, Downing was in arrears on her mortgage, and facing a non-judicial foreclosure. From late 2019 to late 2020, members of Downing's family arranged for her to have meetings with four (4) different real estate brokers and one attorney, to discuss her situation and options. In all five (5) of these meetings, Downing repeatedly demonstrated that she had multiple Alzheimer's-related mental deficits - as forth in Cal. Probate Code § 811 - which rendered her unable to understand what was going on or being discussed, unable to lawfully contract about her mortgage or her financial affairs, and unable to lawfully grant a conveyance of the title of her home.

Then, on October 23, 2020 – a mere eleven (11) days before a scheduled November 3, 2020 foreclosure sale - R. Foster, one of the two co-principals of the Debtor, appeared at the front door of Downing's Yorkshire property, with an offer to "save her home" from foreclosure. In the oral contracts R. Foster repeatedly made with Downing and members of her family, R. Foster said he would pay off Downing's back due mortgage payments.

All Downing had to do was sign over her home to R. Foster, then pay him back in the form of $1,000 a month for five years (i.e. $60,000), after which R. Foster said he would then give the Yorkshire property back to Downing to keep, free of any liens or liabilities.

The next day, October 24, 2020, R. Foster came back to Downing's Yorkshire property to complete the "deal." After having met and talked with Downing on October 23, 2020, R. Foster apparently realized that Downing was mentally incompetent to contract, and arrived on October 24 bearing what he presumably thought would be an effective solution to this problem. Upon walking in the door, R. Foster handed Downing's live-in adult son Nolan White ("Nolan") an 8.5 x 11" sheet of yellow lined notebook paper, on which R. Foster had hand-printed out a statement for Nolan to sign. The statement was an attestation that Downing was of sound mind, and that Nolan was a witness to her signing documents with R. Foster. Nolan – who himself only has a 9th grade education, never went to medical school, had absolutely no power of attorney or conservatorship to allow him to lawfully act on Downing's behalf, and was facing homelessness in ten days unless Downing's home was "saved" from foreclosure – signed.

Then, in the presence of Nolan, R. Foster rushed Downing through the process of signing pages of documents, including a 32-page California Home Equity Sales Contract (EXHIBIT X), and a 16-page Notice of Default Purchase Agreement (EXHIBIT X). R. Foster did so by repeatedly placing his finger on Downing's paperwork, telling her to initial or "sign here," and then instructing her to turn the page. R. Foster didn't give Downing time to read any of the pages, and never allowed Nolan to see any of the documents. Even if R. Foster had given Downing a chance to read these documents, Nolan observed that Downing was not wearing the glasses she needed to read anything (furthermore, Downing's guardians ad litem have subsequently asked Downing to read these documents, but due to her fourth grade literacy level, Downing is not able to do so).

In the process of signing these documents on October 24, 2020, Downing's handwriting exhibited clear signs of Alzheimer's-related loss of motor control. On the main signature line of the Home Equity Sales Contract, Clotee Downing both mistakenly

wrote her name as Clotee Grayson (a maiden name she has not used in over 45 years), and wrote an incorrect date of October 25, 2020. When Downing had finished signing, R. Foster collected all the documents, and took them with him. He did not leave Downing a copy, as legally required by Cal. Civ. Code §§ 1695.5(c) and 1695.6(a).

The mentally incompetent Downing was not even able to articulate R. Foster's name. She simply referred to him as "my savior." R. Foster repeatedly and knowingly exploited Downing's Alzheimer's deficits in order to gain her trust, so that he could financially abuse her. For example, Downing repeatedly told R. Foster that she worked as a school bus driver in South Central Los Angeles (as she has a habit of telling everyone). R. Foster would respond to this information by smiling at Downing, telling her that he had been a student on her school bus, and that he remembered her driving him to school. Downing believed this confidence-man act, and replied that she also remembered R. Foster riding on her bus, even though she couldn't currently remember R. Foster's name.

A few hours after leaving Downing's home on Saturday, October 24, 2020, R. Foster then called Downing's landline, and asked to speak with Nolan - *not* Downing. When Nolan got on the line, he found himself on a purported three-way call between R. Foster and an unidentified, alleged female employee of Downing's bank. R. Foster told Nolan words to the effect of, "I've got the bank on the phone so you can hear this, so ya'll know that you don't have to leave out of the house, I'm gonna pay the bill." The purported female bank employee then started arguing with Foster, saying "it's too late to pay" the bank, and avoid the foreclosure sale. R. Foster snapped back at the female, "what are you gonna do? Put an 81 year old woman in the street? Is that what you're gonna do? … come on … come on," and similar words to that effect. The alleged bank employee then continued to argue back against R. Foster, saying "It's to late" to pay.

R. Foster then told Nolan, "hold on for a minute, I'm gonna speak to the lady," and placed Nolan on hold. After a brief pause in silence, R. Foster then came back on the line, sighing in relief: "[SIGH] They accepted, man!" R. Foster then thanked the alleged bank employee, with words to the effect of "you don't know how you blessed the lady, cause

they was days on getting out of the house! Now they don't have to leave the house."
Foster then said, "you see Nolan? I took care of it. I'll be over there in a day or two."

Nolan genuinely believed this had been a real phone call between Foster and an employee of Downing's mortgage provider, Selene Finance. **Downing's Guardians have recently spoken with Selene, and confirmed this entire phone call was a fake**, telephone theatre con-man performance by R. Foster and this unidentified woman, whom the Guardians suspect and allege to have been R. Foster's wife, Defendant Sonja Foster ("S. Foster"). According to Selene's phone records, Selene did not receive any phone calls regarding Downing's mortgage account on either Friday October 23, Saturday October 24, or Sunday October 25, 2020. The only phone call Selene did receive during this period was a call from S. Foster, at 8:08 AM PST on Monday, October 26, 2020, asking for Selene's FAX number. Then, at approximately 10:44 AM PST that same day, Selene received a FAX from the Debtor that included the 16-page Notice of Default Purchase Agreement Downing had signed on October 24, 2020. In addition, Selene reports that R. Foster was never an authorized user on Downing's account; accordingly, R. Foster would not have been able to simply call Selene Finance, and speak with a representative about Downing's account. The apparent true purpose of the Fosters' fake October 24, 2020 phone call was to deceive Nolan into deepening his trust in R. Foster, so that R. Foster would have an easier time financially exploiting Downing.

Accordingly, **the Debtor never paid one single penny of compensation to Downing for the Yorkshire property**. Instead, Ray Foster – who California Department of Real Estate public records show lacks the California Real Estate Sales License required by Cal. Civ. Code § 1695.17 *et seq.* to lawfully engage in the purchase of any California home in foreclosure - deceived the mentally incompetent Downing into signing over her home to the Debtor **for free**. The Fosters caused the Debtor to prepare real estate and escrow documents that falsely claimed the Debtor paid $300,000 for the Yorkshire property. After reviewing the multiple fraudulent transfer Complaints filed by the Unsecured Creditor's Committee, Downing's Guardians suspect the Fosters prepared

these documents in order to justify fraudulently transferring funds allegedly "paid" for Downing's Yorkshire property out of the Debtor, and into their own pockets.

In truth, the Debtor never even moved Downing's mortgage loan with Selene Finance out of Downing's name. Instead, S. Foster – who does hold a valid California Real Estate Broker's license – apparently contacted Selene Finance on October 24, 2020 by email, impersonated Downing using stolen social security number information, and then instructed Selene to re-route all mail about Downing's mortgage to the Debtor's address, and all phone calls to R. Foster's (909) 261-2455 phone number. The Fosters also instructed Selene to send all email to an account they controlled, Foster12812@yahoo.com. S. Foster's apparent goal was to isolate Downing, and keep her and her family members clueless about the Foster's criminal actions.

The Fosters then swindled Downing out of over $32,000 under R. Foster's promise to "save her home" from foreclosure. Over $26,000 of this money was paid in $1,000 installments directly to R. Foster or S. Foster personally (not the Debtor), via difficult-to-trace/tax means such as R. Foster or an emissary coming to Downing's door to collect cash, or Walmart-to-Walmart wire transfers to R. Foster. After RIA Financial (the vendor that provides the Walmart-to-Walmart service) identified R. Foster as a criminal in May of 2022, and terminated his access to their services, R. Foster instructed Downing's great granddaughter and co-guardian ad litem Athena Lee to continue sending $1,000 monthly payments to S. Foster via Venmo. Downing's family members honored their purported contractual "obligation", and faithfully paid the Fosters $1,000 every month through December of 2022, after which the Fosters closed all their online payment methods, disconnected their phones, and disappeared from the internet. In so doing, the Fosters deliberately frustrated Downing's ability to perform her monthly $1,000 payment, and thereby waived their right to receive that consideration as a matter of contract law.

Starting in February of 2023, the Debtor and its counsel then began threatening to sue the mentally incompetent Downing for non-payment of her monthly $1,000 "rent." Multiple members of Downing's family responded by advising both counsel for the

Debtor, and the Chief Restructuring Officer in the Debtor's bankruptcy case (David Goodrich), of the true facts about Downing's Alzheimer's, the conditions of her purported "contract" with the Debtor / Fosters, and that the Fosters had frustrated performance of the monthly rent payments by closing their accounts and disappearing. Counsel for the debtor nonetheless persisted in their completely frivolous, baseless and malicious campaign of legal terrorism, even threatening to sue Downing's extremely unsophisticated and legally naïve *children* – including an adult child with no residency in or connection to the Yorkshire property whatsoever - unless they summarily removed Downing from her home without Downing's knowing consent. Downing obviously had no legal capacity to consent to any termination of her tenancy or sign any legal document, and her adult children lacked any power of attorney or conservatorship that would allow them to legally act on behalf of Downing, or otherwise legally bind Downing in any way.

The Debtor and its counsel committed a gross fraud upon this Court by falsely claiming that the Yorkshire property was owned by the Debtor, and only had a "tenant." The result is an outcome that is not only <u>literally criminal</u> under multiple California and Federal laws, but also an outrageously obscene, manifest injustice against an innocent, 80-year-old end-stage Alzheimer's patient, whom the principals of the Debtor intentionally targeted for felony elder financial abuse, despite knowing she was legally incompetent to contract.

As a result of this Court's unwitting legal perfection of the years-long real estate fraud scheme by the Debtor's principals, this frail, elderly woman has been sentenced to live out her remaining years in a constant state of confusion as to her surroundings, suffering from endless, tearful mental agony over why she can't "go back home." She is effectively homeless, and has been subjected to multiple instances of horrific felony elder abuse, neglect, abandonment, and theft by multiple family members, as she has been abandoned into the care of successive relatives. For the past two months, she has been living on the living room couch of her granddaughter's home, with no space or

belongings of her own, unable to get even a single good night's rest from the lack of privacy and conflicting needs of the home's other residents.

Clotee Downing is being continuously tortured as a result of the theft of her home by the Fosters and their attorneys. Because of her end-stage Alzheimer's, Downing will never be able to form the recent memories necessary to adjust and acclimate into a new living environment. Accordingly, no amount of financial compensation can ever make her whole, or bring her one simple night of peace, from the injuries the Fosters and their attorneys have inflicted upon her. Downing needs to be able to go back to the Yorkshire Drive home that she can remember, and under California law, she has a right to do so.

Pursuant to the Due Process Clause of both the Fifth and Fourteenth amendments, this Court cannot deprive Downing of her legal rights, under California law, to the return of her wrongfully taken real property without Due Process of law. Said due process must include, at a minimum, reasonable notice, and opportunity to be heard. The Debtors and their attorneys deprived Downing of the right to that notice as part of their efforts to deceive Downing's family members – and this Court – into believing that the Debtor lawfully owned the title to Downing's home, when in fact it did not as a function of law. As part of this scheme to deceive, Downing was not served with notice of the Debtor's bankruptcy proceeding, nor treated as what she legally was: a victim of a series of felony crimes, who at the very most was a mere loan or mortgage customer of the Debtor.

## III.  ARGUMENT

### A. LEGAL STANDARDS

"A motion to alter and amend a judgment is 'an extraordinary remedy which should be used sparingly," *McDowell v. Calderon*, 197 F.3d 1253, 1255 n. 1 (9th Cir.1999). In the Central District of California, it is permissible to file a Rule 59(e) motion on the basis of "a manifest showing of the failure to consider material facts presented to the court before such decision." CDCA Local Rule 7-18.

However, "a Rule 59(e) motion may be granted: (1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is

necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law." *Herron*, supra, at 1111, citing *McDowell*, supra. See also *Zimmerman v. City of Oakland*, 255 F.3d 734, 740(9th Cir.2001); *Turner v. Burlington N. Santa Fe R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003).

"It is appropriate for a court to alter or amend judgment under Rule 59(e)" when a ruling was premised on an incorrect factual assumption. *Duarte v. Bardales*, 526 F.3d 563, 567 (9th Cir. 2008) [abrogated on other grounds by *Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014)].

## B. <u>DEBTOR NEVER OWNED THE YORKSHIRE PROPERTY, AND COMMITTED A FRAUD UPON THE COURT BY CLAIMING OTHERWISE.</u>

On October 17, 2023, the Debtor, by and through its counsel Rich Sturdevant, filed a Motion for Order Authorizing Sale of Downing's Yorkshire property (Doc. 271). As part of this Motion, the Debtor selectively filed only pages 5 through 7 of the 32-page Home Equity Sales Contract that R. Foster directed Downing to sign on or about October 24, 2020. These three pages appear in the record at pages 100 – 102 of Doc. 271.

This Court can and should take judicial notice of the resulting judicial admission the Debtor made at the bottom of pg. 101: **the Debtor's October 24, 2020 Home Equity Sales Contract included an option for Downing to repurchase her home**:

> "I understand that, I am able to reside at the property for a term of 60 month term (renewable every 12 months). 90 days prior to term expiration, **I or a family member, have the opportunity** to qualify themselves to obtain a loan **to purchase the property**." (Doc 271 at 101).

Adding on to this existing judicial admission, Downing's Guardians now supply this Court with all 31 pages in their possession[1] of the full 32-page Home Equity Sales Contract that R. Foster directed Downing to sign on October 24, 2020 (attached as EXHIBIT X). This full document makes it clear that the Debtor was purchasing Downing's home while it was in foreclosure, and that the purchase was therefore subject to the protections of California's Home Equity Sales Contract law. The contract further clearly stated that Downing "<u>shall</u> have a lease for the real property," and that said lease "<u>shall</u> have an option to repurchase the property." (pg 9, ¶ (f) of EXHIBIT X).

In addition, the oral contract that the Debtor's principal, R. Foster, repeatedly made to Downing and her family members was that he would simply "give" the Yorkshire property back to Downing after she had repaid him $1,000 a month for five (5) years.

These facts are legally significant, because under the protections afforded to Downing by California's Home Equity Sales Contract Act, it means the Debtor never had a lawful ownership interest in Downing's Yorkshire property:

> "**In any transaction in which an equity seller purports to grant a residence in foreclosure to an equity purchaser by any instrument which appears to be an absolute conveyance and** reserves to himself or herself or **is given by the equity purchaser an option to repurchase, such transaction shall create a presumption affecting the burden of proof**, which may be overcome by clear and convincing evidence to the contrary **that the transaction is a loan transaction, and the purported absolute conveyance is a mortgage**." Cal Civ. Code § 1695.12.

---

[1] Guardians only have 31 or the 32 pages, because R. Foster eventually provided Downing's family members with a copy of the October 25, 2020 Home Equity Sales Contract, he apparently withheld and did not provide a copy of page 29. Guardians suspect this was intentional. Pages 21 – 32 of the contract are a legally required attached copy of California's Home Equity Sales Contract act. Page 29 contained the citation of §§ 1695.13 and 1695.14 of that law: the sections that say it is unlawful for any person to take "unconscionable advantage" of a property owner in foreclosure, and if they do, the contract may be rescinded anytime during a two-year period.

Accordingly, setting aside for a moment the fact that the October 24, 2020 Home Equity Sales Contract is actually void on multiple legal grounds, *if* the Debtor ever had *any* lawfully cognizable interest in Downing's Yorkshire property, that interest was, at best, a security interest as a loan or mortgage provider to Downing.

Therefore, as a function of law, Downing was nothing more than a loan or mortgage CUSTOMER of the Debtor. That means the only possible interest of the Debtor's Estate in Downing's Yorkshire property was equivalent to the interest of the estate of any major bank or mortgage provider in their customer's homes.

Downing's guardians ad litem are not lawyers, or experts in bankruptcy statutes or case law. But they do understand the basic fact that when a big mortgage provider or bank goes through a bankruptcy, the homes of that bank's loan and mortgage customers do not get summarily seized and sold off by the bankruptcy court as assets to pay off the big bank's creditors. Instead, the expected cash flow from those loan or mortgage customers is treated as a revenue-generating asset of the big bank, which is sold off to another financial institution to take over.

Similarly, Downing's home was not an asset that the Debtor had any legal right to sell.

Under the long history and tradition of powers reserved to the States by the Tenth Amendment, the power to enact laws regarding the ownership of real property are the historical domain of the States. The Debtor may not agree with the laws passed by the California legislature, but it cannot be allowed to waltz into Federal bankruptcy court, and pretend as if those laws do not exist without incurring consequences.

## C. THE COURT WAS TRICKED INTO ACTING IN EXCESS OF ITS STATUTORY AND CONSTITUTIONAL JURISDICTIONAL AUTHORITY, AND THE MERE STATUTORY PROTECTIONS OF 11 U.S.C. § 363(M) CANNOT STAND, OR ACT TO BAR RELIEF

Under the various Due Process clauses found in both the Federal and California constitutions, this Court lacked either the statutory or constitutional jurisdictional

authority to summarily deprive Downing of her fundamental property and liberty interests, under California state law, to the ownership of her real property, without the minimum due process steps of notice, and opportunity to be heard. The mere statutory-level protections afforded to the Buyer by 11 U.S.C. § 363(m) cannot be interpreted to magically consecrate such constitutional violations, or bar this Court from granting Downing relief from the Due Process violations that the Debtor, its principals and its lawyers tricked this Court into unwittingly committing.

The principals of the Debtor knowingly deceived the various governmental organs of the State of California and County of Los Angeles into believing they were the lawful owner's of Downing's Yorkshire property. By so doing, they wrongfully acquired and recorded official records that made it appear as if the Debtor was, in fact, the lawful owner.

The lawyers for the Debtor surely performed document review prior to accepting, or filing into, the Debtor's underlying bankruptcy case. That review would have clearly revealed Downing's contractual right to repurchase the Yorkshire property within the Debtor's full 32-page Home Equity Sales Contract with Downing. Even if that document review had not caught this fact, Downing's family members directly communicated Downing's right to repurchase the home to both Andy Warshaw as counsel for the Debtor, and to David Goodrich, as Chief Restructuring Officer for the Debtor.

Both the Debtor, its principals and its lawyers therefore knew, or reasonably should have known, that the Debtor did not actually lawfully own the title to the Yorkshire property. They also knew, or reasonably should have known, that under the various Due Process clauses found in both the Federal and California constitutions, this Court lacked either the statutory or constitutional authority to summarily deprive Downing of her fundamental property and liberty interests under California state law to the ownership of her real property, without the minimum due process steps of notice, and opportunity to be heard.

Despite having this knowledge, the Debtor, its principals and their lawyers appear to have knowing deceived this Court into believing the Debtor lawfully owned the title to the Yorkshire property. They also failed to ensure Downing was served notice of the bankruptcy case, and instead knowingly bullied her unsophisticated and naïve children with frivolous threats of litigation, unless they agreed to summarily remove the mentally incompetent Downing from her Yorkshire property without her lawful informed consent. In so doing, they knowingly turned the entire process that led up this Court's order approving the sale of the Yorkshire property into a literal fraud, in service of a result legally definable as a crime under California law.

They also appear to have tricked this Court into approving a sale of real property under circumstances that exceed this Court's statutory and constitutional jurisdictional authority.

Under these circumstances, Downing's guardians argue that the statutory protections offered to the Buyer by 11 U.S.C. §363(m) cannot stand, or be interpreted to bar this Court from granting Downing relief from the Due Process violations that the Debtor, its principals and its lawyers tricked this Court into unwittingly committing. The Fifth and Fourteenth amendment prohibit Congress from enacting a statutory scheme that is capable of functioning to summarily deprive a person of their real property, let alone their fundamental property and liberty interests under State law, without the minimum due process steps of notice, and opportunity to be heard. Accordingly, in the context presented here, where fraudulent actions by the Debtor, its principals and its attorneys deceived the Court into unwittingly consecrating such a serious violation of Downing's constitutional rights, the mere statutory-level protections of 11 U.S.C. §363(m) cannot be interpreted to permit that constitutional violation to survive.

### D. **THE CONTRACT IS VOID DUE TO DOWNING'S INCOMPETENCE, AND DOWNING IS ENTITLED TO THE RETURN OF HOME AS FUNCTION OF LAW UNDER CALIFORNIA'S ELDER ABUSE ACT**

Under the legal capacity standards set forth in Cal. Prob. Code §§ 811 and 812, Downing has lacked the legal capacity to contract in matters regarding her finances, or the ownership of her home, since at least 2019. Accordingly, the Notice of Default Purchase Agreement and the Home Equity Sales Contract that R. Foster deceived Downing into signing on October 24 2020, as well as Downing's purported conveyance of her home to the Debtor by a Grant Deed on October 31, 2020, should all be declared void ab initio.

Furthermore, Downing has the right to receive – and the Debtor has the obligation to give – her Yorkshire property back, pursuant to Cal. Welf. & Inst. § 15657.6. Whether the return of Downing's Yorkshire property happens as a result of this Court cancelling the Sale and ordering the Debtor to return the deed to Downing, or ordering the Debtor, its principals and/or their attorneys to repurchase the Yorkshire property from the Buyer and deliver it back up to Downing, this Court cannot summarily dispose of Downing's fundamental rights under California state law without the due process of prior notice, and opportunity to be heard.

California's Elder Abuse and Dependent Adult Civil Protection Act (Cal. Welf. & Inst. Code §§ 15600 – 15675 *et seq.*) protects the real and personal property of mentally incompetent elderly Alzheimer's patients like Downing from being "taken, secreted, appropriated, obtained, or retained" for a wrongful use, with intent to defraud, or by undue influence (*see* definition of "Financial abuse" of an elder, at WIC § 15610.30(a)).

"A person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult." (WIC § 15610.30(b)). "A person or entity takes, secretes, appropriates,

obtains, or retains real or personal property when an elder or dependent adult is deprived of any property right, including by means of an agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a representative of an elder or dependent adult." (WIC § 15610.30(c)).

"A person or entity that takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining the real or personal property of an elder or dependent adult when the elder or dependent adult lacks capacity pursuant to Section 812 of the Probate Code, or is of unsound mind, but not entirely without understanding, pursuant to Section 39 of the Civil Code, shall, upon demand by the elder or dependent adult or a representative of the elder or dependent adult … return the property." (WIC § 15657.6)

Wrongful use, intent to defraud, and undue influence describe the manner by which the Debtor, by and through its principals, purportedly acquired "ownership" of Downing's Yorkshire property.

## E. THE CONTRACT IS VOID AS A FUNCTION OF STATE LAW BECAUSE THE REPRESENTATIVE OF THE DEBTOR WHO SOLICITED, INDUCED AND CAUSED DOWNING TO SIGN THE CONTRACT HAD NO REAL ESTATE SALES LICENSE

Pursuant to California Civil Code § 1695.17(a), possession of a valid and current California Real Estate Sales License is a mandatory requirement for <u>any</u> representative of an equity purchaser, "who in any manner solicits, induces, or causes any property owner to transfer title or solicits any member of the property owner's family or household to induce or cause any property owner to transfer title to [a] residence in foreclosure to [an] equity purchaser." Cal. Civ. C. 1695.15(b)

Defendant Ray Foster, the 52% owner of Debtor and Defendant 2nd Chance Investment Group LLC., personally solicited, induced, and/or caused both Downing, and members of her family, including Nolan, to purportedly transfer the title to her home -

which was in foreclosure - to the Debtor. Accordingly, for those transactions to have been lawfully valid, Ray Foster needed to possess a valid California Real Estate Sales License.

This Court can and should take judicial notice of two important facts that have been officially published by the State of California's Department of Real Estate, and are publically available in the DRE's online Public License Information database: (1) Ray Foster has not had a valid California Real Estate Sales License since June 25, 1993. *See* https://www2.dre.ca.gov/PublicASP/pplinfo.asp?License_id=01034335. (2) Mr. Foster's wife, Defendant Sonja Foster, has a current and valid California Real Estate Broker's license. *See* https://www2.dre.ca.gov/PublicASP/pplinfo.asp?License_id=01468409.

To be clear, Ray Foster was the personal field representative of Debtor 2nd Chance in the purported "acquisition" of Downing's Yorkshire Drive property (and likely every other property the Debtor has listed as an asset in the underlying bankruptcy proceeding). Ray Foster's signature and initials are on all of the documents that the Debtor executed with Downing;

Because Ray Foster was both the agent and employee of 2nd Chance who solicited, induced and caused Downing to purportedly "transfer" the title to her home to the Debtor on October 31, 2020, he was required to possess a valid California Real Estate Sales License on that date.

Because Mr. Foster did not possess a valid California Real Estate Sales License on that date Downing, by and through Guardians, wishes to and hereby does immediately invoke her absolute right, pursuant to California Civil Code § 1695.7(b), to unilaterally declare all of the October 31, 2020 contracts with the Debtor, and her ensuing transfer of the title of her Yorkshire property to the Debtor, as void.

Downing therefore demands that the Debtor immediate return possession of the Yorkshire property to her. If the Debtor no longer has possession of the Yorkshire property, then Downing requests that the Debtor and/or its principals, Rayshon and Sonja Foster be ordered to immediately re-acquire the Yorkshire property at whatever cost that might require, and deliver it up to her.

**F. CRIMINAL ACT UNDER 1695.8: COMPLETELY MISREPRESENTED NATURE OF TRANSACTION (1695.6(D)). ALSO, NEVER LEFT PAPERWORK OR GAVE DOWNING CANCELATION NOTICE PRIOR TO TRANSFERRING DEED (1695.6(A / B)).**

**G. VOID NO CONSIDERATION, AND CRIMINAL ACT UNDER 1695.13. BEYOND KNOWINGLY CONTRACTING WITH ALZHEIMER'S PATIENT, NEVER ACTUALLY PAID DOWNING ONE CENT, SO CONTRACT NEVER PERFECTED (SUSPECT CLAIMED 300K PURCHASE PRICE IS PART OF DEFRAUDING FINANCIAL INSTITUTION/INVESTORS / CREDITORS).**

**H. VOIDABLE UNDER 1695.14 UNCONSCIONABLE ADVANTAGE; TWO-YEAR STATUTE FOR RECESSION – IF DOWNING CHOSE THE RECESSION ROUTE - IS TOLLED DUE TO DOWNING'S INCOMPETENCE**

**I. DEBTOR CANNOT CLAIM BREACH OF "LEASE" PAYMENTS VOIDED CONTRACT AND CREATED RIGHT TO SELL**

Debtor waived their purported CONTRACTUAL right TO ANY payments by frustrating and making performance of payment impossible (also, fraud the entire time – payments sent to principals, not to debtor).

**J. COUNSEL FOR DEBTOR AND CRO GOODRICH ADVISED BY FAMILY OF FACTS.**

knew Downing incompetent, knew debtor DIDN'T OWN HOME AS A FUNCTION OF LAW, & knew debtor had FRUSTRATED performance & thus waived right to payments. Proceeded to threaten family anyway, & withhold documents from the court. at minimum, Breached duty of candor to the Court (fraud). Likely criminal actS under CA WIC 15610.30. (a)(1-3); COurt cannot allow its process to perfect criminal action.

### K. DOWNING'S TENANCY NEVER LAWFULLY QUIT OR TERMINATED. BUYER DEFRAUDED – BOUGHT HOUSE WITH EXISTING TENANCY RIGHTS.

### L. MANIFEST INJUSTICE

ALZHEIMER'S patent who was not competent to contract in the first place, now sentenced to enduring endless suffering / confusion for rest of life (from strange surroundings) due to criminal acts by debtor, debtor's principal, debtor's counsel, and possibly CRO. Victim has no ability to adjust, so no financial compensation can cure the injury. specific performance of return of home required by law and equity. debtor did not pay 1 cent for home, and never lawfully owned the title to begin with. never transferred mortgage out of debtor's name, suggesting entire transaction fraudulent. debtor's principal then impersonated victim to selene in order to isolate victim and family from information about what they were doing. on top of grand theft real estate, debtor's principals further stole over $30,000 from victim, in deceitful manner designed to obfuscate transaction, likely to hide assets from IRS and debtor's creditors. debtor's principals have abused debtor as a vehicle for their real estate and financial frauds, and have now been abusing bankruptcy process and the court as the ultimate instrument to legally perfect their innumerable crimes. the function of law and courts are to work justice. permitting this outcome would be manifestly injust.

### M. BALANCE OF EQUITIES REQUIRES CANCELATION OF SALE, DESPITE 363(M) PROTECTIONS.

Debtor never owned the home, and debtor absolutely obligated / Downing absolutely Entitled to return of home as function of law under both home equity sales contract law and elder abuse act. Home must be returned by either (i) cancelation of sale, or (II) compelled re-purchase of home from buyer, and deliver it up to downing. Option II means less assets available to creditors. ergo, balance of equities requires immediate cancelation of sale

**N. BUYER'S PROPER REMEDY TO RECOVER FINANCIAL LOSSES IS**
**TO (I) FILE AP SUIT AGAINST DEBTOR, PRINCIPALS OF DEBTOR,**
**AND COUNSEL FOR DEBTOR AND PRINCIPALS.**
**ALTERNATIVELY, (II) MOVE FOR SUMMARY SANCTIONS**
**AGAINST DEBTOR AND THEIR COUNSEL.**

## IV.  PRAYER

Downing, by her co-guardians ad litem, prays that this Court causes her Yorkshire property to be returned to her proper ownership, and to the extent possible, and her substantial pending claim for damages against the Debtor be ruled non-dischargeable in the underlying bankruptcy proceeding.

Downing further prays that during the pendency of this motion, the Curt issue an injunction and/or stay to prevent the Buyer from re-selling her Yorkshire property, or any of the DEbrot's creditors from accepting payments on the liens against that property.

Submitted this 4th day of December 2023

_____         _____
Geoff Trapp                            Athena Lee
*Next Friends to and [proposed] co-guardians ad litem for Plainitff Clotee Downing*